**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

**S.H.S. RESORT, LLC**                    **Case No.: 8:10-bk-25886-MGW**
                                          **Chapter 11 Case**

      **Debtor.**
_____/

**AMENDED[1] DISCLOSURE STATEMENT IN SUPPORT OF S.H.S. RESORT, LLC'S,**
**CHAPTER 11 PLAN OF REORGANIZATION, DATED AS OF FEBRUARY 28, 2011**


**I.      INTRODUCTION**

        This is the Disclosure Statement (the "Disclosure Statement") in the Chapter 11 case of
S.H.S. Resort, LLC.  This Disclosure Statement contains information about the Debtor and
describes S.H.S. Resort, LLC's, Chapter 11 Plan of Reorganization, Dated as of February 28,
2011 (the "Plan").

> *YOUR RIGHTS MAY BE AFFECTED.  YOU SHOULD READ*
> *THE  PLAN  AND  THIS  DISCLOSURE  STATEMENT*
> *CAREFULLY  AND  DISCUSS  THEM  WITH  YOUR*
> *ATTORNEY.  IF YOU DO NOT HAVE AN ATTORNEY, YOU*
> *MAY WISH TO CONSULT ONE.*


A.      **Purpose of this Document**

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,

- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*,
  what you will receive on your claim or equity interest if the plan is confirmed),

- Who can vote on or object to the Plan,

- What factors the United States Bankruptcy Court for the Middle District of
  Florida (the "Court") will consider when deciding whether to confirm the Plan,

---

[1] Amended only to correct typographical errors, include dates as set forth in the Court's Order Scheduling
Confirmation, and to include treatment of the holders of Tax Lien Certificates along with the Secured Claims of the
Pinellas County Tax Collector.

- Why the Debtor believes the  Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and

- The effect of confirmation of the Plan.

Be sure to read the Plan as well as this Disclosure Statement.  This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.  All terms used herein shall have the meaning set forth herein or, if not defined herein, shall have the meaning set forth in the definitions section of the Plan.  A copy of the Plan is attached hereto as **Exhibit "A".**

B.      **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan described in this Disclosure Statement.  This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1.      *Time and Place of the Hearing to Approve This Disclosure Statement and Confirm the Plan*

The hearing at which the Court will determine whether to approve this Disclosure Statement and confirm the Plan will take place on April 20, 2011 at 1:30 pm, at the Sam M. Gibbons United States Courthouse, 801 N. Florida Ave, Tampa, Florida 33602.

2.      *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot to the Clerk of the Bankruptcy Court at the above address, with a copy to Hugo S. deBeaubien, Esq., 101 E. Kennedy Blvd., Suite 2800, Tampa, Florida, 33602.  See section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by April 12, 2011 or it will not be counted.

3.      *Deadline For Objecting to the Adequacy of the Disclosure Statement and Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed no later than April 13, 2011.

4.      *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact Hugo S. deBeaubien, Esq., at Shumaker, Loop & Kendrick, LLP, 101 E. Kennedy Blvd., Suite 2800, Tampa, Florida, 33602; Tel.: 813-221-7425; Email: bdebeaubien@slk-law.com.

C.      **Disclaimer**

*The Court has not yet approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms.  The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court may approve this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. This Disclosure Statement is subject to final approval at the hearing on confirmation of the Plan.*

**The Remainder of this Page Intentionally Left Blank**

## II.    BACKGROUND

### A.    Description of Debtor's Business

S.H.S. Resort, LLC ("SHS," "Debtor," "Debtor-in-Possession," or "Reorganized Debtor," as appropriate),  a Florida limited liability company, was created as a single purpose entity in late 2004 to purchase the property on Tampa Bay's northeastern shore that is the home to the Safety Harbor Resort and Spa (the "Resort").   SHS owns only the real property and the personal property of the Resort.  The Resort contains a functioning hotel with one hundred seventy five (175) guest rooms, a first-class spa and fitness center featuring award–winning services and facilities, 3 pools, seven (7) tennis courts, a modern convention center, a theater, a grand ballroom that can accommodate functions with over two hundred (200) diners, a full service restaurant plus tiki bar and lobby lounge, ample meeting and conference space, and approximately fifteen (15) acres of undeveloped greenspace on the shore of Tampa Bay.

### B.    Relation to Debtor's Affiliates; Purchase of the Resort

In mid 2004, Olympia Development Group, Inc. ("Olympia"), through several affiliates and partnerships, controlled the southwest corner of Main Street and Bayshore Drive in downtown Safety Harbor, Florida.  This corner is across the street from the 25 acres now owned by the Debtor.  Olympia's 2004 plans called for development and construction of a mixed use office/retail building on the corner, along with a luxury residential condominium project with views overlooking Bayshore Drive, the municipal marina, and wide expanses of Tampa Bay.  While the project was still in the early planning stages, the historic Safety Harbor Resort and Spa was placed on the market by its then-owner, Meristar Hospitality Corporation.  Olympia quickly learned that all serious bidders were condominium developers with plans to demolish the Resort and build condominiums.   The bidders were lured by the potential development possibilities on the almost 20 acres of developable land, and by the seemingly endless increase in condominium pricing.

Olympia entered the bidding in an effort to save the historic resort, and to control the pace and quality of any future residential project on the Resort's surrounding green space.  Olympia won the bid, created SHS, and closed on the property in December 2004.  SHS retained the former management company in place to allow for seamless operation of the Resort until March 2006.  At that time, Olympia formed a new affiliate, Olympia Hotels Management, LLC ("Olympia Hotels Management"), to operate the resort under a contractual arrangement with SHS.  Olympia Hotels Management continues to operate the Resort under a month to month arrangement.

### C.    The Major Financing on the Resort

In October 2006, after Olympia controlled both the ownership and the operation of the Resort, it arranged for a major refinancing with Wells Fargo Bank.  The resulting loan for $29,700,000 (the "Loan") and net proceeds were used for extensive renovations for all guestrooms and major portions of the common area, as well as capital improvements.  The Loan

contained provisions requiring the sale or development of the 15-acre undeveloped portion of Debtor's property (the "Greenspace"). While the appraised vale of the property and resort supported the full amount of the Loan when the Loan was made, the Resort operations were only able to support and cover about one-half of the debt service allocated to the operating Resort. Olympia's other operations, through a series of inter-company loans or advances, paid the debt service on the remaining one-half of the debt, which was allocated to the Greenspace and future development.

### D.    Reason for Filing Chapter 11

The financial collapse of 2008 hit three sectors of Florida's economy particularly hard. First was real estate. Second was hotel and resort performance. Third was consumer spending on goods and services deemed to be luxury items. This created a perfect storm for a waterfront hotel with developable land whose revenues are driven by hotel accommodations, food and beverage, massages, facials, and other luxury services.

Since 2008, Resort revenues have been down by over 40%. This makes satisfying full debt service and paying operating expenses difficult, especially in the summer months when the Debtor experiences historically low occupancy. Additionally, the ability to sell or develop the waterfront condominiums is extremely difficult under the present circumstances. This fact left SHS with no opportunity to refinance or pay off the one-half of the Loan allocated to the Greenspace. Instead SHS is left with Greenspace that is significantly devalued, and with obligations to continue servicing the debt on the property which currently produces no revenue. Finally, the spa and fitness revenues, along with food and beverage and catering functions, continue to suffer below their 2007 levels based on the overall state of the Florida economy. As revenues dropped, Olympia's outside investment income contributed more and more to the annualized budget of the Resort to keep it afloat.

The Debtor seeks to reorganize by using the valued amount of the secured portion of the Loan, consistent with 11 U.S.C. 506, valued in line with current appraisals and operating cash flow, as its secured debt thereby reducing overall debt service and obligations against the property. By keeping Olympia Hotels Management in place, the Debtor will leverage the knowledge and reputation of the existing management, which will allow for further contributions by Olympia toward the Debtor's reorganization.

### E. Insiders of the Debtor

The Debtor has one equity security holder, its managing member, Olympia Investment Group, LLC.  Olympia Investment Group, in turn, has the following members:

>William Touloumis
>George Touloumis
>Frank Touloumis
>John Touloumis
>Stathy Touloumis
>Anesti Siandris

Although the Equity Security Holders will receive a one hundred percent (100%) stake in the Reorganized Debtor, neither of the Equity Security Holders will receive any distribution on account of any asserted claim either of them holds against the Debtor or its Estate until all other classes of creditors are paid in full pursuant to this Plan..

### F. Management of the Debtor Before, During and After the Bankruptcy

During the two years prior to the date on which the bankruptcy petition was filed, and during the pendency of the Debtor's Chapter 11 case, Debtor has been managed by Olympia Hotels Management, LLC.   After the Effective Date of the Order confirming the Plan, the Reorganized Debtor will continue to be managed by Olympia Hotels Management, LLC.

### G. Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims.  Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld.  The procedures for resolving disputed claims are set forth in Article V of the Plan.

### H. Current and Historical Financial Conditions

The identity and fair market value of the estate's assets are as follows:

Real Property described on **Exhibit "B"** and located in Pinellas County, Florida has a current fair market value of approximately $13,857,816.67, which is below Secured Lender's asserted secured claim amount.   The Secured Lender claims the Debtor is indebted on a mortgage for this Property in an amount exceeding $24,000,000.00.

The Debtor has approximately $14,500,000.00 in assets, consisting of both real and personal property.

### III. SUMMARY OF THE CHAPTER 11 PLAN AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

#### A. What is the Purpose of the Chapter 11 Plan?

As required by Chapter 11 of Title 11 of the United States Code (the "Code"), the Plan places Creditors and Equity Security Holders in various classes and describes the treatment each class will receive on account of their allowed claim amounts. The Plan also provides whether each class of Claims or Equity Security Holders is impaired or unimpaired. Unimpaired classes will receive payment in full on their allowed claim amounts. Impaired classes will receive either payment in full under circumstances less advantageous than previously agreed upon between the claim holder and the Debtor, or pro rata payment of their allowed claim amounts. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan and will be paid on terms set forth in the Plan, as confirmed.

#### B. Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.

*Administrative Expenses and Priority Claims*

Administrative expenses are costs or expenses of administering the Debtor's Chapter 11 case which are allowed pursuant to § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the petition date of October 28, 2010 ("Petition Date"). The Bankruptcy Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | Unknown | Paid in full on the Effective Date of the Plan, or according to terms of obligation, if later. |
| Professional Fees, not yet approved by the Court. **Shumaker, Loop & Kendrick, LLP—Counsel for the Debtor** **Keystone Consulting Group--Accountants** | $125,000.00 (Approx.)  $15,000.00 | Paid in full on the Effective Date of the Plan, or according to separate written agreement, or according to Court Order if such fees have not been approved by the Court on the effective date of the Plan |
| Clerk's Office Fees | Unknown | Paid in full on the Effective Date of the Plan |
| Other administrative expenses | Unknown | Paid in full on the Effective Date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | Unknown | Paid in full on the Effective Date of the Plan |
| TOTAL | $145,000.00 (Approx.) | |

C.  **Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1.  *Classes of Priority Claims*

| Class 1 –Priority Creditors | Impaired. | Priority Creditors will be paid in full over the course of five years from the Effective Date of this Plan along with interest at the rate of 12% from Estate Assets. |
|---|---|---|

2.  *Classes of Secured Claims*

| Class | Description | Impairment | Description of Treatment |
|---|---|---|---|
| Class 2 | Secured Claim of Pinellas County Tax Collector and Tax Lien Certificate Holders | Impaired | The Secured Claim of the Pinellas County Tax Collector and/or of any Tax Lien Certificate Holders will be paid a tax amount consistent with the valuation of the subject property, or such principal amount as reflected on the face of the tax lien certificate, which shall constitute its allowed claim amount in annual payments to be made over the course of five years from the Effective Date of this Plan along with interest at the rate reflected on the face of the tax lien certificate or at the rate of 12% per annum, whichever is lower, from Estate Assets.  As a result of the treatment afforded herein, the Pinellas County Tax Collector and any Tax Lien Certificate Holders will be precluded from exercising their statutory rights and remedies normally afforded in the collection of delinquent ad valorem real estate and tangible personal property taxes or collection under such tax lien certificates. |

| Class 3 | Secured claim of:<br>Secured Lender<br><br>Collateral description =See attached **Exhibit "B"**<br><br>Priority of lien = First | Impaired | The Property constituting Secured Lender's collateral was valued by stipulated Order of the Bankruptcy Court entered January 25, 2011 (Doc. No. 118). The $13,857,816.67 valued amount will be paid as follows:<br><br>The Debtor will pay the Secured Lender the Net Principal amount of $11,057,816.67 less the sum of adequate protection payments, made during the Chapter 11 case prior to the Effective Date, on the basis of a 25 year amortization, with a ten year balloon payment at interest rate of the Prime Rate of interest (determined annually on January 1 of each year) plus 1% interest, subject to an interest rate floor of 4.25%. Each year the interest rate will adjust on the anniversary date of the Effective Date and may be adjusted upwardly or downwardly up to 0.5% per year based upon the Prime Rate plus 1% formula ("Note A"). The Note A payments will be paid from operational cash flow.<br><br>The Debtor will pay the Secured Lender the amount of $2,800,000.00 on the basis of a 3 year note which shall accrue interest rate of the Prime Rate of interest (determined annually on January 1 of each year) plus 1% interest, subject to an interest rate floor of 5.0%. Each year the interest rate will adjust on the anniversary date of the Effective Date and may be adjusted upwardly or downwardly up to 0.5% per year based upon the Prime Rate plus 1% formula ("Note B"). The Note B obligation will be paid upon the sale or refinancing of the 8-acre parcel which can be sold without adversely affecting the Resort and Spa portion of the property.<br><br>Notes A and B shall be collectively known as the Net Principal.<br><br>While payments are made, as set forth above, the Guarantors shall not be liable for any amounts to Secured Lender over and above the repayment of the Net Principal, as outlined above. Any claims against the Guarantors shall be stayed indefinitely as long as timely payments are made on the Net Principal monthly on the Note A and Note B obligations. At the conclusion of the Reorganized Debtor making all payments of the Net Principal during the Note Period, the Guarantors shall be fully and finally released. |

### 3. *Class of General Non-Insider Unsecured Claims*

General Non-Insider unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

The following chart identifies the Plan's proposed treatment of general unsecured claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| Class 4 | Non-Insider Unsecured Trade Creditors | Impaired | Non-Insider Unsecured Trade Creditors holding Non-Insider Allowed Claims will be paid through a series of Distributions totaling ninety percent (90%) of their Allowed Claim, without interest, to be made on a quarterly basis, at a rate of four and a half percent (4.5%) of their Allowed Claim per quarter, beginning on the Effective Date of this Plan and continuing for a period of five years. Any Disputed Claim or Claim for which an objection has been interposed shall have its proportionate quarterly distributions disbursed into a segregated escrow account pending the resolution of the claim objection. |
| Class 5 | Unsecured Claims of Secured Lender | Impaired | Allowed Undersecured Claim of Secured Lender will be paid through a series of Distributions totaling ten percent (10%) of any Allowed Undersecured Claim in equal quarterly installments beginning on the Effective Date of this Plan and continuing for a period of five years. Any Disputed Claim or Claim for which an objection has been interposed shall have its proportionate quarterly distribution disbursed into a segregated escrow account pending the resolution of the claim objection. |

| | | | |
|---|---|---|---|
| | | | |
| Class 6 | Administrative Convenience Class of Unsecured Claims | Impaired | Any Claimant holding a Claim in Class 4 or 5 may elect to voluntarily reduce the amount of their Allowed Claim to $1,000.00 ("Reduced Allowed Claim") and to have such Reduced Allowed Claim paid in full within 90 days of the Effective Date in complete satisfaction of the Claimant's Claim. |

| Class 7 | Unsecured Claims of Insiders and Affiliates of the Debtor | Impaired | Unsecured Creditors who are Insiders or Affiliates of the Debtor will be paid by the Debtor only after all Class 1-6 Allowed Claims have been paid in full. Any Disputed Claim or Claim for which an objection has been interposed shall have its proportionate quarterly distributions disbursed into a segregated escrow account pending the resolution of the claim objection. |
| --- | --- | --- | --- |

4.      *Class of Equity Security Holders*

Equity Security Holders are parties who hold an ownership interest in the Debtor.  In a limited liability company, the members of the LLC are Equity Security Holders.

The following chart sets forth the Plan's proposed treatment of the class of Equity Security Holders:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| Class 8 | Equity Security Holders | Impaired | Equity Security Holders shall receive, on account of their contribution of a portion of their ownership interests in other business ventures and over $2,000,000.00 in working capital, a distribution of membership interests in the Reorganized Debtor consistent with their current Equity Security holdings. |

D.    **Means of Implementing the Plan**

1.    *Source of Payments*

The Reorganized Debtor will continue to operate the Resort and will fund all distributions required under this Plan from such Operations. The Reorganized Debtor will also explore the sale or development of any vacant parcels on the Property to their highest and best use in order to create addition revenue from which to fund Plan distributions; at present, the Debtor expects a sale or refinancing of the 8 acre parcel in connection with such efforts.

2.    *Post-confirmation Management*

The Reorganized Debtor, in conjunction with Olympia Hotels Management, LLC, will be responsible for management of the Resort and the Property. The Reorganized Debtor will pay all expenses from operating revenue as projected on the budget which is appended the Disclosure Statement.

3.    *Additional Means*

The current Equity Security Holders will pledge equity security interests in unrelated business venture to provide additional means for execution of the Plan obligations. Additionally, the current Equity Security Holders will contribute in excess of $2,000,000 of working capital for both the improvement of the subject Property and to assist in the liquidity and operational cash flow of the Debtor.

E.    **Risk Factors**

Assuming that the Plan is confirmed, the Plan's success going forward depends almost entirely on the Reorganized Debtor's ability to generate increasing revenue through its Resort operations, including room and event reservations and spa, food, and beverage services. The Debtor is making every effort to streamline and increase efficiencies from an operations standpoint, and expects that, even at current activity levels, it will have no difficulty meeting its payment obligations to all creditors under the Plan.

F.      **Executory Contracts and Unexpired Leases**

The Plan provides a means by which all executory contracts and unexpired leases will be assumed or rejected by the Debtor under the Plan.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.

If you object to the assumption of your unexpired lease or executory contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not assumed as provided in the Plan, or the subject of a separately filed Motion to Assume or Reject, will be rejected under the Plan.  Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

*The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract Is Thirty (30) days after the rejection of any Lease or Contract, notwithstanding the Bar Date.*  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.


G.      **Tax Consequences of Plan**

*CREDITORS AND EQUITY INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.*

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmed, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity security interest holder at least as much as the creditor or equity security interest holder would receive in a Chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A.    **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that Classes 1, 2, 3, 4, 5, 6, 7 and 8 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that the other classes of claims are unimpaired and that holders of claims in these classes, therefore, do not have the right to vote to accept or reject the Plan.

### 1.    *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline set by the Bankruptcy Court for filing a proof of claim in this case was*** <u>**January 11, 2011.**</u>

***The deadline for filing objections to claims has not been set.***

2.    *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity security interest has the right to vote only if it is in a class which is *impaired* under the Plan.  As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3.    *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity security interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

4.    *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for their claim in each different class.

B.    **Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by cram down on non-accepting classes.

1.    *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2.    *Treatment of Non-Accepting Classes*

Even if one or more impaired classes reject the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner prescribed by § 1129(b) of the Code.  A plan that binds non-accepting classes is commonly referred to as a cram-down plan.  The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not discriminate unfairly, and is fair and equitable toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a cramdown confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

C.    **Liquidation Analysis**

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest Holders who do not accept the Plan will receive at least as much under the Plan as such Creditors and Equity Interest Holders would receive in a chapter 7 liquidation.  A liquidation analysis will be filed under separate cover.

D.    **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1.    *Ability to Fund Plan*

The Debtor-in-Possession believes that it will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on that date and, further, that the Reorganized Debtor will generate sufficient Cash through Operations to fund the Plan during the Plan Distribution Period without having to utilize its additional cash on hand following the Effective Date.  A projected budget and proforma for the Reorganized Debtor in support of these assertions will be filed under separate cover.

*You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

**The Remainder of this Page Intentionally Left Blank**

## V.      EFFECT OF CONFIRMATION OF PLAN

### A.      Binding Effect of Confirmation

In accordance with § 1141(a) of the Code, the provisions of a confirmed plan bind the Debtor, any entity issuing securities under the Plan, any entity acquiring property under the Plan, and any Creditor, equity security holder, or general partner in the Debtor, whether or not the Claim or Interest of such Creditor, equity security holder or general partner is impaired under the Plan and whether or not such Creditor, equity security holder or general partner has accepted the Plan.

### B.      Modification of Plan

The Debtor-in-Possession may modify the Plan at any time before confirmation of the Plan.  However, if the Plan is modified, the Court may require a new disclosure statement and/or re-voting on the Plan.

The Debtor-in-Possession may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

C.     **Final Decree**

Once the Estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Reorganized Debtor, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.  Alternatively, the Court may enter such a final decree on its own motion.

Dated as of March 8, 2011

Respectfully submitted,

By: _/s/ William E. Touloumis_____

**WILLIAM E. TOULOUMIS**
*Managing Member, Olympia Investment Group, LLC, as Managing Member of the Debtor*

-and-

By: _/s/Hugo S. deBeaubien_____

**STEVEN M. BERMAN, ESQ.**
Florida Bar No. 856290
sberman@slk-law.com
**HUGO S. DEBEAUBIEN, ESQ.**
Florida Bar No. 058100
bdebeaubien@slk-law.com
101 E. Kennedy Blvd., Suite 2800
Phone (813) 229-7600
Facsimile (813) 229-1660
*Attorneys for the Debtor*

EXHIBIT A
Loan No. 103719

## DESCRIPTION OF SUBJECT PROPERTY

<u>Exhibit A</u> to Amended and Restated Mortgage with Absolute Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by S.H.S. RESORT, L.L.C., a Florida limited liability company, as Mortgagor for the benefit of Wells Fargo Bank, National Association, as Mortgagee, dated as of the Effective Date.

All the certain real property located in the County of Pinellas County, State of Florida, described as follows:

PARCEL I:

THAT PART OF LOTS A, B AND C, AND A PORTION OF VACATED NORTH BOULEVARD LYING NORTHEASTERLY OF SAID LOT C, IN BLOCK 1, REPLAT OF PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, BEING FURTHER DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA, AND RUN THENCE NORTH 00°29'59" EAST, 64.40 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD FOR A POINT OF BEGINNING; THENCE CONTINUE NORTH 00°29'59" EAST, 214.70 FEET; THENCE SOUTH 89°48'01" EAST, 93.17 FEET; THENCE NORTH 33°02'59" EAST, 581.01 FEET; THENCE NORTH 27°49'59" EAST, 117.96 FEET; THENCE SOUTH 56°57'01" EAST, 36.99 FEET; THENCE NORTH 33°02'59" EAST, 70.00 FEET TO THE NORTHERLY LINE OF VACATED NORTH BOULEVARD; THENCE SOUTH 56°57'01" EAST, 532.89 FEET ALONG SAID NORTHWESTERLY LINE; THENCE SOUTH 33°02'59" WEST, 344.57 FEET; THENCE SOUTH 56°57'01" EAST, 282.85 FEET; THENCE SOUTH 33°02'59" WEST, 655.43 FEET TO A POINT ON THE NORTH RIGHT- OF-WAY LINE OF SOUTH BOULEVARD; THENCE NORTH 56°57'01" WEST ALONG THE AFORESAID SOUTH BOULEVARD RIGHT-OF-WAY LINE, 804.76 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH THAT CERTAIN PORTION OF BAYSHORE BOULEVARD THAT WAS VACATED BY RESOLUTION NO. 92-27, RECORDED IN O.R. BOOK 7978, PAGE 240, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, DESCRIBED THEREIN ON EXHIBIT D AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEING A PORTION OF LOTS A AND B, IN BLOCK 1, REPLAT OF PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA; THENCE NORTH 00°24'22" EAST, ALONG THE WEST LINE OF SAID NORTHEAST 1/4, (BEING THE BASIS OF BEARINGS OF THIS DESCRIPTION), FOR 279.98 FEET TO THE SOUTH RIGHT OF WAY LINE OF SPRINGS BOULEVARD, (ALSO KNOWN AS BAYSHORE BOULEVARD), AS IT IS NOW

ESTABLISHED; THENCE ALONG SAID RIGHT OF WAY LINE SOUTH 89°51'53" EAST, FOR 30.88 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG SAID SOUTH LINE, SOUTH 89°51'53" EAST, FOR 52.61 FEET; THENCE NORTH 35°16'01" EAST FOR 212.42 FEET; THENCE SOUTH 54°43'59" EAST, FOR 16.00 FEET; THENCE SOUTH 35°16'01" WEST FOR 300.00 FEET; THENCE SOUTH 00°33'42" WEST, FOR 164.52 FEET TO THE NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD, AS IT IS NOW ESTABLISHED; THENCE NORTH 57°01'17" WEST ALONG SAID NORTH LINE, FOR 18.84 FEET; THENCE NORTH 00°33'42" EAST, ALONG A LINE 50.00 FEET EAST OF AND PARALLEL TO THE WEST RIGHT-OF-WAY LINE OF FIRST AVENUE, (ALSO KNOWN AS SOUTH BAYSHORE BOULEVARD), AS IT IS NOW ESTABLISHED, FOR 235.14 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPT THAT PORTION WHICH LIES WITHIN THE ABOVE DESCRIBED PARCEL I.

ALSO LESS AND EXCEPTING THEREFROM THAT CERTAIN PROPERTY CONVEYED TO THE CITY OF SAFETY HARBOR BY INSTRUMENT RECORDED IN O.R. BOOK 7990, PAGE 1267, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, AND DESCRIBED THEREIN ON EXHIBIT "A", BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEING A PORTION OF LOT A, IN BLOCK 1, REPLAT OF PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA; THENCE NORTH 00°24'22" EAST, ALONG THE WEST LINE OF SAID NORTHEAST 1/4, (BEING THE BASIS OF BEARINGS OF THIS DESCRIPTION), FOR 64.30 FEET TO THE POINT OF BEGINNING, SAME ALSO BEING A POINT ON THE NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD, AS IT IS NOW ESTABLISHED; THENCE CONTINUE NORTH 00°24'22" EAST, ALONG AFORESAID WEST LINE, FOR 215.68 FEET TO THE SOUTH RIGHT-OF-WAY LINE OF SPRINGS BOULEVARD, (ALSO KNOWN AS BAYSHORE BOULEVARD), AS IT IS NOW ESTABLISHED; THENCE SOUTH 89°51'53" EAST, ALONG SAID SOUTH RIGHT-OF-WAY LINE, FOR 30.88 FEET; THENCE SOUTH 00°33'42" WEST, ALONG A LINE 50.00 FEET EAST OF AND PARALLEL TO THE WESTERLY RIGHT-OF-WAY LINE OF FIRST AVENUE, (ALSO KNOWN AS SOUTH BAYSHORE BOULEVARD), AS IT IS NOW ESTABLISHED, FOR 235.14 FEET; THENCE NORTH 57°01'17" WEST, ALONG AFORESAID NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD FOR 35.88 FEET TO THE POINT OF BEGINNING.

PARCEL II:

THAT PART OF PARK AND HOTEL SITE IN PLAT OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, IN GOVERNMENT LOT 2, SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, RECORDED IN PLAT BOOK 4, PAGE 22, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, LYING SOUTH OF LAND PLATTED AS GRAY AND BUSHA'S SUBDIVISION.

LESS AND EXCEPTING THEREFROM THAT CERTAIN PROPERTY CONVEYED TO THE CITY OF SAFETY HARBOR BY INSTRUMENT RECORDED IN OR BOOK 7990, PAGE 1267, AND DESCRIBED THEREIN ON EXHIBIT "B", BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEING A PORTION OF THE PARK AND HOTEL SITE AS SHOWN ON THE PLAT OF REVISED MAP SUBDIVISION NO. 2 OF ESPIRITU SANTO SPRINGS, RECORDED IN PLAT BOOK 4, PAGE 22, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA; THENCE NORTH 00°24'22" EAST, ALONG THE WEST LINE OF SAID NORTHEAST 1/4, (BEING THE BASIS OF BEARINGS OF THIS DESCRIPTION), FOR 334.09 FEET, TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH 00°24'22" EAST ALONG SAID WEST LINE, FOR 364.97 FEET; THENCE SOUTH 89°38'48" EAST, FOR 28.15 FEET; THENCE SOUTH 00°24'40" WEST, ALONG A LINE 50.00 FEET EAST OF AND PARALLEL TO THE WESTERLY RIGHT-OF-WAY LINE OF FIRST AVENUE, AS IT IS NOW ESTABLISHED, FOR 365.01 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY LINE OF SPRINGS BOULEVARD, (ALSO KNOWN AS BAYSHORE BOULEVARD), AS IT IS NOW ESTABLISHED; THENCE NORTH 89°35'03" WEST, ALONG SAID NORTHERLY LINE, FOR 28.12 FEET TO THE POINT OF BEGINNING.

AND INCLUDING THE FOLLOWING LANDS:

TRACT 1-A:

MORE PARTICULARLY DESCRIBED IN EXHIBIT "B" OF THAT CERTAIN MORTGAGE RENEWAL MODIFICATION, SPREADING AND RELEASE AGREEMENT RECORDED IN O.R. BOOK 5559, BEGINNING ON PAGE 679, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA;

TRACT 2-A:

MORE PARTICULARLY DESCRIBED IN EXHIBIT "B" OF THAT CERTAIN MORTGAGE RENEWAL, MODIFICATION, SPREADING AND RELEASE AGREEMENT, RECORDED IN O.R. BOOK 5559, PAGE 679, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA;

TRACT 1-B:

MORE PARTICULARLY DESCRIBED IN EXHIBIT "B" OF THAT CERTAIN MORTGAGE RENEWAL, MODIFICATION, SPREADING AND RELEASE AGREEMENT, RECORDED IN O.R. BOOK 5559, BEGINNING ON PAGE 679, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA;

TRACT 2-B:

MORE PARTICULARLY DESCRIBED IN EXHIBIT "B" OF THAT MORTGAGE RENEWAL, MODIFICATION, SPREADING AND RELEASE AGREEMENT RECORDED IN O.R. BOOK 5559, BEGINNING ON PAGE 679, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA;

LOT C, AND A PORTION OF VACATED NORTH BOULEVARD LYING NORTHEASTERLY OF SAID LOT C IN BLOCK 1 OF THE REPLAT OF PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN PLAT BOOK 8, BEGINNING ON PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA;

LESS AND EXCEPT:

THAT CERTAIN PIECE OF PROPERTY MORE PARTICULARLY DESCRIBED AS PARCEL 1 OF SCHEDULE B IN THAT CERTAIN PARTIAL RELEASE RECORDED IN O.R. BOOK 7263, BEGINNING ON PAGE 469, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA.

LOTS 1 THROUGH 11 OF CORRECTED MAP OF GRAY AND BUSHA'S SUBDIVISION, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN PLAT BOOK 5, PAGE 92, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA.

LESS ANY PART OF THE AFORESAID PARCEL LYING WITHIN THE RIGHT-OF-WAY OF FIRST AVENUE.

THE ABOVE-DESCRIBED LANDS FOLLOWING PARCEL II ARE THE SAME LANDS DESCRIBED AS PARCELS III, IV AND V HEREINAFTER DESCRIBED.

PARCEL III:

LOT C AND A PORTION OF VACATED NORTH BOULEVARD LYING NORTHEASTERLY OF SAID LOT C IN BLOCK 1 OF THE REPLAT PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO.2, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY WAS FORMERLY A PART; LESS AND EXCEPT THAT PORTION THEREOF LYING WITHIN THE FOLLOWING DESCRIBED TRACT:

THAT PART OF LOTS A, B AND C, AND A PORTION OF VACATED NORTH BOULEVARD LYING NORTHEASTERLY OF SAID LOT C, IN BLOCK 1, REPLAT OF PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, BEING FURTHER DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA, AND RUN THENCE NORTH 00DEG.29'59" EAST, 64.40 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD FOR A POINT OF BEGINNING; THENCE CONTINUE NORTH 00DEG.29'59" EAST, 214.70 FEET; THENCE SOUTH 89DEG.48'01" EAST, 93.17 FEET; THENCE NORTH 33 DEG.02'59" EAST, 581.01 FEET; THENCE NORTH 27DEG.49'59" EAST, 117.96 FEET; THENCE SOUTH 56DEG.57'01" EAST, 36.99 FEET; THENCE NORTH 33DEG.02'59" EAST, 70.00 FEET TO THE NORTHERLY LINE OF VACATED NORTH BOULEVARD; THENCE SOUTH 56DEG.57'01" EAST, 532.89 FEET ALONG SAID NORTHWESTERLY LINE; THENCE SOUTH 33DEG.02'59" WEST, 344.57 FEET; THENCE SOUTH 56DEG.57'01" EAST, 282.85 FEET; THENCE SOUTH 33DEG.02'59" WEST, 655.43 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD; THENCE NORTH 56DEG.57'01" WEST ALONG THE AFORESAID SOUTH BOULEVARD RIGHT-OF-WAY LINE, 804.76 FEET TO THE POINT OF BEGINNING.

PARCEL IV:

LOTS 1 THROUGH 11 OF GRAY AND BUSHA'S SUBDIVISION, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN PLAT BOOK 5, PAGE 92, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA.

4

LESS ANY PART OF THE AFORESAID PARCEL LYING WITHIN THE RIGHT-OF-WAY OF 1ST AVENUE.

PARCEL V:

TRACT 1-A:

DESCRIPTION OF LANDS BY THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, THE NORTH BOUNDARY OF THE REPLAT OF A PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO.2 ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA AND THE APPROXIMATE 1.00 FOOT CONTOUR ESTABLISHED FROM USC&GS MONUMENTS AND CHARTS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST AND RUN NORTH 00DEG.29'59" EAST, 279.10 FEET; THENCE SOUTH 89DEG.48'01" EAST, 93.17 FEET; THENCE NORTH 33DEG.02'59" EAST, 581.01 FEET; THENCE NORTH 27DEG.49'59" EAST, 183.50 FEET; THENCE NORTH 35DEG.42'59" EAST, 14.74 FEET TO THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE NORTH LINE OF THE REPLAT OF A PART OF ESPIRITU SANTO SPRINGS SUBDIVISION #2 FOR A POINT OF BEGINNING; FROM THIS POINT OF BEGINNING, RUN NORTH 40DEG.16'17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 198.06 FEET TO A POINT, SAID POINT BEING THE APPROXIMATE LOCATION OF THE HIGH WATER MARK (ELEVATION 1.00 FEET) WITH THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30; FROM THIS POINT, RUN ALONG THE FOLLOWING CALLS (ESTABLISHED ELEVATION 1.00 FEET FROM USC&GS MONUMENTS AND CHARTS); SOUTH 49DEG.13'50" EAST, 85.79 FEET; SOUTH 62DEG.57'15" EAST, 95.91 FEET; SOUTH 79DEG.47'14" EAST, 84.60 FEET; SOUTH 41DEG.50'44" EAST, 149.96 FEET; SOUTH 83DEG.27'43" WEST, 173.63 FEET; SOUTH 29DEG.02'59" WEST, 46.80 FEET; SOUTH 65DEG.19'25" EAST, 108.96 FEET; SOUTH 54DEG.49'47" EAST, 100.07 FEET; SOUTH 42DEG.16'54" EAST, 105.12 FEET; SOUTH 59DEG.48'22" EAST, 103.79 FEET; SOUTH 52DEG.59'07" EAST, 94.88 FEET; SOUTH 44DEG.56'48" EAST, 53.29 FEET; SOUTH 33DEG.45'01" WEST, 4.50 FEET TO A POINT OF INTERSECTION OF ELEVATION 1.00 FEET AND THE NORTH LINE OF THE REPLAT OF A PART OF ESPIRITU SANTOS SPRINGS SUBDIVISION #2; THENCE NORTH 56DEG.57'01" WEST ALONG THE NORTH LINE OF THE ABOVE-MENTIONED PLAT, 857.37 FEET TO THE POINT OF BEGINNING.

TRACT 2-A:

DESCRIPTION OF LANDS BOUNDED BY THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, THE NORTHERLY BOUNDARY OF MULLET CREEK, THE EASTERLY EXTENSION OF THE NORTH SIDE OF CHURCH STREET AND THE APPROXIMATE ELEVATION OF 1.00 FEET ESTABLISHED BY THE USC&GS MONUMENTS AND CHARTS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, AND RUN NORTH 00DEG.29'59" EAST, 279.10 FEET; THENCE SOUTH 89DEG.48'01" EAST, 93.17 FEET; THENCE NORTH 33DEG.02'59" EAST, 581.01 FEET; THENCE NORTH 27DEG.49'59" EAST, 183.50 FEET; THENCE NORTH 35DEG.42'59" EAST, 14.74 FEET TO THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE NORTH LINE OF THE REPLAT OF A PART OF ESPIRITU SANTOS SPRINGS

5

SUBDIVISION #2; THENCE NORTH 40DEG.16'17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 247.93 FEET TO THE INTERSECTION WITH ELEVATION 1.00 FEET AND THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, SAID POINT BEING THE POINT OF BEGINNING OF THIS DESCRIPTION; CONTINUE NORTH 40DEG.16'17" EAST ALONG SAID EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 263.31 FEET TO A POINT, SAID POINT BEING THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE EASTERLY EXTENSION OF THE NORTH RIGHT-OF-WAY OF CHURCH STREET; THENCE SOUTH 49DEG.35'01" EAST ALONG THE EASTERLY EXTENSION OF THE NORTH RIGHT-OF-WAY OF CHURCH STREET, 95.52 FEET TO A POINT, SAID POINT BEING THE INTERSECTION OF THE EASTERLY EXTENSION OF THE NORTH LINE OF CHURCH STREET APPROXIMATE ELEVATION 1.00 FEET; THENCE ALONG THE FOLLOWING CALLS, WHICH ARE APPROXIMATELY ALONG THE CONTOUR OF ELEVATION 1.00 FEET ESTABLISHED FROM USC&GS MONUMENTS AND CHARTS; SOUTH 34DEG.50'44" WEST, 100.27 FEET; SOUTH 69DEG.50'24" WEST, 114.90 FEET; SOUTH 77DEG.36'53" WEST, 79.63 FEET TO THE POINT OF BEGINNING.

TRACT B-1:

DESCRIPTION OF LANDS BOUNDED BY THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, APPROXIMATELY 0.00 FEET ELEVATION ALONG THE APPROXIMATE SOUTH SIDE OF MULLET CREEK AND APPROXIMATE 1.00 FEET ELEVATION ALONG THE SOUTH, FURTHER DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, AND GO NORTH 00DEG.29'59" EAST, 279.10 FEET; THENCE SOUTH 89DEG.48'01" EAST, 93.17 FEET; THENCE NORTH 33DEG.02'49" EAST, 581.01 FEET; THENCE NORTH 27DEG.49'59" EAST, 183.50 FEET; THENCE NORTH 35DEG.42'59" EAST, 14.74 FEET TO THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE NORTH LINE OF THE REPLAT OF A PART OF ESPIRITU SANTOS SPRINGS SUBDIVISION #2; THENCE NORTH 40DEG 16' 17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 198.06 FEET TO A POINT OF BEGINNING, SAID POINT OF BEGINNING BEING THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE APPROXIMATE 1.00 FEET ELEVATION; THENCE CONTINUE NORTH 40DEG.16' 17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 4.93 FEET TO A POINT OF INTERSECTION WITH THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE APPROXIMATE 0.00 FEET ELEVATION; THENCE RUN ALONG THE FOLLOWING CALLS, WHICH WERE ESTABLISHED ON THE APPROXIMATE 0.00 FEET ELEVATION BY USC&GS CHARTS AND MONUMENTS; SOUTH 50DEG.36'09" EAST, 85.03 FEET; THENCE SOUTH 60DEG.34'28" EAST, 95.44 FEET; THENCE SOUTH 82DEG.26'36" EAST, 102.88 FEET; THENCE NORTH 80DEG.58'11" EAST, 100.73 FEET; THENCE SOUTH 56DEG.45'22" EAST, 43.10 FEET; THENCE SOUTH 35DEG.01'49" EAST, 15.88 FEET; THENCE SOUTH 08DEG.40'29" EAST, 26.19 FEET; THENCE SOUTH 36DEG.21'37" WEST, 82.75 FEET; THENCE SOUTH 19DEG.50'11" WEST 50.04 FEET; THENCE SOUTH 43DEG.49'32" EAST, 158.01 FEET; THENCE SOUTH 30DEG.47'51" EAST, 116.09 FEET; THENCE SOUTH 34DEG.41'36" EAST, 99.79 FEET; THENCE SOUTH 32DEG.41'53" EAST, 57.18 FEET TO A POINT OF INTERSECTION WITH THE APPROXIMATE 1.00 FEET ELEVATION AND 0.00 FEET ELEVATION; THENCE ALONG APPROXIMATE 1.00 FEET ELEVATION THE FOLLOWING CALLS: NORTH 44DEG.56'48" WEST, 53.29 FEET; THENCE NORTH 52DEG.59'07" WEST, 94.88 FEET; THENCE NORTH 59DEG.48'22" WEST, 103.70 FEET; THENCE NORTH 42DEG.16'54" WEST, 105.12 FEET; THENCE NORTH 54DEG.49'47" WEST, 100.07 FEET; THENCE NORTH

6

65DEG.19'25" WEST 108.96 FEET; THENCE NORTH 29DEG.02'59" EAST, 46.80 FEET; THENCE NORTH 83DEG.27'43" EAST, 173.63 FEET; THENCE NORTH 41DEG.50'44" WEST, 149.96 FEET; THENCE NORTH 79DEG.47'14" WEST, 84.60 FEET; THENCE NORTH 62DEG.57'15" WEST, 95.91 FEET; THENCE NORTH 49DEG.13'50" WEST, 85.79 FEET TO THE POINT OF BEGINNING.

TRACT B-2:

DESCRIPTION OF LANDS BOUNDED ON THE EAST BY APPROXIMATE 1.00 FOOT CONTOUR, ON THE NORTH BY THE EASTERLY EXTENSION OF THE NORTH BOUNDARY OF CHURCH STREET AND ON THE SOUTH AND SOUTHEAST BY APPROXIMATE NORTH LINE OF MULLET CREEK, FURTHER DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST AND GO NORTH 00DEG.29'59" EAST, 279.10 FEET; THENCE SOUTH 89DEG.48'01" EAST, 93.17 FEET; THENCE NORTH 33DEG.02'59" EAST, 581.01 FEET; THENCE NORTH 27DEG.49'59" EAST, 183.50 FEET; THENCE NORTH 35DEG.42'59" EAST 14.74 FEET TO THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE NORTH LINE OF THE REPLAT OF A PART OF ESPIRITU SANTOS SPRINGS SUBDIVISION #2; THENCE NORTH 40DEG.16'17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 238.09 FEET TO A POINT OF INTERSECTION WITH ELEVATION 0.00 FEET FOR A POINT OF BEGINNING; FROM THIS POINT OF BEGINNING, CONTINUE NORTH 40DEG.16'17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 9.84 FEET; THENCE ALONG THE APPROXIMATE CONTOUR OF 1.00 FOOT, THE FOLLOWING CALLS: NORTH 77DEG.36'53" EAST, 79.63 FEET; THENCE NORTH 69DEG.50'24" EAST, 114.90 FEET; THENCE NORTH 34DEG.50'44" EAST, 100.27 FEET TO A POINT ON THE EASTERLY EXTENSION OF THE NORTH RIGHT-OF-WAY OF CHURCH STREET; THENCE SOUTH 49DEG.35'01" EAST ALONG THE EASTERLY EXTENSION OF THE NORTH RIGHT-OF- WAY OF CHURCH STREET, 257.04 FEET; THENCE SOUTH 40DEG.24'59" WEST, 45.73 FEET TO A POINT WITH THE APPROXIMATE ELEVATION 0.00 FEET; THENCE ALONG THE APPROXIMATE CONTOUR 0.00 FEET, SAME BEING APPROXIMATE NORTH LINE OF MULLET CREEK, THE FOLLOWING CALLS: SOUTH 85DEG.30'35" WEST, 85.45 FEET; THENCE SOUTH 72DEG.53'11" WEST, 141.23 FEET; THENCE NORTH 62DEG.07'08" WEST, 220.79 FEET TO THE POINT OF BEGINNING.

AS FURTHER DESCRIBED BY CURRENT SURVEY MADE BY LAND PRECISION CORPORATION AS FOLLOWS:

LEGAL DESCRIPTION: (SPA-PARCELS I & III)

THAT PORTION OF LOTS A, B & C, BLOCK NO. 1, VACATED NORTH BOULEVARD AND THE RESERVED TRACT LYING NORTH THEREOF, ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE MAP OR PLAT THEREOF AS RECORDED IN PLAT BOOK 8, PAGE 5 OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, TOGETHER WITH THAT CERTAIN PORTION OF BAYSHORE BOULEVARD THAT WAS VACATED BY RESOLUTION NO. 92-27, RECORDED IN OR. BOOK 7978, PAGE 240, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, LYING IN SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA;

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

7

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA; THENCE RUN N 00°29'59"E, ALONG THE WEST LINE OF THE AFORE SAID NORTHEAST 1/4, 64.40 FEET; THENCE S 56°57'01" E, 35.87 FEET TO THE POINT OF BEGINNING; THENCE N 00°39'19" E, 235.03 FEET; THENCE S 89°46'05" E, 52.62 FEET; THENCE N 35°21'38" E, 212.42 FEET; THENCE N 33°08'42" E, 373.28 FEET; THENCE N 27°55'32" E, 117.97 FEET; THENCE S 56°57'01" E, 36.99 FEET; THENCE N 33°02'59" E, 70.00 FEET; THENCE N 56°57'01" W, 42.73 FEET; THENCE N 35°42'08" E, 10.01 FEET; THENCE S 56°57'01" E, 857.21 FEET; THENCE S 33°02'59" W, 1009.99 FEET; THENCE N 56°57'01" W, 768.89 FEET TO THE POINT OF BEGINNING.

LEGAL DESCRIPTION: (PARKING AREA-PARCELS II & IV)

THAT PORTION OF PARK AND HOTEL SITE, REVISED PLAT OF PART OF ESPIRITU SANTO SPRINGS, ACCORDING THE MAP OR PLAT THEREOF AS RECORDED IN PLAT BOOK 4, PAGE 22 OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, TOGETHER WITH THE CORRECTED MAP OF GRAY AND BUSHA'S SUBDIVISION ACCORDING TO THE MAP OR PLAT THEREOF AS RECORDED IN PLAT BOOK 5, PAGE 92 OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, BEING A PARTIAL REPLAT THEREOF, LYING IN SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA;

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA; THENCE RUN N 00°29'59" E, ALONG THE WEST LINE OF THE AFORE SAID NORTHEAST 1/4, 304.28 FEET; THENCE S 89°29'00" E, 28.12 FEET TO THE POINT OF BEGINNING; THENCE N 00°29'59" E, 821.52 FEET; THENCE S 59°11'11" E, 467.48 FEET; THENCE S 28°19'24" W, 139.76 FEET; THENCE S 33°02'47" W, 548.05 FEET; THENCE N 89°29'00" W, 43.49 FEET TO THE POINT OF BEGINNING.

TRACTS 1-A& B-1: (PORTION PARCEL V)

DESCRIPTION OF TRACTS 1-A & B-1 BEING LANDS BOUND BY THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF COUNTY ROAD 30 & NORTHEASTERLY BOUNDARY OF THE REPLAT OF A PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2 ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, AND LYING SOUTH AND WESTERLY OF MULLET CREEK AND TAMPA BAY REFERENCED BY THE APPROXIMATE 0.00 FEET ELEVATION AS ESTABLISHED BY USC&GS MONUMENTS & CHARTS, LYING IN SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA;

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST THENCE RUN N 00°29'59" E, 279.98 FEET; THENCE S 89°46'05" E, 83.49 FEET; THENCE N 35°21'38" E, 212.42 FEET; THENCE N 33°08'42" E, 373.28 FEET; THENCE N 27°55'32" E, 184.25 FEET; THENCE N 35°42'59" E, 13.99 FEET TO THE INTERSECTION OF SAID SOUTHEASTERLY RIGHT-OF-WAY LINE OF COUNTY ROAD 30

AND SAID NORTHEASTERLY LINE OF SAID REPLAT OF A PART OF ESPIRITU SANTO SPRINGS SUBDIVISION #2 FOR A POINT OF BEGINNING; THENCE N 40°16'17" E ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 202.99 FEET TO THE AFORE REFERENCED APPROXIMATE 0.00 FEET ELEVATION; THENCE ALONG SAID REFERENCED APPROXIMATE 0.00 FEET ELEVATION CONTOUR THE FOLLOWING FOURTEEN (14) COURSES: 1.) S 50°36'09" E, 85.03 FEET; 2.) S 60°34'28" E, 95.44 FEET; 3.) S 82°26'36" E, 102.88 FEET; 4) N 80°58'11" E, 100.73 FEET; 5) S 56°45'22" E, 43.10 FEET; 6) S 35°01'49" E, 15.88 FEET; 7) S 08°40'29" E, 26.19 FEET; 8) S 36°21'37" W, 82.75 FEET; 9) S 19°50'11"W, 50.04 FEET; 10) S43°49'32" E, 158.01 FEET; 11) S 30°47'51" E, 116.09 FEET; 12.) S 34°41'36" E, 99.79 FEET; 13.) S 32°41'53" E, 57.18 FEET; 14) S 35°27'49"W, 4.52 FEET TO THE NORTHEAST CORNER OF THE NORTH LINE OF SAID REPLAT OF A PART OF ESPIRITU SANTOS SPRINGS SUBDIVISION #2; THENCE N 56°57'01" W ALONG THE SAID NORTH LINE, 857.21 FEET TO THE POINT OF BEGINNING.

TRACTS 2-A & B-2: (PORTION PARCEL V)

DESCRIPTION OF TRACTS 2-A & B-2 BEING LANDS BOUND BY THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF COUNTY ROAD 30, THE EASTERLY EXTENSION OF THE NORTH LINE OF CHURCH STREET RIGHT-OF-WAY AND LYING NORTH AND WESTERLY OF MULLET CREEK AND TAMPA BAY REFERENCED BY THE APPROXIMATE 0.00 FEET ELEVATION AS ESTABLISHED BY USC&GS MONUMENTS & CHARTS, LYING IN SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA;

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST THENCE RUN N 00°29'59" E, 279.98 FEET; THENCE S 89°46'05" E, 83.49 FEET; THENCE N 35°21'38" E, 212.42 FEET; THENCE N 33°08'42" E, 373.28 FEET; THENCE N 27°55'32" E, 184.25 FEET; THENCE N 35°42'59" E, 13.99 FEET TO THE INTERSECTION OF SAID SOUTHEASTERLY RIGHT-OF-WAY LINE OF COUNTY ROAD 30 AND SAID NORTHEASTERLY LINE OF SAID REPLAT OF A PART OF ESPIRITU SANTO SPRINGS SUBDIVISION #2; THENCE N 40°16'17" E, 238.11 FEET ALONG THE SOUTHEASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 FOR A POINT OF BEGINNING; THENCE CONTINUE N 40°16'17" E ALONG SAID EASTERLY RIGHT-OF-WAY, 273.13 FEET TO THE INTERSECTION OF THE EASTERLY EXTENSION OF THE NORTH LINE OF CHURCH STREET RIGHT-OF-WAY; THENCE S 49°35'01" E ALONG SAID EASTERLY EXTENSION, 352.56 FEET TO THE AFORE REFERENCED APPROXIMATE 0.00 FEET ELEVATION; THENCE ALONG SAID REFERENCED APPROXIMATE 0.00 FEET ELEVATION CONTOUR THE FOLLOWING FOUR (4) COURSES: 1.) S 40°24'59" W, 45.73 FEET; 2.) S 85°30'35" W, 85.45 FEET; 3.) S 72°53'11" W, 141.23 FEET; 4.) N 62°07'08" W, 220.79 FEET TO THE POINT OF BEGINNING.

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:

**S.H.S. RESORT, LLC**                    **Case No.: 8:10-bk-25886-MGW**
                                          **Chapter 11 Case**

    **Debtor.**
_____/

## S.H.S. RESORT, LLC'S, AMENDED[1] CHAPTER 11
## PLAN OF REORGANIZATION, DATED AS OF FEBRUARY 28, 2011

## ARTICLE I
## SUMMARY

S.H.S. Resort, LLC's, Chapter 11 Plan of Reorganization, dated as of February 28, 2011 (the "Plan"), filed pursuant to Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"), proposes to pay creditors and make distributions to the equity security holders of S.H.S. Resort, LLC ("S.H.S.," "Debtor," "Debtor-In-Possession" or "Reorganized Debtor," as appropriate) over a period of time beginning on the Effective Date (as defined herein), from funds generated by the ongoing operations of the Debtor through the use of its primary asset, the real property and improvements constituting the Safety Harbor Resort and Spa ("Resort") and from the sale or surrender of other parcels of real property owned by the Debtor. The legal description for the Resort and surrounding property owned by the Debtor (collectively, the "Property") is provided on **Exhibit "B"** as attached to the Disclosure Statement filed in support of this Plan**.**

This Plan provides for one (1) class of Priority Claims; one (1) class of Secured Claims of the Pinellas County Tax Collector and/or any Tax Lien Certificate Holders; one (1) class of Secured Claims of Wells Fargo Bank; one (1) class of Unsecured Claims of general trade creditors; one (1) class of Undersecured Claims of Wells Fargo Bank by virtue of its undersecured interest in the Property; one (1) Administrative Convenience Class of unsecured creditors; one (1) class of Unsecured Claims of insiders and other affiliates of the Debtor; and one (1) class of Equity Security Holders.

All Creditors and Equity Security Holders should refer to the remainder of this Plan and the related Disclosure Statement for information regarding the precise treatment of their claim. The Disclosure Statement, which provides more detailed information regarding this Plan and the rights of Creditors and Equity Security Holders, has been circulated with this Plan.

---

[1] Amended only to correct typographical errors, include dates as set forth in the Court's Order Scheduling Confirmation, and to include treatment of the holders of Tax Lien Certificates along with the Secured Claims of the Pinellas County Tax Collector.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

# ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

2.01    <u>Class 1</u>.        All Priority Claims.
                               **(Employees of the Debtor; Florida Department of Revenue; and possibly others)**

2.02    <u>Class 2.</u>       The Secured Claims of the Pinellas County Tax Collector.
                               **(Pinellas County Tax Collector and/or Tax Lien Certificate Holders)**

2.03    <u>Class 3</u>.        The Claims of all Secured Creditors, to the extent allowed as a Secured Claim under § 506 of the Code.
                               **(Wells Fargo Bank)**

2.04    <u>Class 4</u>.        The Claims of all Non-Insider Unsecured Trade Creditors, to the extent allowed pursuant to § 502 of the Code.
                               **(Various)**

2.05    <u>Class 5</u>.        The Undersecured Claims of Secured Lender
                               **(Wells Fargo Bank)**

2.06    <u>Class 6</u>.        The Administrative Convenience Class of Unsecured Claims
                               **(Various)**

2.07    <u>Class 7</u>.        The Unsecured Claims of Insiders and Affiliates of the Debtor
                               **(Olympia Hotels Management, LLC; and possibly others)**

2.08    <u>Class 8</u>.        Equity Security Holders of the Debtor
                               **(Olympia Investment Group, LLC)**

**ARTICLE III**
**TREATMENT OF UNITED STATES TRUSTEE'S FEES**

3.01    United States Trustee Fees.  All fees required to be paid by 28 U.S.C. §1930(a)(6) ("U.S. Trustee Fees") will accrue and be timely paid until the case is closed, dismissed, or converted to another Chapter of the Code.  Any U.S. Trustee Fees owed on or before the Effective Date of this Plan will be paid on the Effective Date.

**ARTICLE IV**
**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS**

4.01    Administrative Claims.  All Allowed Administrative Expense Claims are required to be paid on or before the Effective Date pursuant to  11 U.S.C. §§503, 507 and 1129.   Any Allowed Administrative Expense Claims which are not paid before the Effective Date of this Plan will be paid on the Effective Date.

**The Remainder of this Page Intentionally Left Blank**

# ARTICLE V
## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

5.01    Claims and interests shall be treated as follows under this Plan:

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 –Priority Creditors | Impaired. | Priority Creditors will be paid in full over the course of five years from the Effective Date of this Plan along with interest at the rate of 12% from Estate Assets. |
| Class 2 – Secured Claim of Pinellas County Tax Collector and Tax Lien Certificate Holder(s) | Impaired. | The Secured Claim of the Pinellas County Tax Collector and/or of any Tax Lien Certificate Holders will be paid a tax amount consistent with the valuation of the subject property, or such principal amount as may be reflected on the face of the tax lien certificate, which shall constitute its allowed claim amount in annual payments to be made over the course of five years from the Effective Date of this Plan along with interest at the rate reflected on the face of the tax lien certificate or at the rate of 12% per annum, whichever is lower, from Estate Assets. As a result of the treatment afforded herein, the Pinellas County Tax Collector and any Tax Lien Certificate Holders will be precluded from exercising their statutory rights and remedies normally afforded in the collection of delinquent ad valorem real estate and tangible personal property taxes or collection under such tax lien certificates. |

| Class 3– Secured Claim of Secured Lender. | Impaired. | The Property constituting Secured Lender's collateral was valued by stipulated Order of the Bankruptcy Court entered January 25, 2011 (Doc. No. 118). The $13,857,816.67 valued amount will be paid as follows: |
|---|---|---|
| | | The Debtor will pay the Secured Lender the Net Principal amount of $11,057,816.67 less the sum of adequate protection payments, made during the Chapter 11 case prior to the Effective Date, on the basis of a 25 year amortization, with a ten year balloon payment at interest rate of the Prime Rate of interest (determined annually on January 1 of each year) plus 1% interest, subject to an interest rate floor of 4.25%. Each year the interest rate will adjust on the anniversary date of the Effective Date and may be adjusted upwardly or downwardly up to 0.5% per year based upon the Prime Rate plus 1% formula ("Note A"). The Note A payments will be paid from operational cash flow. |
| | | The Debtor will pay the Secured Lender the amount of $2,800,000.00 on the basis of a 3 year note which shall accrue interest rate of the Prime Rate of interest (determined annually on January 1 of each year) plus 1% interest, subject to an interest rate floor of 5.0%. Each year the interest rate will adjust on the anniversary date of the Effective Date and may be adjusted upwardly or downwardly up to 0.5% per year based upon the Prime Rate plus 1% formula ("Note B"). The Note B obligation will be paid upon the sale or refinancing of the 8-acre parcel which can be sold without adversely affecting the Resort and Spa portion of the property. |
| | | Notes A and B shall be collectively known as the Net Principal. |
| | | While payments are made, as set forth above, the Guarantors shall not be liable for any amounts to Secured Lender over and above the repayment of the Net Principal, as outlined above. Any claims against the Guarantors shall be stayed indefinitely as long as timely payments are made on the Net Principal monthly on the Note A and Note B obligations. At the conclusion of the Reorganized Debtor making all payments of the Net Principal during the Note Period, the Guarantors shall be fully and finally released. |

| | | |
|---|---|---|
| Class 4 - Non-Insider Unsecured Trade Creditors | Impaired. | Non-Insider Unsecured Trade Creditors holding Non-Insider Allowed Claims will be paid through a series of Distributions totaling ninety percent (90%) of their Allowed Claim, without interest, to be made on a quarterly basis, at a rate of four and a half percent (4.5%) of their Allowed Claim per quarter, beginning on the Effective Date of this Plan and continuing for a period of five years. Any Disputed Claim or Claim for which an objection has been interposed shall have its proportionate quarterly distributions disbursed into a segregated escrow account pending the resolution of the claim objection. |
| Class 5 - Undersecured Claims of Secured Lender | Impaired | Allowed Undersecured Claim of Secured Lender will be paid through a series of Distributions totaling ten percent (10%) of any Allowed Undersecured Claim in equal quarterly installments beginning on the Effective Date of this Plan and continuing for a period of five years. Any Disputed Claim or Claim for which an objection has been interposed shall have its proportionate quarterly distribution disbursed into a segregated escrow account pending the resolution of the claim objection. |
| Class 6 - Administrative Convenience Class of Unsecured Claims | Impaired. | Any Claimant holding a Claim in Class 4 or 5 may elect to voluntarily reduce the amount of their Allowed Claim to $1,000.00 ("Reduced Allowed Claim") and to have such Reduced Allowed Claim paid in full within 90 days of the Effective Date in complete satisfaction of the Claimant's Claim. |
| Class 7 – Unsecured Claims of Insiders and Affiliates of the Debtor | Impaired | Unsecured Creditors who are Insiders or Affiliates of the Debtor will be paid by the Debtor only after all Class 1-6 Allowed Claims have been paid in full. Any Disputed Claim or Claim for which an objection has been interposed shall have its proportionate quarterly distributions disbursed into a segregated escrow account pending the resolution of the claim objection. |
| Class 8 – Equity Security Holders of the Debtor | Impaired | Equity Security Holders shall receive, on account of their contribution of a portion of their ownership interests in other business ventures, a distribution of membership interests in the Reorganized Debtor consistent with their current Equity Security holdings. |

# ARTICLE VI
## ALLOWANCE AND DISALLOWANCE OF CLAIMS

6.01    Disputed Claim.   A disputed claim is a claim that has not been allowed or disallowed by a final, non-appealable order, and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

6.02    Delay of Distribution on a Disputed Claim.   No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order. However, if, at the time a distribution would be made pursuant to the provisions of this Plan but for the existence of an objection to a Claim, a Claim is a Disputed Claim, a distribution shall be made into a segregated account pending resolution of the objection to the Claim, the same as if the Claim were not a Disputed Claim.

6.03    Settlement of Disputed Claims.   The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

# ARTICLE VII
## PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.01    <u>Assumed Executory Contracts and Unexpired Leases</u>.

    (a)    Other than as is set forth herein, the Debtor will elect, ten days prior to Confirmation Hearing, which Executory Contracts and Unexpired Leases to assume and which to reject with such decisions to be effective as of the Effective Date of this Plan.

    (b)    The Debtor will assume the Management Agreement with Olympia Hotels Management, LLC.

    (c)    The Debtor will assume all pre-petition agreements for Booked Events at the Resort and Spa.

    (d)    The Debtor will assume all pre-petition gift card, coupon and "Group-On" obligations incurred in the ordinary course of the Debtor's business operations.

    (e)    The Debtor will assume all Spa Membership agreements incurred in the ordinary course of the Debtor's business operations.

7.02    <u>Rejection of Executory Contracts and Unexpired Leases.</u>

Upon the Effective Date, the Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly assumed pursuant to section 7.01 above, or before the date of the order confirming this Plan by separate Motion to Assume or Reject Executory Contract. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the order confirming this Plan.

# ARTICLE VIII
## MEANS FOR IMPLEMENTATION OF THE PLAN

8.01    The Reorganized Debtor will continue to operate the Resort and will fund all distributions required under this Plan from such Operations.  The Reorganized Debtor will also explore the sale or development of any vacant parcels on the Property to their highest and best use in order to create addition revenue from which to fund Plan distributions; at present, the Debtor expects a sale or refinancing of the 8 acre parcel in connection with such efforts.

8.02    The Reorganized Debtor, in conjunction with Olympia Hotels Management, LLC, will be responsible for management of the Resort and the Property.  The Reorganized Debtor will pay all expenses from operating revenue as projected on the budget which is appended the Disclosure Statement.

8.03    The current Equity Security Holders will pledge equity security interests in unrelated business venture to provide additional means for execution of the Plan obligations.

8.04    Additionally, the current Equity Security Holders will contribute in excess of $2,000,000 of working capital for both the improvement of the subject Property and to assist in the liquidity and operational cash flow of the Debtor.

## ARTICLE IX
## GENERAL PROVISIONS

9.01    Definitions and Rules of Construction.  The following definitions shall apply and supplement those set forth elsewhere in this Plan.  Terms which are not defined herein shall have the same meaning as is set out in the Bankruptcy Code:

Administrative Expense Claim: "Administrative Expense Claim" means any Allowed Claim of the kind described in § 507 of the Bankruptcy Code, or the costs and expenses of administration of this Chapter 11 Case which are allowed pursuant to Bankruptcy Code § 503(b), to the extent the holder of such Administrative Expense Claim asserts such claim in this Chapter 11 Case within the time fixed by any applicable administrative bar date set by the Bankruptcy Court, including, without limitation, any actual, necessary costs and expenses of preserving or operating the Debtor's estate, any indebtedness or obligation incurred or assumed by the Debtor post-petition, all allowances of compensation and reimbursement of expenses relating to this Chapter 11 Case which are allowed pursuant to an order of the Bankruptcy Court under Bankruptcy Code §§ 330 or 503, any fees or charges assessed against the Debtor's estate, or any other post-petition Claim arising against the Debtor.   This term "Administrative Expense Claim" shall include any Claim which falls within this definition, including, without limitation, the anticipated  or potential claims of the following persons:

      a.     Debtor's Counsel, and

      b.     Keystone Consulting Group, Inc.

Administrative Expense Claimant:   "Administrative Expense Claimant" means any Person holding an Allowed Administrative Expense Claim.

Administrative Expense Bar Date: "Administrative Expense Bar Date" means the last date for filing Administrative Expense Applications, that date being either at least fourteen (14) days prior to the hearing on Confirmation, or any continued hearing on Confirmation, or no more than thirty (30) days after the occurrence of the last event giving rise to the Administrative Expense Claim.

Affiliate: "Affiliate" shall have the same meaning as set forth in the Bankruptcy Code.

Allowed: "Allowed" means and includes, with respect to any Claim or Interest, (a) any Claim (other than a Disputed Claim) or Interest, proof of which was timely filed with the Clerk of the Bankruptcy Court on or before the Bar Date (or, by Order of the Bankruptcy Court was, after notice and a hearing, not required to be filed) or (b) any Claim (other than a Disputed Claim) or Interest that has been listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent and, in either case, (1) for which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed in this Plan, in the Bankruptcy Code, in the Bankruptcy Rules, or in a Final Order of the Bankruptcy Court, or (2) an objection has

been interposed and such Claim or Interest, or portion thereof, has been allowed by a Final Order of the Bankruptcy Court.

Allowed Amount, Allowed Claim or Allowed Interest: "Allowed Amount", "Allowed Claim" or "Allowed Interest" means the dollar amount in which a Claim or Interest is Allowed; provided however, that the Allowed Amount of a Claim or Interest shall not exceed the Estimated Amount of such Claim or Interest as determined pursuant to an Estimation Order. No amount shall be Allowed for or on account of: (1) punitive damages, (2) attorney's fees or other court costs, (3) penalties, (4) default rates of interest with respect to secured claims, (5) late fees, charges or other assessments in addition to the principal amount of the indebtedness or (6) post-petition interest with respect to unsecured or undersecured claims, on account of any Claim or Interest except as otherwise expressly specified in this Plan or provided by Final Order of the Bankruptcy Court.

Assumed Contracts: "Assumed Contracts" means those executory contracts and/or unexpired leases assumed pursuant to this Plan or other Order of this Court.

Ballot: "Ballot" means the ballot to be distributed to each holder of a Claim in any impaired Class in connection with solicitation of votes to accept or reject this Plan.

Ballot Date: "Ballot Date" means the date set by the Bankruptcy Court as the last date for timely submission of a Ballot accepting or rejecting this Plan, that date being **April 12, 2011**.

Bankruptcy Code: "Bankruptcy Code" or "Code" means Title 11 of the United States Code.

Bankruptcy Court: "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Middle District of Florida, Ft. Myers Division, or, to the extent the reference is withdrawn, the United States District Court for the Middle District of Florida, Tampa Division.

Bankruptcy Rules: "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, as are in effect on the Petition Date or as hereafter amended to the extent such amendments are applicable to this Chapter 11 Case.

Bar Date: "Bar Date" means the last date for filing Proofs of Claim. The Bankruptcy Court previously set **January 11**, **2011** as the Bar Date in this case.

Booked Event: "Booked Event" means any reservation for an event—excluding hotel room reservations and individual spa appointments--made at the Resort after the Petition Date.

<u>Booked Event Deposit</u>: "Booked Event Deposit" means those deposits for Booked Events held in a segregated DIP account pursuant to the Order Granting Expedited Motion to Honor Pre-Petition Gift Cards, Deposits and Other Credits and to Establish a Booked Event Deposit Protocol (Doc. 45).

<u>Business Day</u>: "Business Day" means any day other than a Saturday, Sunday, or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

<u>Cash</u>: "Cash" means lawful currency of the United States of America and its equivalents.

<u>Claim</u>: "Claim" means (a) any right to payment (including, without limitation, a guarantee) from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, sole, joint, several, joint and several, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. The term "Claim," when used with respect to litigation, also includes any claim which has been or could be asserted in the litigation. Notwithstanding anything to the contrary contained herein, for purposes of this Plan, the term "Claim" shall be given the broadest possible meaning permitted by the Bankruptcy Code and applicable law, including, but not limited to, all manner and type of claim, whenever and wherever such claim may arise.

<u>Claimant</u>: A person or entity which holds a Claim.

<u>Class</u>: "Class" means a group of Claims or Interests classified together pursuant to this Plan.

<u>Confirmation</u>: "Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order approving confirmation of this Plan or any subsequent version of such Plan.

<u>Confirmation Date</u>: "Confirmation Date" means the date the Confirmation Order is entered on the docket of the Bankruptcy Court pursuant to Bankruptcy Rule 5003; provided, however, that if, on motion, the Confirmation Order or consummation of this Plan is stayed pending appeal, <u>and</u> a bond is obtained and posted by the appellant so as to preserve defenses to a mootness argument on appeal, then the Confirmation Date shall be <u>the later of</u> the date of entry of the Final Order vacating such stay, or the date on which such stay expires, or the date upon which such stay is no longer in effect.

<u>Confirmation Hearing</u>: "Confirmation Hearing" means the hearing held by the Bankruptcy Court on confirmation of this Plan pursuant to Bankruptcy Code § 1129, now scheduled to occur on April 20, 2011, at 1:30 p.m. at the Sam M. Gibbons United States Courthouse, 801 N. Florida Ave, Tampa, Florida 33602.

<u>Confirmation Order</u>: "Confirmation Order" means the Order of the Bankruptcy Court confirming this Plan or any subsequent version of such Plan, whether or not such order is a Final Order.

<u>Contingent</u>: "Contingent" means a right that has not accrued and that is dependent upon a future event or events that has or have not occurred and may never occur.

<u>Creditor</u> and <u>Claimant</u>: "Creditor" and "Claimant" mean any party or entity having a Claim against the Debtor, including, but not limited to, Creditors with Priority Claims, Creditors with Administrative Expense Claims, Secured Lender, and General Unsecured or Undersecured Creditors.

<u>Debtor,</u> <u>Debtor-In-Possession</u> and <u>Reorganized Debtor</u>: "Debtor," "Debtor-In-Possession," and "Reorganized Debtor" mean S.H.S. Resort, LLC.

<u>Disclosure Statement</u>: "Disclosure Statement" means the Disclosure Statement filed in support of this Plan.

<u>Distribution</u>: "Distribution" means a distribution of Cash or other non-Cash consideration made by the Reorganized Debtor pursuant to the Plan.

<u>Distribution Date</u>: "Distribution Date" means any date that a Distribution is made under the Plan.

<u>Disputed Claim</u>: Prior to the date that an objection has been and may be timely filed by the Debtor or any other party in interest, a Claim shall be considered a "Disputed Claim" to the extent that:

  a.    the amount of the Claim specified in the proof of claim exceeds the amount of the Claim listed by the particular Debtor in the Schedules as not disputed, contingent, or unliquidated; or

  b.    the Claim was not listed by the particular Debtor in the Schedules; or

  c.    the Claim was listed by the particular Debtor in the Schedules as disputed, contingent or unliquidated; or

  d.    the Claim is reflected as unliquidated or contingent in the Proof of Claim.

A "Disputed Claim" shall remain disputed unless such objection has been withdrawn, overruled or denied in whole or part by a Final Order of the Bankruptcy Court or granted in whole or part by a Final Order of the Bankruptcy Court. Subsequent to that date, a "Disputed Claim" means a Claim as to which an objection has been or may be timely filed by the Debtor or any other party in interest and which objection, if timely

filed, has not been withdrawn, denied, or estimated by an order of the Bankruptcy Court. To the extent an objection relates to the allowance of only a part of a Claim, or to its status (e.g., priority, secured, unsecured), such Claim shall be a Disputed Claim only to the extent of the objection.

Effective Date: "Effective Date" means that date which is fourteen (14) days after the entry of the Confirmation Order on the docket by the Bankruptcy Court, assuming no Motions for Reconsideration or Notices of Appeal have been filed with respect to which a stay pending reconsideration or appeal has been obtained. The filing of a Motion for Reconsideration or Notice of Appeal, in the absence of a stay pending reconsideration or appeal, will not delay the Effective Date.

Equitable Subordination: "Equitable Subordination" includes claims by the Debtor or the Trustee to subordinate the claims or interests of any party pursuant to the provisions of 11 U.S.C. § 510(c).

Equity Security Holders: "Equity Security Holders" shall include all Persons who hold a membership interest in the Debtor.

Estate: "Estate" means, as to the Debtor, the estate created for the Debtor by Section 541 of the Bankruptcy Code upon commencement of its Chapter 11 case.

Estate Assets: "Estate Assets" means all of the Debtor's property, including without limitation, any income, profits and proceeds, along with the assets owned by the Debtor as well as any other entities substantively consolidated into the Debtor, including but not limited to the Debtor's Equipment, Inventory, available Cash, Accounts Receivable, and the claims arising from the Litigation Claims. Any reference in this Plan to liquidation proceeds, net liquidation proceeds, or proceeds of liquidation or similar language shall contemplate this definition.

Estimated Claim: "Estimated Claim" means the amount at which the Bankruptcy Court or, where required by applicable law, the District Court, estimates any Claim against the Debtor which is contingent, unliquidated or disputed, for the purpose of (a) allowance under Section 502(c) of the Bankruptcy Code or (b) assisting the Bankruptcy Court in making the findings required for Confirmation of this Plan pursuant to Sections 1129(a)(7)(A)(ii) and (a)(11) and, if necessary, Sections 1129(b)(1) and (2) of the Bankruptcy Code.

Executory Contracts: "Executory Contracts" shall mean any contracts which are described as executory contracts within the meaning and effect of 11 U.S.C. 365, which will be either Assumed Contracts or Rejected Contracts under this Plan and Disclosure Statement.

Executory Contract Claims: "Executory Contract Claims" shall mean any Claims, including future rights to payments, which arise from the Debtor's action in assuming various Executory Contracts.

Executory Contract Creditors: "Executory Contract Creditors" shall mean any Creditors whose Claims, including future rights to payments, arise from the Debtor's action in assuming or rejecting Executory Contracts.

Final Distribution: "Final Distribution", when used with respect to an Allowed Claim, means the Distribution to be made on the Final Distribution Date to fully pay all amounts available to be paid to holders of Allowed Claims pursuant to this Plan.

Final Distribution Date: "Final Distribution Date", when used with respect to an Allowed Claim of an Unsecured Creditor, means the date on which the payment is made in the fourth quarter of the fifth year following the Effective Date, as provided herein. When used with respect to the Allowed Claim of the Secured Lender, "Final Distribution Date" means the 15th day of the 360th month following the Initial Distribution Date.

Final Order:  "Final Order" means an Order of the Bankruptcy Court, the implementation, operation or effect of which has not been stayed and as to which Order (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing or *writ of certiorari* has expired and as to which no appeal or petition for review or rehearing or *certiorari* has been taken and is pending.

Governmental Unit: "Governmental Unit" means any foreign, provincial, federal, state, local or municipal (a) government, (b) governmental agency, (c) governmental commission, (d) governmental department, (e) governmental bureau, (f) governmental ministry or (g) governmental entity.

Guarantors: "Guarantors" means any person or entity who executed a personal guaranty in favor of the Secured Lender for any money loaned which is secured by the Property.

Initial Distribution Date: For Unsecured Creditors, the "Initial Distribution Date" will occur 90 days after the Effective Date; for Secured Lender, the "Initial Distribution Date will be 15th day of the first full month following the Effective Date.

Insider: "Insider" shall have the same meaning as set forth in the Bankruptcy Code.

Interest: "Interest" shall mean the rights held in any equity security by any equity security holder as such terms are defined in 11 U.S.C. § 101.

Lien: "Lien" means, with respect to any of the Debtor's assets or property, along with the other Estate Assets, any mortgage, lien, pledge, charge, security interest, encumbrance or other security device of any kind affecting such asset or property.

Litigation Claims: "Litigation Claims" shall refer to any claim brought by the Debtor, Debtor-in-Possession or the Reorganized Debtor to recover fraudulent, preferential or

otherwise avoidable transfers, or any other claim which the Debtor, Debtor-in-Possession or Reorganized Debtor may hold.

<u>Litigation</u>: "Litigation" shall mean shall mean the pursuit of any Litigation Claims by the Debtor, Liquidated Debtor, or Distribution Agent seeking to recover assets, including receivables, litigation claims against Office Depot, Inc. and those which were the subject of fraudulent, preferential or otherwise avoidable transfers, or any other pursuit of legal remedies in a court of law that shall be necessitated by this bankruptcy filing or the implementation of this Plan.

<u>Net Principal</u>: "Net Principal" shall mean the amount of principal due to Secured Lender, as of the Petition Date, pursuant to the terms of the Promissory Note and Mortgage executed by the Debtor in favor of Secured Lender as determined by the value of the Property and net of any post-petition payments made to Secured Lender between the Petition Date and the Effective Date, which will reduce the Principal to the net principal.

<u>Non-Insider:</u> A Non-Insider is any creditor or other party in interest who is not an Insider as defined herein.

<u>Order</u>: "Order" means an order or judgment of any court of competent jurisdiction.

<u>Operations</u>: "Operations" includes the revenue-generating functions of the Resort and Spa, including, but not limited to, the sale of hotel rooms, spa services and products, events and food and beverages.

<u>Person</u>: "Person" means any person, individual, partnership, corporation, limited liability company, joint venture company, association or other entity of whatever kind, whether or not for profit, including, but not limited to, any "person" as that term is defined in Section 101(41) of the Bankruptcy Code, but excluding any Governmental Units.

<u>Petition Date</u>: "Petition Date" means October 28, 2010.

<u>Plan</u>: "Plan" means this Chapter 11 Plan of Reorganization, Dated as of February 28, 2010, filed by the Debtor-in-Possession, and all schedules and other exhibits hereto, as well as any amendments, supplements, or modifications submitted by the Debtor-in-Possession in a manner consistent with the provisions of this Plan and the Bankruptcy Code.

<u>Plan Distribution Period</u>: "Plan Distribution Period" means the period commencing on the Effective Date and, for Unsecured Creditors, continuing for a period of five years, with Distributions being made on a quarterly basis, and for Secured Lender, continuing for a period of ten years, with Distributions being made on a monthly basis on the 15th day of each month.

<u>Priority Claim</u>: "Priority Claim" means any Claim entitled to priority pursuant to Bankruptcy Code §§ 507, 503, or other applicable law.

<u>Principal</u>: "Principal" shall mean the amount of principal due to Secured Lender, as of the Petition Date, pursuant to the terms of the Promissory Note and Mortgage executed by the Debtor in favor of Secured Lender as determined by the value of the Property collectively valued at $13,857,816.67.

<u>Proof of Claim</u>: "Proof of Claim" means any proof of claim filed with the Bankruptcy Court with respect to the Debtor pursuant to Bankruptcy Rules 3001 and 3002.

<u>Proof of Interest</u>: "Proof of Interest" means any proof of interest filed with the Bankruptcy Court with respect to the Debtor pursuant to Bankruptcy Rule 3002.

<u>Personal Property</u>. "Personal Property" means any assets owned by the Debtor, other than the Property, described below.

<u>Property</u>: "Property" means of the real property and improvements as more particularly described on **Exhibit "B"** to the Disclosure Statement filed in support of this Plan.

<u>Rejected Contracts</u>: "Rejected Contracts" means those executory contracts and/or unexpired leases either affirmatively rejected or not assumed prior to confirmation of this Plan.

<u>Schedules</u>: "Schedules" means the schedules and summary of schedules, and any amendments thereto, filed in this Chapter 11 case by the Debtor.

<u>Secured Claim</u>: "Secured Claim" means an Allowed Claim of a Creditor which is secured by a lien on any property of the Debtor's estate, and with respect to the Allowed Claim of a Creditor which is secured by a lien on any property of the other Estate Assets, to the extent of the value, determined pursuant to Bankruptcy Code § 506(a), of such Creditor's interest in the estate's interest in such property, or, in the absence of a Final Order determining secured status, the entire amount of the Allowed Claim as indicated in the corresponding Proof of Claim. Except where the Claim arises from a nonrecourse loan, if the value of such Creditor's interest in the Debtor's interest in the subject property is less than the amount of the Allowed Claim, then such deficiency shall constitute an Unsecured Claim. "Secured", when used as an adjective modifying the term "Claim", has the same corresponding meaning.

<u>Secured Lender</u>: "Secured Lender" or "Wells Fargo," as appropriate, means Wells Fargo Bank.

<u>Subordinated Claim</u>: "Subordinated Claim" means any Allowed Claim which this Court, by separate Order of this Court, including the Confirmation Order, subordinates pursuant to 11 U.S.C. §510(c).

Trade Creditor: "Trade Creditor" means any person or entity which holds a Claim by virtue of amounts owed by the Debtor for products or services supplied or rendered in furtherance of Operations.

Unexpired Leases: "Unexpired Leases" means any leases of real or personal property described as unexpired leases within the meaning and effect of 11 U.S.C. § 365 which will be either Assumed Contracts or Rejected Contracts under this Plan.

Unsecured Claim: "Unsecured Claim" means any Claim, held by the Non-Insider Creditors of the Debtor, other than an Administrative Expense Claim, Priority Claim, Secured Claim, or Tax Claim, and includes (a) the deficiency portion of an undersecured Claim, (b) the Claims of Insiders (as that term is defined above), and (c) any Claims for contract or lease rejection damages.

Unsecured Creditor: "Unsecured Creditor" means any Creditor holding an Unsecured Claim.

9.03    Severability.    If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

9.04    Binding Effect.    The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

9.05    Captions.    The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

9.06    Controlling Effect.    Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Florida and those of the United States govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**ARTICLE X**
**EFFECT OF CONFIRMATION**


10.01   Binding Effect of Confirmation.   In accordance with § 1141(a) of the Bankruptcy Code, the provisions of a confirmed plan bind the Debtor, any entity issuing securities under the Plan, any entity acquiring property under the Plan, and any Creditor, equity security holder, or general partner in the Debtor, whether or not the Claim or Interest of such Creditor, equity security holder or general partner is impaired under the Plan and whether or not such Creditor, equity security holder or general partner has accepted the Plan.


10.02   Limitation on Guarantor Liability.   Additionally, based upon the contributions of: (A) in excess of $2,000,000.00 in working capital and (B) the pledge of equity security interests in unrelated business ventures to provide additional means for execution of the Plan obligations, the Guarantors shall have no liability to Secured Lender over and above the Net Principal owed to Secured Lender, to be determined as outlined above.   Furthermore, any action against any of the Guarantors shall be stayed indefinitely pending the making of the monthly payments to Secured Lender during the Plan Distribution Period, as outlined above.

# ARTICLE XI
## OTHER PROVISIONS

### 11.1    Confirmation Order

The Confirmation Order shall contain all injunctions, including those set forth in Articles V and X above, and other orders that may be necessary to implement the Plan.  To the extent necessary, the Confirmation Order shall contain any such provisions as may be necessary to provide for the substantial consummation of the Plan on the Effective Date.

### 11.2    No Admissions

This Plan provides for the resolution, settlement, and compromise of all Claims against the Debtor, including those claims against third parties derived from Claims against the Debtor. No proposed course of conduct contemplated herein shall be construed as legally or equitably binding upon the Debtor, or any other party, prior to the Confirmation Date.

### 11.3    Amendments

The Debtor retains the right to amend, modify, or supplement this Plan at any time prior to or after the Confirmation Hearing, to the full extent that this is authorized by law.  Notice of any such amendment which materially adversely affects any Creditors or Equity Security Holders shall be sent to such parties as the Bankruptcy Court may direct.

### 11.4    Notices

All notices, motions, objections, or affidavits required by this Plan to be served on the Debtor-In-Possession or Reorganized Debtor shall be in writing, addressed as follows:

Steven M Berman, Esq. and
Hugo S. deBeaubien, Esq.
Shumaker, Loop & Kendrick, LLP
101 E. Kennedy Blvd, Suite 2800
Tampa, FL  33602

and shall be sent by United States first class mail or overnight delivery service or shall be made by hand delivery, but telecopy transmission alone shall not suffice as valid notice pursuant to this Plan.

11.5    Construction

Where not inconsistent or in conflict with the provisions of this Plan, the words and phrases used herein shall have the meanings ascribed thereto in the Bankruptcy Code and in the Bankruptcy Rules.


11.6    Dates

Rule 9006 of the Federal Rules of Bankruptcy Procedure shall govern the calculation of any dates or deadlines referenced in the Plan.


11.7    Substantial Consummation

The Plan shall be deemed substantially consummated immediately upon the occurrence of the Effective Date and the Initial Distribution to the Unsecured Creditors and the Secured Lender.  Upon such substantial consummation, the Debtor may request the Bankruptcy Court to enter a Final Decree closing the case and for such other orders that may be necessary and appropriate.

11.8   Surcharge

The Debtor retains the right to bring any appropriate claims to surcharge the collateral of any Secured Creditors pursuant to 11 U.S.C. §506 and other applicable law.


Dated: March 8, 2011


Respectfully submitted,

By: /s/ William E. Touloumis
    **WILLIAM E. TOULOUMIS**
    *Managing Member, Olympia Investment Group, LLC, as Managing Member of the Debtor*

-and-

By: /s/Steven M. Berman
    **STEVEN M. BERMAN, ESQ.**
    Florida Bar No. 856290
    sberman@slk-law.com
    **HUGO S. DEBEAUBIEN, ESQ.**
    Florida Bar No. 058100
    bdebeaubien@slk-law.com
    101 E. Kennedy Blvd., Suite 2800
    Phone (813) 229-7600
    Facsimile (813) 229-1660
    *Attorneys for the Debtor*