# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

In re:

**S.H.S. RESORT, LLC**                    **Case No.: 8:10-bk-25886-MGW**
                                          **Chapter 11 Case**

          **Debtor.**
_____/

## ORDER PRELIMINARILY
## GRANTING AMENDED MOTION FOR ENTRY OF AN
## ORDER AUTHORIZING SALE OF REAL PROPERTY FREE
## AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES (Doc. 233)

This case having come on for hearing on May 25, 2011, on the Debtor's Amended Motion for Entry of an Order Authorizing Sale of Real Property Free and Clear of All Liens, Claim and Encumbrances (Doc. 233)("Amended Motion to Sell"), this Court having heard argument from counsel for the Debtor, counsel for German American Capital Corporation, and counsel for the City of Safety Harbor, this Court having reviewed the Amended Motion to Sell and being otherwise familiar with the papers and pleadings in this case, for the reasons stated orally and in open court which shall constitute the record of this Court, accordingly, it is

**ORDERED**:

1.       The Amended Motion to Sell is hereby granted on a preliminary basis, as further set forth herein.

2.       The Debtor is hereby authorized to sell the property generally described in the Amended Motion to Sell ("Property") to the City of Safety Harbor ("the City" or "Primary Buyer", as appropriate) ("City Sale"), and to enter into that certain Agreement for Purchase and Sale which was executed by the City on May 20, 2011 ("City Contract"), pursuant to the City Contract, a copy of which is attached hereto as Exhibit "A", subject to the Court's final approval

before the Sale may be consummated and become final.  In order for the Court to issue final approval, the Court will consider the following terms and conditions:

a. The Debtor and the City's ability to agree upon and execute an agreement (or agreements), as appropriate, regarding the permitted uses of the Property to be sold. Such agreement shall be subject to final approval by this Court.

b. The Debtor and the City's ability to agree upon the final area, location, and boundaries of the Property to be sold.

c. The City's survey of the Property to be sold.

d. The City's appraisal of the Property to be sold.

e. The exact purchase price to be paid by the City, based on the final determination of the property to be sold to the City, its location, and the survey and appraisal of the Property to be sold.

3. The precise terms of the Sale, once finalized, shall be subject to approval by the City Commission for the City of Safety Harbor before the sale may be consummated and become final.

4. In the event that any of the foregoing conditions are not satisfied or in the event that this Court shall, for any reason, not enter a final order approving the City Sale, the Debtor is hereby authorized to pursue sale of the property described in the Amended Motion to Sell to Investment Properties Revocable Trust ("IPRT" or "Back-up Buyer", as appropriate) ("IPRT Sale"), pursuant to that certain Purchase Agreement which was executed by IPRT and the Debtor on March 9, 2011 ("IPRT Contract"), a copy of which is attached hereto as Exhibit "B", subject to the entry of a final order by this Court approving the IPRT Sale.

5. This Court finds both the Primary Buyer and the Back-up Buyer are both purchasers acting in good faith within the meaning and effect of 11 U.S.C. §363(m) and both the Primary Buyer and the Back-up Buyer are entitled to the protections afforded therein.

6.      The proceeds from either the City Sale or the IPRT Sale shall be used and distributed in accord with the Debtor's Second Amended Plan of Reorganization, dated as of April 6, 2011 (Doc. 175)("Plan"), as well as the Order entered thereon.

7.      This Court shall conduct a continued (non-evidentiary) hearing on the Amended Motion to Sell on July 27, 2011, at 1:30 p.m. at the Sam M. Gibbons United States Courthouse, 801 N. Florida Ave, Courtroom 8A, Tampa, Florida, 33602, at which time this Court will finally consider any remaining Objections as previously filed by the Pinellas County Tax Collector (Doc. 174), Helios AMC (Doc. 179) and the City of Safety Harbor (Doc. 182), the terms and conditions set forth above, and, if appropriate, will issue its final order on the Amended Motion to Sell.

June 02, 2011

**DONE** and **ORDERED** in Chambers at Tampa, Florida, on _____.

_____
Michael G. Williamson
United States Bankruptcy Judge

**Copies furnished to:**
**Steven M. Berman, Esq.**, 101 E. Kennedy Blvd, Suite 2800, Tampa, FL 33602
**Hywel Leonard, Esq.,** 4221 W. Boy Scout Blvd, Suite 1000, Tampa, FL 33607
**Nicole Nate, Esq.,** 2570 Coral Landings Blvd, Suite 201, Palm Harbor, FL 34684
**Forlizzo Law Group,** 2903 Rigsby Lane, Safety Harbor, FL 34695
**Local Rule 1007(d) Matrix**
**Office of the United States Trustee**, 501 E. Polk St., Suite 1200, Tampa, FL 33602

## AGREEMENT FOR PURCHASE AND SALE

THIS AGREEMENT, made and entered into by and among S.H.S RESORT, LLC, a Florida limited liability company (hereinafter called the *"Seller"*), and THE CITY OF SAFETY HARBOR, a municipal corporation existing under the laws of the state of Florida (hereinafter called the *"Buyer"*). The date upon which the later of the Seller and Buyer execute this Agreement shall be referred to as the *"Effective Date."*

### W I T N E S S E T H:

That for and in consideration of the sum of TEN DOLLARS ($10.00) and other good and valuable consideration in hand paid by each of the parties to the other, the receipt whereof is hereby acknowledged each from the other, and in further consideration of the mutual promises, covenants and agreements herein contained, Buyer and Seller, intending to be legally bound, hereby agree as follows:

1. <u>PROPERTY</u>. Seller hereby agrees to sell, assign, transfer, and convey to Buyer, and Buyer hereby agrees to purchase from Seller, all of Seller's right, title and interest in that certain real and personal property described as follows:

    a. <u>Land</u>. Seller's fee simple interest in that certain approximately fifteen (15) acre parcel of real property located in Pinellas County, Florida (hereinafter called the *"Land"*), more particularly described in **Exhibit "A"** attached hereto and incorporated herein by reference. The Land is depicted on the sketch attached hereto as **Exhibit "B"** and incorporated herein by reference. The attached sketch is for informational purposes only and in the event of any conflict between it and the Survey to be obtained by Buyer pursuant to Paragraph 6 of this Agreement, the Survey shall control.

    b. <u>Improvements</u>. All structures, parking areas, sidewalks, landscaping, utilities, fixtures and improvements situated thereon, owned by Seller and located on or used in connection with the Land, and all appurtenances thereto, now or hereafter located upon the Land (hereinafter called the *"Improvements"*).

    c. <u>Easements</u>. All easements, rights of way, licenses, privileges, hereditaments and appurtenances, belonging to or inuring to the benefit of the Land and/or Seller, including without limitation the easement for ingress and egress described in Exhibit "A" attached hereto and incorporated herein by reference, and all right, title and interest of Seller in and to the land lying within a street or roadway adjoining the Land and all right, title and interest of Seller in and to any strips, gores, and other pieces of land and any vacated or hereafter vacated street(s) or road(s) adjoining the Land, and all right, title and interest of Seller, if any, in and to any award to be made in lieu thereof and in and to any unpaid award for damage to the Land by reason of change of grade of any street.

    d. <u>Personal Property</u>. All furniture, furnishings, fixtures, machinery, equipment and other items of personal property of every kind, description or nature whatsoever owned by Seller that is now or at the time of Closing, as hereinafter defined, shall be located in or upon or

00156425.DOCSLK_TAM: #1346678v4

affixed to the Land or the Improvements or easements, or any part thereof (hereinafter called the "***Personal Property***"), and Seller shall not remove any portion of said Personal Property prior to the Closing of this transaction of purchase and sale, unless replaced in kind and value or unless approved by Buyer in writing.

        e. <u>Intangible Personal Property</u>. All of Seller's right, title and interest in and to all deposits, licenses, governmental approvals, permits, contracts and other intangible rights pertaining in any way to the operation of the Land, the Improvements, easements, and/or Personal Property (hereinafter called the "***Intangible Property***").

All of the foregoing items referenced in this Paragraph 1 may hereinafter be collectively referred to as the "***Property***."

    2. <u>PURCHASE PRICE FOR PROPERTY</u>. The full purchase price for the Property (hereinafter called the "***Purchase Price***") shall be Four Million Nine Hundred Fifty-Two Thousand Nine Hundred Eighty-Nine and 80/100 U.S. Dollars ($4,952,989.80), calculated as follows and subject to the following conditions:

    (a) Four Million Four Thousand Seven Hundred Seventy-Five and 72/100 Dollars ($4,004,775.72) based on a per square-foot purchase price equal to Ten and 33/100 U.S. Dollars ($10.33) for the approximately 8.9 acres of upland property depicted on Exhibit B attached hereto as "Recreation/Open Space" (hereinafter referred to as "***Property A***") subject to adjustment based upon the exact square footage of Property as determined by the survey to be obtained by Buyer pursuant to paragraph 6 below The resulting purchase price for Property A shall be further subject to confirmation by an appraisal obtained by Buyer based on active recreational uses. If the appraised value of Property A is less than $10.33 per square foot, the parties will renegotiate the purchase price of Property A. If the parties cannot agree to a new purchase price, the City may terminate this Agreement as it relates to Property A; plus

    (b) Thirty-Seven Thousand Three Hundred Seventy-Four and 48/100 U.S. Dollars ($37,374.48) based on a per square-foot purchase price equal to Zero and 13/100 U.S. Dollars ($0.13) for the approximately 6.6 acres of submerged/wetland area shown on Exhibit B as "Wetland Area" (hereinafter referred to as "***Property B***") subject to adjustment based upon the exact square footage of Property as determined by the survey to be obtained by Buyer pursuant to paragraph 6 below The resulting purchase price for Property B shall be further subject to confirmation by an appraisal obtained by Buyer based on preservation use. If the appraised value of Property B is less than $0.13 per square foot, the parties will renegotiate the purchase price of Property B. If the parties cannot agree to a new purchase price, the City may terminate this Agreement as it relates to Property B; plus

    (c ) Nine Hundred Ten Thousand Eight Hundred Thirty-Nine and 60/100 U.S. Dollars ($910,839.60) based on a per square-foot purchase price equal to Thirteen and 94/100 U.S. Dollars ($13.94) for that certain approximately one and one-half (1.5) acres depicted on Exhibit "B" as "+/- 1.5 AC" (hereinafter referred to as "***Property C***") subject to adjustment based upon the exact square footage of Property as determined by the survey to be obtained by Buyer pursuant to paragraph 6 below. The resulting purchase price for Property C shall be further subject to

confirmation by an appraisal obtained by Buyer based on the permissible uses of the current zoning classification of Property C. If the appraised value of Property C is less than $13.94 per square foot, the parties will renegotiate the purchase price of Property C. If the parties cannot agree to a new purchase price, the City may terminate this Agreement as it relates to Property C.

The Purchase Price shall be computed based on the exact size of the properties, computed to the nearest one one-thousandth (1/1000) of an acre, as shown on the survey to be provided to Buyer pursuant to paragraph 6 of this Agreement.

Notwithstanding the foregoing, Buyer and Seller agree that if Buyer or Seller makes a written request within ten (10) days of the Effective Date for Seller to retain a portion of the Land pursuant to this paragraph then, during the Inspection Period (defined below), the parties shall reasonably cooperate with one another to identify an approximately one and one-half (1.5) to two and one-half (2.5) acres of the Property to be retained by Seller (the "Carve-Out Parcel"), in a location mutually acceptable to both Buyer and Seller, as approved by the Safety Harbor City Commission. Upon agreeing to the location of the Carve-Out Parcel and approval of the location by the Safety Harbor City Commission, Buyer and Seller shall enter into an Amendment to this Agreement pursuant to which the Carve-Out Parcel will be legally described, and the Purchase Price adjusted accordingly. The Purchase Price shall be reduced based upon the per square-foot purchase prices for Property A, Property B and Property C set forth above, depending upon location of the Carve-Out Parcel (*for example: if the Carve-Out Parcel is located within Property A, the Purchase Price would be reduced by an amount equal to $10.33 per square foot of property included within the Carve-Out Parcel; if portions of the Carve-Out Parcel are located in both Property A and Property C, then the Purchase Price would be reduced by an amount equal to $10.33 per square foot of property located within Property A, and $13.94 per square foot of property lying within Property C*). In the event the parties have not agreed upon the location of the Carve-Out Parcel and entered into an Amendment to this Agreement as set forth in this paragraph prior to expiration of the Inspection Period, then either party may terminate this Agreement by providing written notice of such termination to the other party and to Escrow Agent, upon which the Escrow Agent shall refund the Escrow Deposit to Buyer, this Agreement shall be of no further force and effect, and the parties shall have no further obligation hereunder.

The Purchase Price shall be payable as follows:

(i) Buyer shall deposit with Zimmet, Unice & Salzman, P.A. (hereinafter referred to as "*Escrow Agent*") an amount equal to five percent (5%) of the Purchase Price by cashiers' check or wire transfer within five (5) days of approval of this Agreement by the Safety Harbor City Commission, which amount hereinafter shall be referred to as the "*Escrow Deposit*," and which shall be credited to Buyer and paid to Seller at Closing subject to the terms of this Agreement. Escrow Agent agrees and is instructed by the parties hereto to accept and hold the Escrow Deposit in escrow, in a non-interest bearing trust account with a federally insured commercial bank in the State of Florida, pursuant to the terms of this Agreement and for the purposes herein expressed. In the event that Buyer properly elects to cancel this Agreement pursuant to any provision hereof, the Escrow Deposit, shall be returned to Buyer forthwith.

(ii) At Closing of this transaction, Buyer shall pay a sum equal to the difference between the Purchase Price and the amount of the Escrow Deposit that may be credited to Buyer in accordance with the provisions of the prior subparagraph. Said sum shall be subject to prorations, credits, and adjustments permitted or required by this Agreement, and shall be paid by wire transfer of immediately available funds, or by certified or cashier's check drawn on a Florida banking institution.

## 3. CLOSING; CONDITIONS TO CLOSING.

a.      Closing of the purchase and sale of the Property (the "*Closing*") shall occur on or before thirty (30) days after the last day of the Inspection Period (the "*Closing Date*"), subject to satisfaction of all Closing Contingencies set forth in section 3(b) below. Closing shall take place at the offices of Escrow Agent, which shall act as closing agent for this transaction.

b.      Conditions to Buyer's Obligations. The obligation of Buyer to consummate the Closing is subject to the satisfaction, as of Closing, of each of the following "*Conditions to Closing*" (any of which may be waived in whole or in part in writing by Buyer at or prior to Closing):

(i)      *City Commission Approval.* The purchase of the Property must have been approved by the Safety Harbor City Commission; and

(ii)      *Required Permits.* Any and all permits, licenses or qualifications from governmental bodies having jurisdiction over the Property that are required for Buyer's Intended Use (defined below) of the Property, including without limitation any zoning approval(s) shall have been obtained; and

(iii)      *Access Easement.* Buyer and Seller shall have agreed upon the form of an easement agreement, if necessary, to allow Buyer and its patrons pedestrian and/or vehicular access to the Property. The location of such easement must be determined and agreed-upon by Buyer and Seller; and

(iv)      *Restrictions and Easement Agreement.* Buyer and Seller shall have agreed upon the form of a Declaration of Covenants, Conditions and Easements, subject to approval by the Safety Harbor City Commission, which document shall restrict Buyer's use and development of the Property, excluding Property C, to active recreational uses (hereinafter, "*Buyer's Intended Use*").

(v)      Prior to Closing, any of the warranties and representations of Seller contained in this Agreement shall prove untrue or incorrect, or at the time of Closing shall no longer be true and correct;

(vi)      Seller shall have failed to honor or fulfill any covenant or undertaking of Seller pursuant to any provision of this Agreement after 20 days' notice of default;

00156425.DOCSLK_TAM: #1346678v4

(vii)   Prior to Closing, conditions or restrictions are placed on the development of the Property as contemplated by this Agreement, by federal, state, or county or municipal bodies, laws, regulations or ordinances, which would cause a delay in development of the Property for Buyer's Intended Use, and which Seller has not satisfied or otherwise cured so as to prevent such delay;

(viii)   Title Company is not committed to issue to Buyer the title insurance policy required pursuant to this Agreement;

(ix)   Any other event shall have occurred which gives Buyer the right to termination pursuant to any other provision of this Agreement.

In the event that any of the foregoing Conditions to Closing have not been achieved on or prior to the Closing date, Buyer may terminate this Agreement by providing written notice thereof to Seller, and in such event Escrow Agent shall return the Escrow Deposit to Buyer, and this Agreement shall be thereupon null and void and all rights and obligations of the parties shall terminate.

4. <u>INSPECTION</u>.  Buyer and Buyer's representatives shall have a period of one hundred twenty (120) days subsequent to the Effective Date (hereinafter called the "*Inspection Period*") during which Buyer, Buyer's agents, contractors, employees and representatives, shall have the right and opportunity to:

a.   Conduct physical inspections of the Property;

b.   Conduct a review of the applicable zoning and building codes, and confirm that the Property conforms to all such laws;

c.   Conduct a complete environmental audit of the Property, including without limitation, an inspection of the subsurface soils, upland habitats and wildlife species, wetlands, and flood plain classifications;

d.   Conduct a survey of the Property;

e.   Conduct an investigation as to availability of utilities and applicable service areas of the Property;

f.   Conduct a review of the title to the Property;

g.   enter upon the Property so as to be able to perform all inspections, surveys, studies and audits set forth in this Paragraph 4;

provided, however, that: (i) Buyer shall promptly repair any damage to the Property caused by any of the foregoing; (ii) Buyer shall pay all costs and expenses incurred in connection with the foregoing; and, (iii) Buyer shall indemnify and save Seller harmless of and

from all losses, costs, injuries, damages and liability of any kind arising out of or in connection with Buyer's activities on the Property, including the acts and omissions of Buyer's agents, employees, architects, engineers and other personnel. Nothing contained herein shall be considered a waiver of any immunity from or limitation of liability the Buyer may be entitled to under the doctrine of sovereign immunity or Section 768.28, Florida Statutes.

Notwithstanding the foregoing, the Inspection Period may be extended by Buyer for an additional period of up to thirty (30) days, upon Buyer delivering written notice of such Inspection Period extension prior to expiration of the original Inspection Period. In such case, the Closing Date shall be extended for an equal number of days, accordingly.

Seller agrees that it will cooperate with Buyer in such inspections by giving Buyer reasonable access to the Property, and by assisting Buyer in obtaining relevant documents in the possession or control of others, provided that all out-of-pocket costs and expenses in connection therewith are paid by Buyer.

If, during the Inspection Period, Buyer determines that the Property is acceptable, Buyer shall provide written notice of acceptance to Seller, prior to expiration of the Inspection Period. In the event Buyer determines, in its sole discretion, that a portion of the Property is unacceptable, Buyer shall provide written notice to Seller and may reduce the size of the Property purchased under this Agreement by the portion identified as unacceptable and the Purchase Price shall be reduced accordingly. In the event the Buyer fails to provide written notice of acceptance to Seller at or before expiration of the Inspection Period, this Agreement shall terminate and be of no further force and effect, whereupon (i) Escrow Agent shall return the Escrow Deposit to Buyer, and (ii) this Agreement shall be thereupon null and void and all rights and obligations of the parties shall terminate.

5. TITLE INSURANCE. Buyer shall, within fifteen (15) days of the Effective Date, obtain a written title insurance commitment from Old Republic National Title Insurance Company (hereinafter referred to as the "*Title Company*"), through Escrow Agent, for the issuance of an ALTA Form "B" Standard Florida Policy of title insurance, insuring Buyer's fee simple interest in the Property, in the full amount of the Purchase Price, together with legible copies of all instruments disclosed therein as affecting title to the Property (hereinafter called the "*Title Commitment*"). The Title Commitment shall reflect that Seller has a marketable, record fee simple title in and to the Property, subject only to ad valorem real property taxes for the year of closing, zoning ordinances (provided that the same do not prohibit any existing use of the Property and are consistent with all terms, representations and warranties contained in this Agreement), such exceptions as Buyer may agree to in writing (the foregoing matters shall hereinafter be referred to as the "*Permitted Exceptions*"), and to matters which shall be fully discharged and removed to Buyer's satisfaction at or prior to Closing (which matters shall not be deemed Permitted Exceptions as that term shall hereinafter be employed). The cost and expense for the Title Commitment search and examination fee shall be paid by Seller.

If the Title Commitment discloses that Seller does not hold fee simple title to the Property, or that such interest in the Property is subject to any liens, encumbrances, easements, restrictions or other matters other than the Permitted Exceptions, that are unacceptable to Buyer,

Buyer shall notify Seller, in writing, on or before ten (10) days following Buyer's receipt of the Title Commitment, specifying the matters which exist with respect to the title to the Property that are unacceptable to Buyer (hereinafter called the "*Title Defects*"). Upon receipt of such notice, Seller shall use good faith and diligent efforts, to cure all Title Defects to the satisfaction of the Buyer, during a period of thirty (30) days subsequent to the date of receipt of such notice, and this transaction shall be closed on or before twenty (20) days after the Buyer notifies the Seller in writing that the Title Defects have been removed to Buyer's satisfaction and have been removed from the Title Commitment, but not earlier than the date for Closing provided for under Paragraph 3 above. Notwithstanding any provision of this Agreement to the contrary, Seller agrees to use the Seller's proceeds of Closing to cure any liens (including, without limitation, mortgages, judgments and mechanics' liens) affecting title to which proper objection has been made by Buyer, and Buyer agrees that Seller may use Seller's Closing proceeds for such purpose. If Seller fails to cure any Title Defects at or prior to the end of the aforesaid thirty (30) day period, then, at Buyer's option, (i) Buyer may cancel this Agreement, whereupon the Escrow Deposit shall be returned to Buyer upon demand therefor and all rights, obligations and liabilities of the parties under this Agreement shall terminate, or (ii) Buyer may elect to purchase the Property in the same manner as if no Title Defects had been found, without reduction of the Purchase Price, but Buyer shall not thereby waive any remedies for such Title Defects, except that Buyer shall release Seller from any liability therefor and from any obligation to share in or otherwise be responsible for the payment of any costs which are incurred in connection with any effort to cure such Title Defects. These shall be the sole remedies of Buyer in the event of a Title Defect. Seller shall pay the premium for the policy of title insurance to be issued to Buyer at Closing. The title insurance policy shall be issued subject only to the Permitted Exceptions, and with all standard exceptions contained in the Title Commitment deleted (except for the Permitted Exceptions), and said policy shall be issued simultaneously with Closing; provided, that the requirements of this sentence shall be satisfied if the authorized agent of Title Company deletes and initials the "gap" exception in the Title Commitment, and deletes and initials all other exceptions contained therein, including all of the standard exceptions, except the Permitted Exceptions.

Seller shall furnish to Title Company, at Closing, with a Seller's Affidavit stating either that there have been no improvements made to the Property during the ninety (90) days immediately preceding the date of Closing, or, if there have been such improvements, that all lienors and potential lienors in connection with such improvements have been paid in full. The affidavit shall further state that there are no unrecorded easements or agreements affecting title to the Property, and that there are no parties entitled to possession thereof. The aforesaid affidavit is hereinafter referred to as the "*No-Lien and Possession Affidavit.*"

6. SURVEY. Buyer, at Buyer's sole cost and expense, may obtain a survey of the Land and all Improvements thereon prepared by a professional Florida land surveyor licensed to practice in the State of Florida and approved by Buyer (hereinafter referred to as the "*Survey*") and shall deliver a copy of the same to Seller not later than the end of the Inspection Period. The Survey shall be prepared in accordance with the Minimum Technical Standards for Land Surveying in the State of Florida, pursuant to Chapter 21HH-6, Florida Administrative Code, shall be certified to Buyer, Seller, Title Company, and Escrow Agent, and shall show all of the following:

00156425.DOCSLK_TAM: #1346678v4

       a. an accurate metes and bounds description of the overall perimeter boundaries of the Land;

       b. all improvements on the Land;

       c. the location of all easements and rights-of-way affecting or serving the Land or Improvements, including but not limited to any easements described on Exhibit "A" hereto;

       d. all encroachments on the Land, and all encroachments of any Improvements on the Land onto other lands or any easement;

       e. all matters necessary to cause the Title Company to delete the standard survey and unrecorded easement exceptions from the title insurance policy;

       f. the location of any easements necessary for the furnishing of off-site improvements;

       g. the total acreage of the Land;

       h. certification as to whether the Land is located in a floodplain; and

       i. all drainage ditches, canals, rivers, creeks, ponds, lakes, and other waterways located on or traversing the Land, if any; and

       j. show all dedicated public streets providing access and whether such access is paved to the Land.

If the Survey shows any encroachments on the Land or any easements appurtenant thereto, shows that any Improvements on the Land encroach on any easement or any other lands, shows lack of lawful access to the Land and Improvements over dedicated and publicly maintained streets or roads, is not sufficient to cause the unqualified deletion of the standard survey and unrecorded easement exceptions from the owner's title insurance policy, or shows any other state of facts rendering title to the Property unmarketable (collectively the "*Survey Defects*"), then written notice to that effect shall be given to Seller within the Inspection Period, and Seller shall have the same obligation and same time to remedy such Survey Defects as is allowed under this Agreement for curing Title Defects. If Seller fails to cure any Survey Defects at or prior to the end of the aforesaid period, then, at Buyer's option, (i) Buyer may cancel this Agreement, whereupon the Escrow Deposit shall be returned to Buyer upon demand therefor and all rights, obligations and liabilities of the parties under this Agreement shall terminate, or (ii) Buyer may elect to purchase the Property in the same manner as if no Survey Defects had been found, without reduction of the Purchase Price, but Buyer shall not thereby waive any remedies for such Survey Defects, except that Buyer shall release Seller from any liability therefor and from any obligation to share in or otherwise be responsible for the payment of any costs which are incurred in connection with any effort to cure such Survey Defects. These shall be the sole remedies of Buyer in the event of a Survey Defect.

7. <u>SELLER'S REPRESENTATIONS AND WARRANTIES</u>. Seller hereby makes the following representations and warranties, each of which is true as of the date hereof and all of which will be true on and as of the Closing Date:

a. <u>Title to Property</u>. Seller holds good, indefeasible and marketable title in and to all of the Land, subject only to the Permitted Exceptions.

b. <u>Authority of Seller</u>. Seller is a Florida limited liability company, organized and in good standing under the laws of the Florida, and upon entry of an Order Authorizing the Sale of Property Free and Clear of Liens by the United States Bankruptcy Court, Middle District of Florida, Tampa Division, in Case No.: 8:10-bk-25886-MGW, styled *In re: S.H.S. Resort, LLC, Debtor* (the "*Bankruptcy Case*"), will have the right and power to enter into this Agreement and sell the Property in fee simple in accordance with the terms and conditions hereof. The execution, delivery and performance of this Agreement by Seller have been duly and validly authorized by all necessary company action on the part of Seller and all required consents or approvals by the members of Seller have been duly obtained.

c. <u>Environmental Representations</u>. Seller warrants and represents that it has not performed and has no knowledge of any excavation, dumping or burial of any refuse materials or debris of any nature whatsoever on the Land. Seller represents and warrants to Buyer that to Seller's best knowledge and belief there are no Hazardous Materials (as defined below) on the Property that would subject Buyer to any liability under either Federal or state laws, including, but not limited to, the disposal of any foreign objects or materials upon or in the Land, lawful or otherwise. Without limiting the generality of the foregoing, Seller represents and warrants to Buyer that to the Seller's best knowledge and belief: (1) the Land is not now and has never been used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, process or in any manner deal with Hazardous Materials (as that term is hereinafter defined); (2) no Hazardous Materials have ever been installed, placed, or in any manner dealt with on the Land; (3) no owner of the Land or any tenant, subtenant, occupant, prior tenant, prior subtenant, prior occupant or person (collectively, "Occupant") has received any notice or advice from any governmental agency or any Occupant with regard to Hazardous Materials on, from or affecting the Land and (4) no radon or other radioactive materials are located on the Land. The term "Hazardous Materials" as used herein includes, without limitation, gasoline, petroleum products, explosives, radioactive materials, hazardous materials, hazardous wastes, hazardous or toxic substances, polychlorinated biphenyls or related or similar materials, asbestos or any material containing asbestos, or any other substance or material as may be defined as a hazardous or toxic substance by any Federal, state or local environmental law, ordinance, rule, or regulation including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Section 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801, et seq.) the Resource Conservation and Recovery Act, as amended (42 U.S.C. Section 1251, et seq.), the Clean Air Act, as amended (42 U.S.C. Section 7401, et seq.) and in the regulations adopted and publications promulgated pursuant thereto.

d. <u>No Special Taxes</u>. The Property is free from special taxes and assessments; more particularly, there are no assessments for public improvements or otherwise against the Property which remain unpaid, including without limitation, those for construction of sewer, water, gas and electric lines and mains, streets, roads, sidewalks and curbs and, to the best of Seller's knowledge, none have been proposed.

e. <u>Regulatory and Governmental Status of Property</u>.

(i) To the best of Seller's knowledge, there are no outstanding orders, requirements or demands of any federal, state or local government agency or of any other governmental body, including a court of competent jurisdiction (collectively, an "*Authority*") that have not been complied with, with respect to the Property. Any such orders issued to Seller prior to Closing will be complied with by Seller prior to Closing.

(ii) To the best of Seller's knowledge, other than the Bankruptcy Case and that certain case styled <u>*Wells Fargo Bank National Association vs. SHS Resort, LLC*</u>; Pinellas County Circuit Court Case No.: 10015705CI (the "Foreclosure Action") there are no proceedings, litigation or claims pending before an Authority with respect to the Property (or to Seller's knowledge is threatened); any documents which may hereafter be received by Seller in connection with such a proceeding will promptly be provided to Buyer. If any such proceedings are instituted after the date hereof and before Closing, Seller agrees to take such steps prior to Closing at Seller's own cost and expense, as may be necessary to terminate such proceedings.

f. <u>Leases</u>. There are no leases affecting the Property, and no party has any right to occupy or use the Property other than Seller. Between the date hereof and Closing, Seller will not make any new leases affecting the Property or any part thereof.

g. <u>Management Agreements and Service Contracts</u>. Seller shall furnish Buyer with a true, correct and complete copy of each maintenance, security, and/or service contract, business agreements and all other agreements, if any (the "*Service Contracts*") presently in force with respect to the Property within ten (10) days from the Effective Date hereof. Seller agrees, at Seller's sole expense, to cancel any Service Contract as of Closing upon Buyer's written request. The Service Contracts (if any) are now in full force and effect in accordance with their terms and conditions without any material default by Seller or the other parties thereto. There are no collective bargaining agreements or contracts (written or oral) to which Seller is a party. The Seller shall not amend the Service Contracts and shall not enter into any new Service Contracts or renew any existing Service Contract prior to Closing without first obtaining Buyer's prior written approval, unless such Service Contract is cancelable by Buyer within ten (10) days after Closing.

i. <u>Condemnation Proceedings; Roadways</u>.

(i) To the best of Seller's knowledge, there are no condemnation proceedings against the Property or any part thereof and the Seller has received no notice, oral or written, of the desire of any public authority or other entity to take or use the

Property or any part thereof. Seller shall deliver to Buyer within ten (10) days after Seller's receipt thereof copies of any such notices received through the date of Closing.

(ii) All roadways upon the Property connect to adjacent public streets. Seller has received no notice, oral or written, of any change or proposed change in the route, grade, width, or otherwise affecting any major street or road abutting the Property. If Seller receives any such notice, it promptly will give notice of same to Buyer.

j. Pending Litigation. Other than the pending Bankruptcy Case and the Foreclosure Action, Seller is not now a party to any litigation affecting the Property, and Seller knows of no litigation or threatened litigation affecting or which would affect the Property or any basis for any such litigation. To the best of Seller's knowledge, there is no proceeding pending for the reduction of the assessed valuation of the Property or any portion thereof. Seller shall give Buyer prompt notice of the institution prior to Closing of any such litigation.

k. No Encroachments. To the best of Seller's knowledge, any Improvements are completely within the boundary lines of the Land as described in Exhibit "A," any Improvements on the Property do not violate any setback requirements and no structure of any kind encroaches on the Land, and there are no material encroachments on or from the Property or on or from an easement, right-of-way or roadway.

l. Defaults As a Result of This Agreement. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will: (i) conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, any agreement or instrument to which Seller, or any predecessor of Seller, is a party; or (ii) violate any restriction to which the Seller is subject, including any charter, articles of incorporation, by-laws or similar documents; or (iii) constitute a violation of any applicable code, resolution, law, statute, regulation, ordinance, rule, judgment, decree, or order; or (iv) result in the creation of any lien, charge or encumbrance (except as provided for in this Agreement), upon any of the properties or assets to be sold or assigned to Buyer, pursuant to the provisions of this Agreement.

m. No Mechanic's Liens. All labor performed upon or material furnished for the Property will, as of Closing, be paid for.

n. Seller has no information or knowledge of any change contemplated in any applicable laws, ordinances, or regulations, or any judicial or administrative action, or any action by adjacent landowners, or natural or artificial conditions upon the Property which would prevent, limit or impede Buyer's development or use of the Property.

o. Seller has no knowledge of any failure to have complied with all applicable laws, ordinances, regulations, statutes, rules and restrictions pertaining to and affecting the Property. Performance of this Agreement will not result in any breach of, or constitute any default under, or result in the imposition of, any lien or encumbrance upon the Property under any agreement or other instrument to which Seller is a party or by which Seller or the Property might be bound. Seller shall comply, at its sole expense, with any and all environmental and

other applicable rules, regulations, and conditions of existing and future development or operational permits.

p. No written or verbal commitments have been made to any governmental authority, utility company, school board, church or other religious body, or any homeowners association, or to any other organization, group, or individual, relating to the Property which would impose an obligation upon Buyer or its successors or assigns to make any contribution or dedications of money or land or to construct, install, or maintain any improvements of a public or private nature on or off the Property.

q. Except as depicted on Exhibit B, no other part of the Property has been designated as wetlands or inhabited by any endangered species by any governmental agency having jurisdiction.

r. Seller has not failed to disclose to Buyer any known material adverse fact or condition regarding this Agreement, the Property or the transaction contemplated hereunder.

s. All information furnished to Buyer by or on behalf of Seller prior to the execution hereof or pursuant to the provisions of this Agreement is true and correct in all material respects and fairly and accurately reflects the condition or statement of facts reported to be described or represented thereby.

t. Buyer is the sole contract purchaser of the Property, including all surface and mineral estates.

u. There are no known surface faults, ground settling soil or subsoil conditions or similar problems from any cause on or in the vicinity of the Property which would restrict, impair or prohibit use of the Property in accordance with Buyer's intended use of the Property.

v. Seller shall deliver possession of the Property and all of the rights thereto at Closing.

w. <u>Events Pending Closing and Further Information</u>. Seller agrees to immediately notify Buyer, in writing, of any event or condition of which Seller has knowledge and which occurs prior to Closing hereunder, which causes a material change in the facts relating to, or the truth of any of the above representations. Seller has no knowledge or information of any facts or circumstances which would materially adversely affect the operation of the Property which are not set forth in this Agreement. Each of the warranties and representations contained in this paragraph and other paragraphs of this Agreement shall be deemed made as of the date of this Agreement and again as of the date of Closing. Seller's representations and warranties set forth in this Paragraph 7 shall be continuing and are deemed to be material to Buyer's execution of this Agreement and Buyer's performance of its obligations hereunder. All such representations and warranties shall be true and correct on and as of the Closing, and all of such representations and warranties shall survive the Closing Date or any cancellation or termination of this Agreement, and shall not be affected by any investigation, verification or approval by any party hereto or by anyone on behalf of any party hereto. Seller agrees to indemnify and hold Buyer

harmless for, from, and against any loss, costs, damages, expenses, obligations and attorneys' fees incurred should an assertion, claim, demand, action or cause of action be instituted, made or taken, which is contrary to or inconsistent with the representations or warranties contained herein.

8. <u>BUYER'S REMEDIES IN EVENT OF BREACH OF SELLER'S REPRESENTATIONS AND WARRANTIES</u>. All obligations of Buyer under this Agreement are subject to the fulfillment, at or prior to Closing, on the condition precedent that all representations, covenants, and warranties of Seller contained in this Agreement shall not only have been true and complete as of the Effective Date hereof, but shall also be true and complete again as of the Closing Date and Seller's performance of all covenants and obligations of Seller under this Agreement. If any of the representations and warranties contained in this Agreement are not true and correct both on the Effective Date of this Agreement and again as of the date of Closing, Buyer may elect to cancel this Agreement, in which event Buyer shall be entitled to a return of the Escrow Deposit and this Agreement shall thereupon be deemed null and void (but without prejudice to any right or remedy Buyer may have as a result of any breach of the representations and warranties contained herein), or Buyer may elect to close the sale without adjustment to the Purchase Price.

9. <u>SELLER'S DELIVERIES AND CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS</u>: In addition to other conditions precedent set forth elsewhere in this Agreement, Seller shall deliver to Buyer at Closing all of the following documents, the delivery and accuracy of which shall be a condition to Buyer's obligation to consummate the purchase and sale herein contemplated:

a. <u>Special Warranty Deed</u>. Seller shall convey title which is marketable, insurable, and indefeasible. An executed Special Warranty Deed reasonably satisfactory in form and substance to counsel for Buyer and in form for recordation, conveying all of seller's right, title and interest in and to the Land, free and clear of all liens, encumbrances, easements and restrictions except for the Permitted Exceptions as referred to in Paragraph 5 hereof.

b. <u>Bill of Sale</u>. A bill of sale, duly executed by Seller and transferring, assigning and conveying to Buyer (i) good and marketable title to all the Personal Property, and (ii) all rights of Seller in, to and under any leases of the Personal Property, if any.

c. <u>Seller's Authorization</u>. A certificate of Seller's good standing as a limited liability company in the State of Florida, together with a certified copy of the resolution of Seller's Board of Directors evidencing authorization of the officers or agents acting for Seller and authorization and approval of this Agreement and all transactions and deliveries contemplated hereby.

e. <u>No-Lien and Possession Affidavit</u>. Seller shall deliver an owner's affidavit in form sufficient and acceptable to the Title Company so as to allow it to eliminate the applicable standard owner's exceptions, including mechanic's lien, and gap exceptions from the commitment and policy, and otherwise reasonably acceptable to Buyer, and running to the benefit of Buyer, the Title Company, and the Title Agent.

00156425.DOCSLK_TAM: #1346678v4

f. <u>Non-Foreign Affidavit</u>. The Affidavit and/or any Withholding Document, as defined in and required by Paragraph 15 below.

g. <u>Settlement Statement</u>. A settlement statement in form reasonably acceptable to Buyer and Seller.

h. <u>Absolute Assignment of Leases, Permits, Licenses and Services Contracts</u>. Seller must execute and deliver to Buyer, in a form reasonably acceptable to Buyer, an absolute assignment of all leases, permits, licenses and service contracts affecting the Property, including without limitation all security deposits held by Seller in connection with any tenant leases.

i. <u>Other Documents</u>. Seller and Buyer shall execute and/or deliver all other documents required by this Agreement and/or Title Agent, including without limitation an Order of the United States Bankruptcy Court authorizing the sale of the Property to Buyer under the terms and conditions set forth in this Agreement.

Moreover, Seller shall deliver copies of forms of all of the forgoing documents, and all other documents which Seller is required to deliver under the terms of this Agreement, to Buyer's counsel, at the office of said counsel, for review and approval no later than three (3) days prior to Closing.

10. <u>PRORATED ITEMS AND ADJUSTMENTS</u>: The Buyer and Seller shall each pay their own legal fees related to the preparation of this Agreement and all documents required to settle the transaction contemplated hereby. At Closing, the following adjustments and prorations shall be computed as of midnight of the day preceding Closing and the cash portion of the Purchase Price shall be adjusted to reflect such prorations, as follows:

a. <u>Service Contracts and Other Accounts Payable; Insurance</u>. All prepayments made or payments due under any continuing service contract affecting the Property, including water, sewer, electric, gas, telephone and other utility bills, parking, garbage removal, promotional contracts and maintenance agreements and fees and expenses for music, entertainment, trade association dues and trade subscription, and management contracts, shall be prorated, and paid by the Buyer to the Seller, or vice versa, as the case may be. Seller shall be responsible for effecting all "change" notices for all utilities and other service contracts, and all such notices shall be delivered to the provider of the service prior to Closing. Any prepaid insurance premiums relating to policies which Buyer may elect to assume, in its sole discretion, shall be prorated. Seller shall bear all costs for canceling any and all insurance policies, management contracts and other service contracts not assumed by Buyer, and Seller shall cause all such cancellations to occur prior to or as of Closing.

b. <u>Real Property Taxes</u>. Seller acknowledges that Buyer is exempt from real property taxation. At Closing, real estate taxes and assessments for the Property for the year within which the Closing occurs shall be prorated and paid in accordance with the procedures established by §196.295, <u>Florida Statutes</u>. Seller shall remain responsible and liable for all taxes regardless of when accrued and payable based on Seller's ownership.

00156425.DOCSLK_TAM: #1346678v4

c. <u>Personal Property Taxes</u>. Personal property taxes attributable to the Personal Property, if any, shall be paid by Seller.

d. <u>Special Assessments</u>. All special assessments and other similar charges which affect or have become a lien upon the Property at Closing shall, at the Buyer's option, either be paid in full by Seller at Closing or credited against the cash portion of the Purchase Price and assumed by Buyer. If an assessment may be paid in installments, all installments shall be deemed payable as of the day prior to Closing and shall be discharged of record by Seller or Buyer shall be given credit therefor against the Purchase Price.

e. <u>Miscellaneous</u>. In the event accurate prorations and other adjustments cannot be made at Closing because current bills are not obtainable, the parties shall prorate on the best available information, subject to adjustment upon receipt of the final bill. Seller shall use its best efforts to have all Utility meters read on the date of Closing so as accurately to determine the proration of current Utility bills.

11. <u>CLOSING COSTS</u>. Buyer and Seller shall pay the costs of Closing as follows: Seller shall pay the title insurance premium and all other charges by the Title Company, the costs for preparation and recording of any required corrective title documents and state documentary stamp taxes on the warranty deed conveying title to Buyer; Buyer shall pay the cost of recording the warranty deed conveying title to the Buyer, all survey costs for the Survey, the costs associated with any financing obtained by Buyer, and the cost of all due diligence conducted by Buyer.

12. <u>CONDEMNATION</u>: In the event of condemnation or transfer in lieu thereof ("*Condemnation*") or receipt of notice of Condemnation of any material part of the Property by governmental authority on or prior to the date of Closing, Buyer may, at its election, terminate this Agreement and the full amount of the Escrow Deposit shall thereupon be returned to Buyer and the parties shall have no further obligation to one another under this Agreement. In the event that Buyer shall not elect to terminate this Agreement, then this Agreement shall remain in full force and effect, and Buyer shall be entitled to receive all awards, proceeds, deposits, and monies received or collected by reason of such condemnation and Buyer shall be entitled to control all negotiations with the condemning authority. Further, Seller shall assign and transfer to Buyer at Closing by written instrument all of Seller's right, title, and interest in any condemnation awards and proceeds.

13. <u>FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT PROVISION</u>. Except as otherwise provided herein, Buyer, pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended ("*Section 1445*") and the regulations promulgated thereunder ("*Regulations*"), shall be required to and shall withhold such amount as is necessary to comply with Section 1445 and the Regulations and shall timely remit to the Internal Revenue Service the amount so withheld along with properly completed remittance forms. If, however, on or before the date of Closing, Seller provides Buyer with (1) an Affidavit of Non-Foreign Status regarding Seller, (2) a Notice of Non-Recognition Treatment, or (3) a Withholding Certificate establishing that no, or a reduced, amount of federal income tax is required to be withheld under Section 1445 (collectively "*Withholding Document*") in proper form as required by the Regulations, and

00156425.DOCSLK_TAM: #1346678v4

Buyer has no knowledge or notice that the Withholding Document furnished by Seller is false, as determined in accordance with the Regulations, then Buyer shall not be required to withhold any portion of the amount payable to Seller or shall be allowed to withhold such lesser amount as is required by the applicable Withholding Document, as the case may be, and shall submit the amount so withheld to the Internal Revenue Service along with properly completed remittance forms.

14. BROKERAGE. Buyer and Seller hereby each represent and warrant to one another that neither has dealt with, consulted, or contacted any real estate broker, agent or finder in connection with or in bringing about the sale of the Property. Seller hereby agrees to defend, indemnify and hold Buyer harmless against claims by any broker, agent or salesman claiming by, through or under Seller, for a commission or other compensation in connection with the purchase and sale of the Property. Buyer hereby agrees to defend, indemnify and hold Seller harmless against any claims of any brokers, agents or salesmen claiming entitlement to a commission by, through or under Buyer in connection with the purchase and sale of the Property.

15. DEFAULT OF BUYER. In the event that Buyer defaults with respect to the performance of any or all of its obligations under this Agreement and such default continues for a period of thirty (30) days after delivery of written notice thereof from Seller to Buyer, the Escrow Deposit shall be paid by Escrow Agent to Seller as liquidated and agreed upon damages for the default of Buyer, and in full settlement of all claims, and this Agreement thereupon shall be deemed null and void. This shall be the sole and exclusive remedy of Seller in the event of any default by Buyer under this Agreement.

16. DEFAULT OF SELLER. In the event that Seller defaults with respect to the performance of any or all of its obligations under this Agreement or refuses to perform this Agreement, the Escrow Deposit shall be returned to Buyer, in full settlement of all claims, and this Agreement thereupon shall be deemed null and void. This shall be the sole and exclusive remedy of Seller in the event of any default by Buyer under this Agreement.

17. ATTORNEYS' FEES AND COSTS. In connection with any litigation or court proceedings arising out of this Agreement, the prevailing party shall be entitled to recover all costs incurred, including reasonable attorneys' and legal assistants' fees incurred for services rendered before suit is brought, prior to trial, at trial, on appeal, or in federal bankruptcy proceedings.

18. PROVISIONS WITH RESPECT TO ESCROW AGENT. Escrow Agent shall hold the Deposit in escrow in a non- interest-bearing trust account until the earlier occurrence of (i) Closing, (ii) election by Buyer to terminate this Agreement by reason of a specific right of termination granted to Buyer under this Agreement or (iii) breach of this Agreement by either party. Escrow Agent shall release and pay over to Seller the Deposit upon the earlier of (i) the Closing Date or (ii) Buyer's breach of or default under this Agreement. In the event of a proper termination, then the Deposit including all interest thereon shall be released by Escrow Agent and paid to Buyer. The tax identification numbers of the Parties shall be furnished to Escrow Agent upon request. If, for any reason, the Closing does not occur and either party makes a written demand upon Escrow Agent for payment of the Deposit, Escrow Agent shall give written

notice to the other party of such demand. If Escrow Agent does not receive a written objection from the other party to the proposed payment within five (5) business days after the giving of such notice, Escrow Agent is hereby authorized to make such payment. If Escrow Agent does receive such written objection within such five (5) business day period, Escrow Agent shall continue to hold such amount until otherwise directed by written instructions from the parties to this Agreement or a final judgment or arbitrators' decision. However, Escrow Agent shall have the right at any time to deposit the Deposit with the Clerk of the Court. Escrow Agent shall give written notice of such deposit to Seller and Buyer. Upon such deposit, Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

The parties acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that Escrow Agent shall not be deemed to be the agent of either of the parties for any act or omission on his part unless taken or suffered in bad faith in willful disregard of this Agreement or involving gross negligence. Seller and Buyer shall be responsible to reimburse Escrow Agent for all costs, claims and expenses, including reasonable attorney's fees, incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions or omissions taken by Escrow Agent in bad faith, in willful disregard of this Agreement or involving gross negligence on the part of the Escrow Agent.

The parties shall deliver to Escrow Agent an executed copy of this Agreement, which shall constitute the sole instructions to Escrow Agent. Buyer and Seller may elect, in their sole discretion, to execute preprinted escrow instructions; provided that in the event of any conflict between the preprinted escrow instructions and the provisions of this Agreement, the provisions of this Agreement shall control.

Escrow Agent, as the person responsible for closing the transaction within the meaning of Section 6045 (e) (2) (A) of the Internal Revenue Code of 1986 (the "Code"), shall file all necessary information reports, returns, and statements (collectively, the "tax reports") regarding the transaction required by the Code including, but not limited to, the tax reports required pursuant to Section 6045 of the Code.

19. NOTICES. Any notice or demand which must or may be given under this Agreement or by law shall be in writing and shall be deemed to have been given when delivered by personal delivery (and for the purposes of this Agreement receipt by telecopy at the notice addresses set forth below shall constitute personal delivery) or when deposited in the United States mail, certified, return receipt requested, full postage prepaid, addressed to the respective parties at the following addresses:

IF TO SELLER:                S.H.S. Resort, LLC
                            100 Main Street, Suite 206
                            Safety Harbor, Florida 34695
                            Facsimile: (727) ___-____

WITH A COPY TO:             Steven S. Berman, Esq.
                            Shumaker, Loop & Kendrick, LLP
                            101 East Kennedy Boulevard, Suite 2800
                            Tampa, Florida 33602

Facsimile: (813) 229-1660
sberman@slk-law.com

IF TO BUYER:                The City of Safety Harbor ATTN: City Manager
                            750 Main Street
                            Safety Harbor, Florida 34695
                            Facsimile: (727) 724-1566

WITH A COPY TO:             Alan S. Zimmet, Esq.
                            Zimmet, Unice & Salzman, P.A.
                            2570 Coral Landings Blvd., Suite 201
                            Palm Harbor, Florida 34684
                            Facsimile: (727) 723-1421
                            azimmet@zimmetunice.com

IF TO ESCROW AGENT:         Zimmet, Unice & Salzman, P.A.
                            2570 Coral Landings Blvd., Suite 201
                            Palm Harbor, Florida 34684
                            Attn: Alan S. Zimmet
                            Facsimile: (727) 723-1421
                            azimmet@zimmetunice.com

The foregoing addresses may be changed by the giving of a written notice as provided in this Paragraph. For the purposes of this Agreement, notice given to or by an attorney for any of the parties hereto shall be deemed notice to the party whom said attorney represents in connection with this transaction.

20. GENDER. Words of any gender used in this Agreement shall be held and construed to include any other gender; any words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.

21. CAPTIONS. The captions in this Agreement are inserted only for the purpose of convenient reference and in no way define, limit or prescribe the scope or intent of this Agreement or any part hereof.

22. CONSTRUCTION. The parties hereto acknowledge that with respect to the transactions contemplated herein (A) each party and its counsel has reviewed and revised this Agreement and that no term, covenant or provision of this Agreement shall be construed by any court, government, governmental authority or arbitration panel against any party hereto by reason of such party's being deemed to have drafted or structured such term, covenant or provision; (B) neither party has received from the other any accounting, tax, legal or other advice; and (C) each party has relied solely on the advice of its own accounting, tax, legal and other advisors.

23. ENTIRE AGREEMENT. This Agreement constitutes the entire understanding and agreement of the parties hereto and supersedes all prior understandings, if any, there being no

00156425.DOCSLK_TAM: #1346678v4

other oral or written promises, conditions, representations, understandings, or terms of any kind as conditions or inducements to the execution hereof and none have been relied upon by either party. Any subsequent conditions, representations, warranties, agreements or amendments to or modifications of this Agreement shall not be valid and binding upon the parties unless the same shall be embodied in a subsequent writing signed by the party to be charged thereby.

24. COUNTERPART EXECUTION. This Agreement may be executed by all parties in multiple counterparts, each of which shall be deemed an original, but all of such counterparts taken together shall constitute one and the same Agreement.

25. GOVERNING LAW. This Agreement shall be construed, governed, interpreted and enforced in accordance with the laws of the State of Florida. Jurisdiction for any state action arising out of this Agreement shall lie solely in the Sixth Judicial Circuit in and for Pinellas County, Florida, and for any federal action arising out of this Agreement shall lie solely in the U.S. District Court, Middle District of Florida, Tampa Division.

26. TIME. Any reference herein to time periods of fewer than seven (7) days shall in the computation thereof exclude Saturdays, Sundays and all legal holidays in Pinellas County, Florida. Any time period which shall end on a Saturday, Sunday or legal holiday in Pinellas County, Florida, shall automatically extend to 5:00 p.m. of the next full day which is not a Saturday, Sunday or such legal holiday. Time is of the essence of this Agreement and each and every term and provision hereof.

27. SUCCESSORS AND ASSIGNS. The terms, covenants and conditions of this Agreement shall inure to the benefit of, and shall be binding upon, the respective heirs, personal representatives, successors and assigns of the parties hereto.

28. ASSIGNMENT. This Agreement may not be assigned by Buyer.

29. **Survival.** Notwithstanding any presumption to the contrary, all obligations, covenants, conditions, representations, warranties and agreements of the Seller and Buyer contained in this Agreement shall be restated as true and correct as of Closing and survive the Closing contemplated herein.

30. **Partial Invalidity.** In the event that any paragraph or portion of this Agreement is determined to be unconstitutional, unenforceable or invalid, such paragraph or portion of this Agreement shall be stricken from and construed for all purposes not to constitute a part of this Agreement, and the remaining portion of this Agreement shall remain in full force and effect and shall, for all purposes, constitute this entire Agreement.

31. **Seller's Indemnification.** Seller hereby agrees to defend, indemnify, save and hold Buyer, its successors and assigns, harmless from and against any and all liabilities and claims regarding or relating to the Property, arising from personal injury, property damage and contractual liability existing or occurring on or before the Closing, or as a result of Seller's acts or omissions unless same arise from any negligent actions or activities of Buyer, its agents or employees. The obligations of Seller under this paragraph shall not be affected by an

investigation by or on behalf of Buyer, or by any information which Buyer may have or obtain, and shall be in addition to any other statutory claim or right of indemnification, contribution or for any other claim for breach of contract Buyer may have. The terms of this paragraph shall expressly survive the Closing.

32. **Waiver of Breach**. The failure of any party hereto to enforce any provision of this Agreement shall not be construed to be a waiver of such or any other provision, nor in any way to affect the validity of all or any part of this Agreement or the right of such party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year hereinafter listed. We have read and fully understand this Agreement.

**SIGNATURES WITNESSED BY:**            **SELLER:**

**S.H.S Resort, LLC**, a Florida limited liability company

_____            By: _____
Print Name:_____            Print Name: _____
                                       Title: _____
                                       Date: May _____, 2011
_____
Print Name:_____


                                       **BUYER:**

                                       **The City of Safety Harbor,** a municipal
                                       corporation existing under the laws of the state
                                       of Florida
                                       By: Matt McLachlan for Matt Spoor, City Manager
                                       Print Name: Matt McLachlan for Matt Spoor, City Mgr
                                       Title: Community Development Director
**ATTEST:**                            Date: May 20, 2011

_____
Print Name:_____
CITY CLERK
00156425.DOCSLK_TAM: #1346678v4

**Zimmet, Unice & Salzman, P.A.**

By: _____

    Alan S. Zimmet
    President

Date: _____

# EXHIBIT "A"

## DESCRIPTION OF SUBJECT PROPERTY

Exhibit A to Amended and Restated Mortgage with Absolute Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by S.H.S. RESORT, L.L.C., a Florida limited liability company, as Mortgagor for the benefit of Wells Fargo Bank, National Association, as Mortgagee, dated as of the Effective Date.

All the certain real property located in the County of Pinellas County, State of Florida, described as follows:

PARCEL I:

THAT PART OF LOTS A, B AND C, AND A PORTION OF VACATED NORTH BOULEVARD LYING NORTHEASTERLY OF SAID LOT C, IN BLOCK 1, REPLAT OF PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, BEING FURTHER DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA, AND RUN THENCE NORTH 00°29'59" EAST, 64.40 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD FOR A POINT OF BEGINNING; THENCE CONTINUE NORTH 00°29'59" EAST, 214.70 FEET; THENCE SOUTH 89°48'01" EAST, 93.17 FEET; THENCE NORTH 33°02'59" EAST, 581.01 FEET; THENCE NORTH 27°49'59" EAST, 117.96 FEET; THENCE SOUTH 56°57'01" EAST, 36.99 FEET; THENCE NORTH 33°02'59" EAST, 70.00 FEET TO THE NORTHERLY LINE OF VACATED NORTH BOULEVARD; THENCE SOUTH 56°57'01" EAST, 532.89 FEET ALONG SAID NORTHWESTERLY LINE; THENCE SOUTH 33°02'59" WEST, 344.57 FEET; THENCE SOUTH 56°57'01" EAST, 282.85 FEET; THENCE SOUTH 33°02'59" WEST, 655.43 FEET TO A POINT ON THE NORTH RIGHT- OF-WAY LINE OF SOUTH BOULEVARD; THENCE NORTH 56°57'01" WEST ALONG THE AFORESAID SOUTH BOULEVARD RIGHT-OF-WAY LINE, 804.76 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH THAT CERTAIN PORTION OF BAYSHORE BOULEVARD THAT WAS VACATED BY RESOLUTION NO. 92-27, RECORDED IN O.R. BOOK 7978, PAGE 240, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, DESCRIBED THEREIN ON EXHIBIT D AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEING A PORTION OF LOTS A AND B, IN BLOCK 1, REPLAT OF PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA; THENCE NORTH 00°24'22" EAST, ALONG THE WEST LINE OF SAID NORTHEAST 1/4, (BEING THE BASIS OF BEARINGS OF THIS DESCRIPTION), FOR 279.98 FEET TO THE SOUTH RIGHT OF WAY LINE OF SPRINGS BOULEVARD, (ALSO KNOWN AS BAYSHORE BOULEVARD), AS IT IS NOW

ESTABLISHED; THENCE ALONG SAID RIGHT OF WAY LINE SOUTH 89°51'53" EAST, FOR 30.88 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG SAID SOUTH LINE, SOUTH 89°51'53" EAST, FOR 52.61 FEET; THENCE NORTH 35°16'01" EAST FOR 212.42 FEET; THENCE SOUTH 54°43'59" EAST, FOR 16.00 FEET; THENCE SOUTH 35°16'01" WEST FOR 300.00 FEET; THENCE SOUTH 00°33'42" WEST, FOR 164.52 FEET TO THE NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD, AS IT IS NOW ESTABLISHED; THENCE NORTH 57°01'17" WEST ALONG SAID NORTH LINE, FOR 18.84 FEET; THENCE NORTH 00°33'42" EAST, ALONG A LINE 50.00 FEET EAST OF AND PARALLEL TO THE WEST RIGHT-OF-WAY LINE OF FIRST AVENUE, (ALSO KNOWN AS SOUTH BAYSHORE BOULEVARD), AS IT IS NOW ESTABLISHED, FOR 235.14 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPT THAT PORTION WHICH LIES WITHIN THE ABOVE DESCRIBED PARCEL I.

ALSO LESS AND EXCEPTING THEREFROM THAT CERTAIN PROPERTY CONVEYED TO THE CITY OF SAFETY HARBOR BY INSTRUMENT RECORDED IN O.R. BOOK 7990, PAGE 1267, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, AND DESCRIBED THEREIN ON EXHIBIT "A", BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEING A PORTION OF LOT A, IN BLOCK 1, REPLAT OF PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA; THENCE NORTH 00°24'22" EAST, ALONG THE WEST LINE OF SAID NORTHEAST 1/4, (BEING THE BASIS OF BEARINGS OF THIS DESCRIPTION), FOR 64.30 FEET TO THE POINT OF BEGINNING, SAME ALSO BEING A POINT ON THE NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD, AS IT IS NOW ESTABLISHED; THENCE CONTINUE NORTH 00°24'22" EAST, ALONG AFORESAID WEST LINE, FOR 215.68 FEET TO THE SOUTH RIGHT-OF-WAY LINE OF SPRINGS BOULEVARD, (ALSO KNOWN AS BAYSHORE BOULEVARD), AS IT IS NOW ESTABLISHED; THENCE SOUTH 89°51'53" EAST, ALONG SAID SOUTH RIGHT-OF-WAY LINE, FOR 30.88 FEET; THENCE SOUTH 00°33'42" WEST, ALONG A LINE 50.00 FEET EAST OF AND PARALLEL TO THE WESTERLY RIGHT-OF-WAY LINE OF FIRST AVENUE, (ALSO KNOWN AS SOUTH BAYSHORE BOULEVARD), AS IT IS NOW ESTABLISHED, FOR 235.14 FEET; THENCE NORTH 57°01'17" WEST, ALONG AFORESAID NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD FOR 35.88 FEET TO THE POINT OF BEGINNING.

PARCEL II:

THAT PART OF PARK AND HOTEL SITE IN PLAT OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, IN GOVERNMENT LOT 2, SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, RECORDED IN PLAT BOOK 4, PAGE 22, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, LYING SOUTH OF LAND PLATTED AS GRAY AND BUSHA'S SUBDIVISION.

LESS AND EXCEPTING THEREFROM THAT CERTAIN PROPERTY CONVEYED TO THE CITY OF SAFETY HARBOR BY INSTRUMENT RECORDED IN OR BOOK 7990, PAGE 1267, AND DESCRIBED THEREIN ON EXHIBIT "B", BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

2

BEING A PORTION OF THE PARK AND HOTEL SITE AS SHOWN ON THE PLAT OF REVISED MAP SUBDIVISION NO. 2 OF ESPIRITU SANTO SPRINGS, RECORDED IN PLAT BOOK 4, PAGE 22, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA; THENCE NORTH 00°24'22" EAST, ALONG THE WEST LINE OF SAID NORTHEAST 1/4, (BEING THE BASIS OF BEARINGS OF THIS DESCRIPTION), FOR 334.09 FEET, TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH 00°24'22" EAST ALONG SAID WEST LINE, FOR 364.97 FEET; THENCE SOUTH 89°38'48" EAST, FOR 28.15 FEET; THENCE SOUTH 00°24'40" WEST, ALONG A LINE 50.00 FEET EAST OF AND PARALLEL TO THE WESTERLY RIGHT-OF-WAY LINE OF FIRST AVENUE, AS IT IS NOW ESTABLISHED, FOR 365.01 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY LINE OF SPRINGS BOULEVARD, (ALSO KNOWN AS BAYSHORE BOULEVARD), AS IT IS NOW ESTABLISHED; THENCE NORTH 89°35'03" WEST, ALONG SAID NORTHERLY LINE, FOR 28.12 FEET TO THE POINT OF BEGINNING.

AND INCLUDING THE FOLLOWING LANDS:

TRACT 1-A:

MORE PARTICULARLY DESCRIBED IN EXHIBIT "B" OF THAT CERTAIN MORTGAGE RENEWAL MODIFICATION, SPREADING AND RELEASE AGREEMENT RECORDED IN O.R. BOOK 5559, BEGINNING ON PAGE 679, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA;

TRACT 2-A:

MORE PARTICULARLY DESCRIBED IN EXHIBIT "B" OF THAT CERTAIN MORTGAGE RENEWAL, MODIFICATION, SPREADING AND RELEASE AGREEMENT, RECORDED IN O.R. BOOK 5559, PAGE 679, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA;

TRACT 1-B:

MORE PARTICULARLY DESCRIBED IN EXHIBIT "B" OF THAT CERTAIN MORTGAGE RENEWAL, MODIFICATION, SPREADING AND RELEASE AGREEMENT, RECORDED IN O.R. BOOK 5559, BEGINNING ON PAGE 679, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA;

TRACT 2-B:

MORE PARTICULARLY DESCRIBED IN EXHIBIT "B" OF THAT MORTGAGE RENEWAL, MODIFICATION, SPREADING AND RELEASE AGREEMENT RECORDED IN O.R. BOOK 5559, BEGINNING ON PAGE 679, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA;

LOT C, AND A PORTION OF VACATED NORTH BOULEVARD LYING NORTHEASTERLY OF SAID LOT C IN BLOCK 1 OF THE REPLAT OF PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN PLAT BOOK 8, BEGINNING ON PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA;

LESS AND EXCEPT:

THAT CERTAIN PIECE OF PROPERTY MORE PARTICULARLY DESCRIBED AS PARCEL 1 OF SCHEDULE B IN THAT CERTAIN PARTIAL RELEASE RECORDED IN O.R. BOOK 7263, BEGINNING ON PAGE 469, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA.

LOTS 1 THROUGH 11 OF CORRECTED MAP OF GRAY AND BUSHA'S SUBDIVISION, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN PLAT BOOK 5, PAGE 92, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA.

LESS ANY PART OF THE AFORESAID PARCEL LYING WITHIN THE RIGHT-OF-WAY OF FIRST AVENUE.

THE ABOVE-DESCRIBED LANDS FOLLOWING PARCEL II ARE THE SAME LANDS DESCRIBED AS PARCELS III, IV AND V HEREINAFTER DESCRIBED.

PARCEL III:

LOT C AND A PORTION OF VACATED NORTH BOULEVARD LYING NORTHEASTERLY OF SAID LOT C IN BLOCK 1 OF THE REPLAT PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO.2, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY WAS FORMERLY A PART; LESS AND EXCEPT THAT PORTION THEREOF LYING WITHIN THE FOLLOWING DESCRIBED TRACT:

THAT PART OF LOTS A, B AND C, AND A PORTION OF VACATED NORTH BOULEVARD LYING NORTHEASTERLY OF SAID LOT C, IN BLOCK 1, OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, BEING FURTHER DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA, AND RUN THENCE NORTH 00DEG.29'59" EAST, 64.40 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD FOR A POINT OF BEGINNING; THENCE CONTINUE NORTH 00DEG.29'59" EAST, 214.70 FEET; THENCE SOUTH 89DEG.48'01" EAST, 93.17 FEET; THENCE NORTH 33 DEG.02'59" EAST, 581.01 FEET; THENCE NORTH 27DEG.49'59" EAST, 117.96 FEET; THENCE SOUTH 56DEG.57'01" EAST, 36.99 FEET; THENCE NORTH 33DEG.02'59" EAST, 70.00 FEET TO THE NORTHERLY LINE OF VACATED NORTH BOULEVARD; THENCE SOUTH 56DEG.57'01" EAST, 532.89 FEET ALONG SAID NORTHWESTERLY LINE; THENCE SOUTH 33DEG.02'59" WEST, 344.57 FEET; THENCE SOUTH 56DEG.57'01" EAST, 282.85 FEET; THENCE SOUTH 33DEG.02'59" WEST, 655.43 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF SOUTH BOULEVARD; THENCE NORTH 56DEG.57'01" WEST ALONG THE AFORESAID SOUTH BOULEVARD RIGHT-OF-WAY LINE, 804.76 FEET TO THE POINT OF BEGINNING.

PARCEL IV:

LOTS 1 THROUGH 11 OF GRAY AND BUSHA'S SUBDIVISION, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED IN PLAT BOOK 5, PAGE 92, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA.

4

LESS ANY PART OF THE AFORESAID PARCEL LYING WITHIN THE RIGHT-OF-WAY OF 1ST AVENUE.

PARCEL V:

TRACT 1-A:

DESCRIPTION OF LANDS BY THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, THE NORTH BOUNDARY OF THE REPLAT OF A PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO.2 ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA AND THE APPROXIMATE 1.00 FOOT CONTOUR ESTABLISHED FROM USC&GS MONUMENTS AND CHARTS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST AND RUN NORTH 00DEG.29'59" EAST, 279.10 FEET; THENCE SOUTH 89DEG.48'01" EAST, 93.17 FEET; THENCE NORTH 33DEG.02'59" EAST, 581.01 FEET; THENCE NORTH 27DEG.49'59" EAST, 183.50 FEET; THENCE NORTH 35DEG.42'59" EAST, 14.74 FEET TO THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE NORTH LINE OF THE REPLAT OF A PART OF ESPIRITU SANTO SPRINGS SUBDIVISION #2 FOR A POINT OF BEGINNING; FROM THIS POINT OF BEGINNING, RUN NORTH 40DEG.16'17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 198.06 FEET TO A POINT, SAID POINT BEING THE APPROXIMATE LOCATION OF THE HIGH WATER MARK (ELEVATION 1.00 FEET) WITH THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30; FROM THIS POINT, RUN ALONG THE FOLLOWING CALLS (ESTABLISHED ELEVATION 1.00 FEET FROM USC&GS MONUMENTS AND CHARTS); SOUTH 49DEG.13'50" EAST, 85.79 FEET; SOUTH 62DEG.57'15" EAST, 95.91 FEET; SOUTH 79DEG.47'14" EAST, 84.60 FEET; SOUTH 41DEG.50'44" EAST, 149.96 FEET; SOUTH 83DEG.27'43" WEST, 173.63 FEET; SOUTH 29DEG.02'59" WEST, 46.80 FEET; SOUTH 65DEG.19'25" EAST, 108.96 FEET; SOUTH 54DEG.49'47" EAST, 100.07 FEET; SOUTH 42DEG.16'54" EAST, 105.12 FEET; SOUTH 59DEG.48'22" EAST, 103.79 FEET; SOUTH 52DEG.59'07" EAST, 94.88 FEET; SOUTH 44DEG.56'48" EAST, 53.29 FEET; SOUTH 33DEG.45'01" WEST, 4.50 FEET TO A POINT OF INTERSECTION OF ELEVATION 1.00 FEET AND THE NORTH LINE OF THE REPLAT OF A PART OF ESPIRITU SANTOS SPRINGS SUBDIVISION #2; THENCE NORTH 56DEG.57'01" WEST ALONG THE NORTH LINE OF THE ABOVE-MENTIONED PLAT, 857.37 FEET TO THE POINT OF BEGINNING.

TRACT 2-A:

DESCRIPTION OF LANDS BOUNDED BY THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, THE NORTHERLY BOUNDARY OF MULLET CREEK, THE EASTERLY EXTENSION OF THE NORTH SIDE OF CHURCH STREET AND THE APPROXIMATE ELEVATION OF 1.00 FEET ESTABLISHED BY THE USC&GS MONUMENTS AND CHARTS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, AND RUN NORTH 00DEG.29'59" EAST, 279.10 FEET; THENCE SOUTH 89DEG.48'01" EAST, 93.17 FEET; THENCE NORTH 33DEG.02'59" EAST, 581.01 FEET; THENCE NORTH 27DEG.49'59" EAST, 183.50 FEET; THENCE NORTH 35DEG.42'59" EAST, 14.74 FEET TO THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE NORTH LINE OF THE REPLAT OF A PART OF ESPIRITU SANTOS SPRINGS

5

SUBDIVISION #2; THENCE NORTH 40DEG.16'17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 247.93 FEET TO THE INTERSECTION WITH ELEVATION 1.00 FEET AND THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, SAID POINT BEING THE POINT OF BEGINNING OF THIS DESCRIPTION; CONTINUE NORTH 40DEG.16'17" EAST ALONG SAID EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 263.31 FEET TO A POINT, SAID POINT BEING THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE EASTERLY EXTENSION OF THE NORTH RIGHT-OF-WAY OF CHURCH STREET; THENCE SOUTH 49DEG.35'01" EAST ALONG THE EASTERLY EXTENSION OF THE NORTH RIGHT-OF-WAY OF CHURCH STREET, 95.52 FEET TO A POINT, SAID POINT BEING THE INTERSECTION OF THE EASTERLY EXTENSION OF THE NORTH LINE OF CHURCH STREET APPROXIMATE ELEVATION 1.00 FEET; THENCE ALONG THE FOLLOWING CALLS, WHICH ARE APPROXIMATELY ALONG THE CONTOUR OF ELEVATION 1.00 FEET ESTABLISHED FROM USC&GS MONUMENTS AND CHARTS; SOUTH 34DEG.50'44" WEST, 100.27 FEET; SOUTH 69DEG.50'24" WEST, 114.90 FEET; SOUTH 77DEG.36'53" WEST, 79.63 FEET TO THE POINT OF BEGINNING.

TRACT B-1:

DESCRIPTION OF LANDS BOUNDED BY THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, APPROXIMATELY 0.00 FEET ELEVATION ALONG THE APPROXIMATE SOUTH SIDE OF MULLET CREEK AND APPROXIMATE 1.00 FEET ELEVATION ALONG THE SOUTH, FURTHER DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, AND GO NORTH 00DEG.29'59" EAST, 279.10 FEET; THENCE SOUTH 89DEG.48'01" EAST, 93.17 FEET; THENCE NORTH 33DEG.02'49" EAST, 581.01 FEET; THENCE NORTH 27DEG.49'59" EAST, 183.50 FEET; THENCE NORTH 35DEG.42'59" EAST, 14.74 FEET TO THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE NORTH LINE OF THE REPLAT OF A PART OF ESPIRITU SANTOS SPRINGS SUBDIVISION #2; THENCE NORTH 40DEG 16' 17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 198.06 FEET TO A POINT OF BEGINNING, SAID POINT OF BEGINNING BEING THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE APPROXIMATE 1.00 FEET ELEVATION; THENCE CONTINUE NORTH 40DEG.16' 17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 4.93 FEET TO A POINT OF INTERSECTION WITH THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE APPROXIMATE 0.00 FEET ELEVATION; THENCE RUN ALONG THE FOLLOWING CALLS, WHICH WERE ESTABLISHED ON THE APPROXIMATE 0.00 FEET ELEVATION BY USC&GS CHARTS AND MONUMENTS; SOUTH 50DEG.36'09" EAST, 85.03 FEET; THENCE SOUTH 60DEG.34'28" EAST, 95.44 FEET; THENCE SOUTH 82DEG.26'36" EAST, 102.88 FEET; THENCE NORTH 80DEG.58'11" EAST, 100.73 FEET; THENCE SOUTH 56DEG.45'22" EAST, 43.10 FEET; THENCE SOUTH 35DEG.01'49" EAST, 15.88 FEET; THENCE SOUTH 08DEG.40'29" EAST, 26.19 FEET; THENCE SOUTH 36DEG.21'37" WEST, 82.75 FEET; THENCE SOUTH 19DEG.50'11" WEST 50.04 FEET; THENCE SOUTH 43DEG.49'32" EAST, 158.01 FEET; THENCE SOUTH 30DEG.47'51" EAST, 116.09 FEET; THENCE SOUTH 34DEG.41'36" EAST, 99.79 FEET; THENCE SOUTH 32DEG.41'53" EAST, 57.18 FEET TO A POINT OF INTERSECTION WITH THE APPROXIMATE 1.00 FEET ELEVATION AND 0.00 FEET ELEVATION; THENCE ALONG APPROXIMATE 1.00 FEET ELEVATION THE FOLLOWING CALLS: NORTH 44DEG.56'48" WEST, 53.29 FEET; THENCE NORTH 52DEG.59'07" WEST, 94.88 FEET; THENCE NORTH 59DEG.48'22" WEST, 103.70 FEET; THENCE NORTH 42DEG.16'54" WEST, 105.12 FEET; THENCE NORTH 54DEG.49'47" WEST, 100.07 FEET; THENCE NORTH

65DEG.19'25" WEST 108.96 FEET; THENCE NORTH 29DEG.02'59" EAST, 46.80 FEET; THENCE NORTH 83DEG.27'43" EAST, 173.63 FEET; THENCE NORTH 41DEG.50'44" WEST, 149.96 FEET; THENCE NORTH 79DEG.47'14" WEST, 84.60 FEET; THENCE NORTH 62DEG.57'15" WEST, 95.91 FEET; THENCE NORTH 49DEG.13'50" WEST, 85.79 FEET TO THE POINT OF BEGINNING.

TRACT B-2:

DESCRIPTION OF LANDS BOUNDED ON THE EAST BY APPROXIMATE 1.00 FOOT CONTOUR, ON THE NORTH BY THE EASTERLY EXTENSION OF THE NORTH BOUNDARY OF CHURCH STREET AND ON THE SOUTH AND SOUTHEAST BY APPROXIMATE NORTH LINE OF MULLET CREEK, FURTHER DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST AND GO NORTH 00DEG.29'59" EAST, 279.10 FEET; THENCE SOUTH 89DEG.48'01" EAST, 93.17 FEET; THENCE NORTH 33DEG.02'59" EAST, 581.01 FEET; THENCE NORTH 27DEG.49'59" EAST, 183.50 FEET; THENCE NORTH 35DEG.42'59" EAST 14.74 FEET TO THE INTERSECTION OF THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 AND THE NORTH LINE OF THE REPLAT OF A PART OF ESPIRITU SANTOS SPRINGS SUBDIVISION #2; THENCE NORTH 40DEG.16'17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 238.09 FEET TO A POINT OF INTERSECTION WITH ELEVATION 0.00 FEET FOR A POINT OF BEGINNING; FROM THIS POINT OF BEGINNING, CONTINUE NORTH 40DEG.16'17" EAST ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 9.84 FEET; THENCE ALONG THE APPROXIMATE CONTOUR OF 1.00 FOOT, THE FOLLOWING CALLS: NORTH 77DEG.36'53" EAST, 79.63 FEET; THENCE NORTH 69DEG.50'24" EAST, 114.90 FEET; THENCE NORTH 34DEG.50'44" EAST, 100.27 FEET TO A POINT ON THE EASTERLY EXTENSION OF THE NORTH RIGHT-OF-WAY OF CHURCH STREET; THENCE SOUTH 49DEG.35'01" EAST ALONG THE EASTERLY EXTENSION OF THE NORTH RIGHT-OF- WAY OF CHURCH STREET, 257.04 FEET; THENCE SOUTH 40DEG.24'59" WEST, 45.73 FEET TO A POINT WITH THE APPROXIMATE ELEVATION 0.00 FEET; THENCE ALONG THE APPROXIMATE CONTOUR 0.00 FEET, SAME BEING APPROXIMATE NORTH LINE OF MULLET CREEK, THE FOLLOWING CALLS: SOUTH 85DEG.30'35" WEST, 85.45 FEET; THENCE SOUTH 72DEG.53'11" WEST, 141.23 FEET; THENCE NORTH 62DEG.07'08" WEST, 220.79 FEET TO THE POINT OF BEGINNING.

AS FURTHER DESCRIBED BY CURRENT SURVEY MADE BY LAND PRECISION CORPORATION AS FOLLOWS:

LEGAL DESCRIPTION: (SPA-PARCELS I & III)

THAT PORTION OF LOTS A, B & C, BLOCK NO. 1, VACATED NORTH BOULEVARD AND THE RESERVED TRACT LYING NORTH THEREOF, ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2, ACCORDING TO THE MAP OR PLAT THEREOF AS RECORDED IN PLAT BOOK 8, PAGE 5 OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, TOGETHER WITH THAT CERTAIN PORTION OF BAYSHORE BOULEVARD THAT WAS VACATED BY RESOLUTION NO. 92-27, RECORDED IN OR. BOOK 7978, PAGE 240, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, LYING IN SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA;

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA; THENCE RUN N 00°29'59"E, ALONG THE WEST LINE OF THE AFORE SAID NORTHEAST 1/4, 64.40 FEET; THENCE S 56°57'01" E, 35.87 FEET TO THE POINT OF BEGINNING; THENCE N 00°39'19" E, 235.03 FEET; THENCE S 89°46'05" E, 52.62 FEET; THENCE N 35°21'38" E, 212.42 FEET; THENCE N 33°08'42" E, 373.28 FEET; THENCE N 27°55'32" E, 117.97 FEET; THENCE S 56°57'01" E, 36.99 FEET; THENCE N 33°02'59" E, 70.00 FEET; THENCE N 56°57'01" W, 42.73 FEET; THENCE N 35°42'08" E, 10.01 FEET; THENCE S 56°57'01" E, 857.21 FEET; THENCE S 33°02'59" W, 1009.99 FEET; THENCE N 56°57'01" W, 768.89 FEET TO THE POINT OF BEGINNING.

LEGAL DESCRIPTION: (PARKING AREA-PARCELS II & IV)

THAT PORTION OF PARK AND HOTEL SITE, REVISED PLAT OF PART OF ESPIRITU SANTO SPRINGS, ACCORDING THE MAP OR PLAT THEREOF AS RECORDED IN PLAT BOOK 4, PAGE 22 OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, TOGETHER WITH THE CORRECTED MAP OF GRAY AND BUSHA'S SUBDIVISION ACCORDING TO THE MAP OR PLAT THEREOF AS RECORDED IN PLAT BOOK 5, PAGE 92 OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, BEING A PARTIAL REPLAT THEREOF, LYING IN SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA;

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA; THENCE RUN N 00°29'59" E, ALONG THE WEST LINE OF THE AFORE SAID NORTHEAST 1/4, 304.28 FEET; THENCE S 89°29'00" E, 28.12 FEET TO THE POINT OF BEGINNING; THENCE N 00°29'59" E, 821.52 FEET; THENCE S 59°11'11" E, 467.48 FEET; THENCE S 28°19'24" W, 139.76 FEET; THENCE S 33°02'47" W, 548.05 FEET; THENCE N 89°29'00" W, 43.49 FEET TO THE POINT OF BEGINNING.

TRACTS 1-A& B-1: (PORTION PARCEL V)

DESCRIPTION OF TRACTS 1-A & B-1 BEING LANDS BOUND BY THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF COUNTY ROAD 30 & NORTHEASTERLY BOUNDARY OF THE REPLAT OF A PART OF ESPIRITU SANTO SPRINGS SUBDIVISION NO. 2 ACCORDING TO THE PLAT THEREOF, RECORDED IN PLAT BOOK 8, PAGE 5, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, AND LYING SOUTH AND WESTERLY OF MULLET CREEK AND TAMPA BAY REFERENCED BY THE APPROXIMATE 0.00 FEET ELEVATION AS ESTABLISHED BY USC&GS MONUMENTS & CHARTS, LYING IN SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA;.

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST THENCE RUN N 00°29'59" E, 279.98 FEET; THENCE S 89°46'05" E, 83.49 FEET; THENCE N 35°21'38" E, 212.42 FEET; THENCE N 33°08'42" E, 373.28 FEET; THENCE N 27°55'32" E, 184.25 FEET; THENCE N 35°42'59" E, 13.99 FEET TO THE INTERSECTION OF SAID SOUTHEASTERLY RIGHT-OF-WAY LINE OF COUNTY ROAD 30

AND SAID NORTHEASTERLY LINE OF SAID REPLAT OF A PART OF ESPIRITU SANTO SPRINGS SUBDIVISION #2 FOR A POINT OF BEGINNING; THENCE N 40°16'17" E ALONG THE EASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30, 202.99 FEET TO THE AFORE REFERENCED APPROXIMATE 0.00 FEET ELEVATION; THENCE ALONG SAID REFERENCED APPROXIMATE 0.00 FEET ELEVATION CONTOUR THE FOLLOWING FOURTEEN (14) COURSES: 1.) S 50°36'09" E, 85.03 FEET; 2.) S 60°34'28" E, 95.44 FEET; 3.) S 82°26'36" E, 102.88 FEET; 4) N 80°58'11" E, 100.73 FEET; 5) S 56°45'22" E, 43.10 FEET; 6) S 35°01'49" E, 15.88 FEET; 7) S 08°40'29" E, 26.19 FEET; 8) S 36°21'37" W, 82.75 FEET; 9) S 19°50'11"W, 50.04 FEET; 10) S43°49'32" E, 158.01 FEET; 11) S 30°47'51" E, 116.09 FEET; 12.) S 34°41'36" E, 99.79 FEET; 13.) S 32°41'53" E, 57.18 FEET; 14) S 35°27'49"W, 4.52 FEET TO THE NORTHEAST CORNER OF THE NORTH LINE OF SAID REPLAT OF A PART OF ESPIRITU SANTOS SPRINGS SUBDIVISION #2; THENCE N 56°57'01" W ALONG THE SAID NORTH LINE, 857.21 FEET TO THE POINT OF BEGINNING.

TRACTS 2-A & B-2: (PORTION PARCEL V)

DESCRIPTION OF TRACTS 2-A & B-2 BEING LANDS BOUND BY THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF COUNTY ROAD 30, THE EASTERLY EXTENSION OF THE NORTH LINE OF CHURCH STREET RIGHT-OF-WAY AND LYING NORTH AND WESTERLY OF MULLET CREEK AND TAMPA BAY REFERENCED BY THE APPROXIMATE 0.00 FEET ELEVATION AS ESTABLISHED BY USC&GS MONUMENTS & CHARTS, LYING IN SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST, PINELLAS COUNTY, FLORIDA;

BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 29 SOUTH, RANGE 16 EAST THENCE RUN N 00°29'59" E, 279.98 FEET; THENCE S 89°46'05" E, 83.49 FEET; THENCE N 35°21'38" E, 212.42 FEET; THENCE N 33°08'42" E, 373.28 FEET; THENCE N 27°55'32" E, 184.25 FEET; THENCE N 35°42'59" E, 13.99 FEET TO THE INTERSECTION OF SAID SOUTHEASTERLY RIGHT-OF-WAY LINE OF COUNTY ROAD 30 AND SAID NORTHEASTERLY LINE OF SAID REPLAT OF A PART OF ESPIRITU SANTO SPRINGS SUBDIVISION #2; THENCE N 40°16'17" E, 238.11 FEET ALONG THE SOUTHEASTERLY RIGHT-OF-WAY OF COUNTY ROAD 30 FOR A POINT OF BEGINNING; THENCE CONTINUE N 40°16'17" E ALONG SAID EASTERLY RIGHT-OF-WAY, 273.13 FEET TO THE INTERSECTION OF THE EASTERLY EXTENSION OF THE NORTH LINE OF CHURCH STREET RIGHT-OF-WAY; THENCE S 49°35'01" E ALONG SAID EASTERLY EXTENSION, 352.56 FEET TO THE AFORE REFERENCED APPROXIMATE 0.00 FEET ELEVATION; THENCE ALONG SAID REFERENCED APPROXIMATE 0.00 FEET ELEVATION CONTOUR THE FOLLOWING FOUR (4) COURSES: 1.) S 40°24'59" W, 45.73 FEET; 2.) S 85°30'35" W, 85.45 FEET; 3.) S 72°53'11" W, 141.23 FEET; 4.) N 62°07'08" W, 220.79 FEET TO THE POINT OF BEGINNING.

# EXHIBIT "B"



Exhibit B

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT ("Agreement") is made and entered into as of the Effective Date of this Agreement (as hereinafter defined) by and between **SHS Resort, LLC** (hereinafter referred to as "Seller") and **Investment Properties Revocable Trust** and/or its assigns (hereinafter referred to as the "Buyer").

Subject to the terms and conditions of this Agreement, Seller agrees to sell and Buyer agrees to buy a certain tract of land containing approximately 6.75+/- gross acres (with 4.95 +/- of which being upland acres), located near the Safety Harbor Spa, City of Safety Harbor, County of Pinellas, State of Florida, as legally described in Exhibit "A," and shown on Exhibit "B," which are attached hereto by Seller and made a part hereof, together with all hereditaments and appurtenances pertaining to such tract, and all improvements located thereon, including without limitation all of Seller's right, title, and interest in and to adjacent streets, alleys, and rights-of-way (all of which will be hereafter collectively referred to as the "Premises").

1.     **PURCHASE PRICE**. The purchase price ("Purchase Price") to be paid for the Premises shall be Two Million Eight Hundred Thousand and 00/100 Dollars ($2,800,000.00). The Purchase Price shall be paid as follows:

$25,000.00 initial Earnest Money (the "Earnest Money") delivered to and held by Forlizzo Law Group ("Escrow Agent") within five (5) business days of Buyer's receipt of a fully executed Agreement;

$25,000.00 additional Earnest Money delivered to Escrow Agent upon expiration of the Feasibility Period (as hereinafter defined) (for purposes of this Agreement, the initial Earnest Money and additional Earnest Money may be hereinafter collectively referred to as the "Earnest Money"); and

$2,750,000.00 cash by wire transfer payable at closing, plus or minus prorations and closing costs, as set forth hereinafter.

$2,800,000.00 Total Purchase Price paid and deposited in U.S. Funds.

2.     **CONVEYANCE**. Subject to the terms and conditions of this Agreement and for the consideration set forth herein, Seller agrees to convey, transfer, assign, sell and deliver to Buyer all of Seller's right, title and interest in and to the following:

      a.     Title to the Premises, which shall be conveyed by Warranty Deed, in a form suitable for recording, conveying good and marketable fee simple title in the Premises to Buyer, free and clear of all liens and encumbrances, except exceptions permitted under this Agreement;

      b.     All of Seller's right, title and interest, to the extent transferable, in and to and under any of those certain contract rights, easements, covenants, privileges, servitudes, appurtenances and other rights belonging to or inuring to the benefit of Seller as owner of the Premises and pertaining to the Premises;

c.     All of Seller's right, title and interest to the extent transferable in and to all governmental orders, resolutions, grants, site plans or approved plats, zoning approvals, development rights, resolutions, permits and rights accruing to Seller as a result of its ownership of the Premises, and the operation of same (collectively the "Rights and. Permits"). The responsibility for all obligations, fees, costs and expenses of Seller under the Rights and Permits arising from and after the Closing Date shall be assumed by Buyer at Closing to the extent that the same have been assigned by this provision;

3.     **SURVEY.** Within five (5) days of the Effective Date, Seller shall tender to Buyer Seller's existing survey that includes the Premises, boundary survey of the jurisdictional wetlands proximately located near the Premises, soil reports, and environmental reports. Not later than sixty (60) days prior to closing, Buyer may cause said survey to be remade as of a date subsequent to the date of this Agreement or may procure a new survey; in any event, said survey (the "Survey") shall: (i) be certified to Seller, Buyer, any lender to Buyer and the title insurer and shall be in compliance with ALTA minimum standards for land title surveys; (ii) show the boundary lines of the Premises; (iii) locate all permanent improvements on the Premises; (iv) show all such improvements to be entirely located within the boundary lines of the Premises; (v) show all encroachments over boundary lines, easements and rights of way; (vi) show the location and course of all visible and recorded easements and rights of way; (vii) show access from the Premises to public rights of way; (viii) show utilities, including water, sanitary sewer, storm sewer, and gas lines to the point of connection with the public system, if such connection exists, or access to such systems from the Premises; and (ix) certify the number of square feet and portions thereof lying within the boundary lines of the Premises.

4.     **ESCROW.** Any escrow agent receiving funds is authorized and agrees by acceptance thereof to promptly deposit and to hold same in an escrow account and to disburse same subject to clearance thereof in accordance with the terms and conditions of this Agreement. Failure of clearance of funds shall not excuse performance by Buyer. In the event of doubt as to Escrow Agent's duties or liabilities under the provisions of this Agreement, the Escrow Agent may in its sole discretion, continue to hold the monies which are the subject of this escrow until the parties mutually agree to the disbursement thereof, or until a judgment of a court of competent jurisdiction shall determine the rights of the parties thereto, or Escrow Agent may deposit all the monies then held pursuant to this Agreement with the Clerk of the appropriate Court of the County having jurisdiction of the dispute, and upon notifying all parties concerned of such action, all liability on the part of the Escrow Agent shall fully terminate except to the extent of accounting for any monies theretofore delivered out of escrow. If Escrow Agent is a licensed real estate broker, the escrow fee will comply with provisions of Section 475.25 (1)·(d), F.S., as amended. In the event of any suit between Buyer and Seller wherein the Escrow Agent is made a party by virtue of acting as such Escrow·Agent hereunder, or in the event of any suit wherein Escrow Agent interpleads the Earnest Money, Escrow Agent shall be entitled to recover a reasonable attorney's fee and costs incurred, said fees and costs to be charged and assessed as court costs against the non-prevailing party. All parties agree that the Escrow Agent shall not be liable to any party or person whomsoever for misdelivery to Buyer or Seller of monies subject to this escrow, unless such misdelivery shall be due to willful breach of this Agreement or gross negligence on the part of the Escrow Agent. All funds held in escrow shall be placed in an interest bearing federally

insured account with interest accruing to the benefit of Buyer and applied against the Purchase Price at Closing, or otherwise disbursed in accordance with the provisions of this Agreement. Notwithstanding anything in this Agreement to the contrary, this escrow provision, including any matters regarding the funds held in escrow and the duties of the Escrow Agent, shall be governed and construed in accordance with the law of the jurisdiction where the Escrow Agent has its principal place of business. In addition, the venue for any litigation regarding this escrow provision shall be the county where the Escrow Agent has its principal place of business.

5. **TITLE COMMITMENT; TITLE POLICY.** Within five (5) days of the Effective Date, Seller shall tender to Buyer a true and complete copy of Seller's existing title policy, if any, of the Premises indicating that Seller is the sole owner. In addition, not later than thirty (30) days prior to the expiration of the Feasibility Period (as the same may have been extended pursuant to the terms of Section 8, below), Seller shall, at Seller's expense (based on Florida minimum promulgated rate with the Butler rebate applied, and provided that in the event the Seller elects not to close the commitment fee shall be deducted from the Earnest Money), procure from a title agent selected by Buyer and approved by Seller, a Commitment for Owner's ALTA Title Insurance, Marketable Form B, with extended coverage over the general exceptions issued by a title insurance company ("Title Company") ("Commitment") setting forth the state of title to the Premises and all exceptions and restrictions of record including deed restrictions, liens and covenants. Said Commitment shall indicate that Seller is the sole owner of the Premises, that it is fully authorized to convey the Premises and it shall indicate the amount of any real estate taxes attributable to the Premises. Along with such Commitment, Buyer shall also be furnished with copies of all documents affecting the Premises as reflected in the Commitment. In the event any exceptions appear in such Commitment or title documents other than the standard printed exceptions (which shall be modified in the Owner's Title Policy as hereafter provided) or in the Survey referenced in Section 3, above, that are unacceptable to Buyer, then Buyer shall, within thirty (30) days after Buyer's receipt of the last of such Survey and Commitment and title documents, notify Seller in writing of such fact. Seller shall undertake to eliminate or modify such unacceptable exceptions to the reasonable satisfaction of Buyer. In the event Seller is unable with the exercise of due diligence to satisfy said obligations within thirty (30) days after said notice, Buyer may, at its option, (i) accept title subject to the objections raised by Buyer, without an adjustment in the Purchase Price, in which event said objections shall be deemed to be waived for all purposes; or (ii) satisfy such obligations on behalf of Seller and deduct from the Purchase Price at Closing the actual cost of satisfying said objections, but in no event shall such deductions exceed $25,000.00; or (iii) rescind this Agreement, whereupon the Earnest Money shall be immediately returned to Buyer with accrued interest thereon and this Agreement shall be of no further force and effect.

6. **UNIFORM COMMERCIAL CODE SEARCHES.** Prior to Closing, Buyer shall obtain a statement from the Title Company after appropriate searches of the Uniform Commercial Code ("UCC") records of the Secretary of State of Florida and the Clerk of the Circuit Court of Pinellas County, Florida, reflecting any UCC financing statements filed of record affecting the Premises. Seller shall cause any such financing statements to be terminated or the Premises to be released therefrom at or prior to Closing.

7. **MAIL-AWAY CLOSING.** At the election of Seller or Buyer upon notice to the other party not less than five (5) days prior to the Closing, this sale shall be closed by the Title Company utilizing an express courier service (e.g., Federal Express), in accordance with generally accepted practices utilized by title companies in commercial real estate closings. Upon the establishment of such a mail-away closing, anything herein to the contrary notwithstanding, payment of the Purchase Price and delivery of the deed shall be made utilizing wire transfers or express courier deliveries, as appropriate.

8. **FEASIBILITY PERIOD.** Buyer shall have a period of Sixty (60) days following the date the proposed transaction and this Agreement is approved in writing by the Court of competent jurisdiction for the bankruptcy proceeding which affects the Premises ("Feasibility Period") within which to conduct and make such feasibility studies of the Premises as Buyer deems necessary, including but not limited to studies regarding economic use of the Premises, the status of title of the Premises, engineering studies, soil analysis, core drilling, zoning studies, mechanical studies, sewer studies and conduct any and all physical inspections of the Premises. Seller shall cooperate with Buyer in making such inspections and allow Buyer full access during reasonable business hours to the Premises for the purpose of such inspections. Buyer shall notify Seller not less than one (1) business day in advance of making any such inspections. All due diligence and inspections shall be performed in a manner to eliminate or minimize interference with Seller's ongoing business, on a schedule subject to Seller's prior approval.

In the event that Buyer determines, in Buyer's sole and absolute discretion prior to the expiration of the Feasibility Period, that the acquisition of the Premises is not desirable, then this Agreement shall automatically cancel and terminate. If Buyer does not give written notice to Seller prior to the expiration of the Feasibility Period of Buyer's intent to continue and pursue this Agreement, then Escrow Agent shall refund to Buyer the Earnest Money, together with any accrued interest thereon, and, in which event neither Buyer nor Seller shall have any further rights, duties or obligations under this Agreement, except as otherwise expressly provided herein. If Buyer elects in writing prior to the expiration of the Feasibility Period to continue this Agreement, then the election shall be deemed to establish that Buyer's findings upon inspection of the Premises and examination of related documents and records furnished or made available by Seller are satisfactory and acceptable to it and that Buyer intends to close, subject only to (i) the failure of Seller to perform all of its obligations hereunder and (ii) satisfaction of all conditions hereof. If Buyer continues this Agreement by written notice as hereinabove provided, Buyer's right to inspect the Premises and the books and records of Seller relating thereto shall continue until the Closing Date.

9. **CLOSING DATE.** The consummation of the transaction contemplated by this Agreement ("Closing" or "Closing Date") shall, unless the closing date is extended as hereinafter provided, take place at a mutually acceptable location in Pinellas County, Florida on or before the later of the following: (a) sixty (60) days after the expiration of the Feasibility Period or (b) fifteen (15) days after the Buyer obtains final, non-appealable site plan approval for Buyer's intended development of the Premises, the Premises have been platted, and the off-site mitigation plan for Mitigation Area #1, as depicted on the Site Plan, has been approved by all appropriate governmental agencies having jurisdiction and all appeal periods have expired. However, notwithstanding anything to the contrary contained herein, the Closing shall not occur later than 270 days

after the expiration of the Feasibility Period, an upon such day Buyer shall either Close on the transaction contemplated by this Agreement or terminate this Agreement in which event Buyer shall receive a refund of the Earnest Money.

10. **DOCUMENTS TO BE DELIVERED BY SELLER**. Within five (5) days of the Effective Date, Seller shall deliver to Buyer true and correct copies of the following documents (to the extent in Seller's possession) relating to the Premises if in existence:

      a.    geotechnical reports;

      b.    environmental reports;

      c.    engineer reports, drawings and studies;

      d.    any and all licenses, permits, authorizations and approvals, if any, required by law, affecting the Premises;

      e.    any other material data or information in Seller's possession;

      f.    legal description;

      g.    existing survey as set forth in Section 3, above; and

      h.    the various items listed in Sections 2(b) and 2(c) of this Agreement.

11. **SELLER'S REPRESENTATIONS AND WARRANTIES**. Seller represents, warrants and covenants to Buyer that as of the date hereof and the Closing Date:

      a.    The transfer of the Premises described herein may be accomplished under all applicable laws and regulations and with the approval of City of Safety Harbor ("City") as a discrete and separate parcel of property and shall not be considered an illegal "lot split" of a larger portion of property.

      b.    There are no leases, tenancies or other rights of occupancy or use for any portion of the Premises, other than as identified in this Agreement;

      c.    Seller is not a party to any written agreement with any person, firm, corporation, or other entity that has any right or option to acquire the Premises or any portion thereof;

      d.    There are no judicial proceedings of any type which have been instituted or which are pending or threatened against the Premises except for the previously filed bankruptcy proceeding that affects the Premises;

e      There is not pending, nor has Seller received a written notice from a public authority of, a contemplated condemnation of the Premises or any part thereof;

f.      There are and shall be no liens or claims against Seller applicable to the Premises for federal withholding taxes or estate taxes, or any other taxes or charges whatsoever except ad valorem general real estate taxes, and as otherwise disclosed in the bankruptcy schedules ;

g.      Seller has received no notice of any fact or condition that exists which would result in the termination of any right to access the Premises from adjoining public or private streets or ways that exists as of the Effective Date or which would result in discontinuation or refusal of service by any applicable utility providers of adequate sewer, water, gas, electric, telephone or other utility service to the Premises;

h.      Seller's execution of and performance under this Agreement shall not constitute a breach of any written agreement, understanding, order, judgment or decree to which Seller is a party and to which any part of the Premises may be bound;

i.      Pending the Closing, Seller agrees that Seller will not transfer the Premises except as herein expressly contemplated or create any easements, restrictions, liens, mortgages, or other encumbrances with respect to the Premises, or which affect the Premises, except with Buyer's prior written consent, except for mortgages or trust deeds which shall be released at or prior to Closing;

j.      Seller has full power and authority to enter into this Agreement and to consummate the transaction contemplated herein, and all actions necessary to authorize the execution of this Agreement and conveyance of the Premises have been taken such that, upon execution by all parties hereto, this Agreement shall be the valid and binding obligation of Seller and such authority shall be effective on the date Closing Date; .

k.      To the best of Seller's knowledge, no hazardous substances as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 USC 9601(14), pollutants or contaminants as defined by CERCLA, 42 USC 96D4(A) (2), or hazardous wastes as defined by the Resource Conservation and Recovery Act ("RCRA"), 42 USC 6903 (5), or other similar applicable federal or state laws and regulations including, but not limited to, asbestos, PCBs, and urea formaldehyde, have been generated, released, stored, or deposited over, beneath, or on the Premises or on or in any structures in interest in the Premises;

l. That the true and correct copies of the documents supplied to Buyer by Seller pursuant to Section 10 of this Agreement have not been changed or modified; and

m. The Premises is not subject to any property owner's or community association assessments and/or maintenance fees, except as shown on Exhibit "C", attached hereto.

The continued validity in all material respects of all representations, covenants and warranties set forth in this Agreement shall be conditions precedent to the performance of the obligations of Buyer and Seller hereunder. All representations and warranties set forth in this Agreement shall be continuing and shall be true and correct on and as of the Closing Date.

12. **CONDITION OF PREMISES**. Subsequent to the execution of the Agreement and until the Closing Date, Seller agrees that the Premises will be kept in good order in accordance with past practice and that all acts required with respect to any portion of the Premises will be made in order to correct any violations of which Seller shall receive written notice after the Effective Date from any governmental body having jurisdiction over the Premises and in order to allow Seller to deliver the Premises to Buyer in the same condition as exists on the date hereof.

13. **CONDITIONS PRECEDENT**. This Agreement and Buyer's obligation to close are subject to the following additional express conditions precedent. Notwithstanding anything to the contrary which may be contained herein, each of the following conditions is intended for the exclusive protection and benefit of Buyer:

a. The continued validity of each and all of the representations, warranties and covenants of Seller contained in this Agreement in all material respects, as of the Closing Date;

b. The delivery of the Closing documents required to be delivered by Seller described in this Agreement;

c. Seller shall have performed, observed and complied with all of the covenants, agreements and conditions required by this Agreement to be performed, observed and complied with by Seller prior to or as of the Closing;

d. Buyer shall have been furnished with the Title Commitment as required by Section 5 of this Agreement, and such Commitment shall be updated at Seller's expense at Closing with such update showing no change in the status of title as previously approved by Buyer;

e. Verification that the Premises is properly zoned in the official records of Pinellas County, Florida with a corresponding land use plan approved by Pinellas County, Florida and the State of Florida, and final, non-appealable site plan approval for the Premises from all applicable governmental authorities, which are necessary to allow, in Buyer's sole discretion, Buyer's intended

development of the Premises as nine (9) single family residential lots along with other, necessary improvements;

f.      Before Closing, Buyer shall have secured all required governmental approvals for the installation and use of adequate sanitary and storm sewer and water facilities. Seller agrees to support Buyer's efforts in securing any such approvals and agrees to execute any documentation necessary to assist Buyer in said efforts;

g.      Buyer shall have obtained a soils test and an Environmental and Hazardous Waste Report on the Premises that must be acceptable to Buyer in its sole discretion;

h.      Buyer shall have determined, in Buyer's sole discretion, that the utilities necessary to service Buyer's proposed development of the Premises are available;

i.      Seller shall grant to Buyer an easement, in form acceptable to Buyer, that encumbers the property designated on Exhibit "B" as the "Access Easement" and which grants access to the Premises and permits the construction of utilities systems to serve the Premises and the installation of landscaping;

j.      Seller and Buyer shall identify site retention serving the Premises that is acceptable to Buyer and as generally depicted on Exhibit "B" as "Site Retention" with Buyer being responsible for the construction of such off-site retention improvements;

k.      If necessary, Seller shall identify certain real property that is acceptable to Buyer, outside the Premises, that will serve as mitigation for the environmental impact on that area designated on Exhibit "B" as "Mitigation Area #1." Buyer shall be responsible for such off-site areas being accepted by all necessary governmental agencies and properly permitted as mitigation areas;

l.      Seller shall grant to Buyer an easement, in form acceptable to Buyer, that encumbers the property designated on Exhibit "B" as the "Landscape/Retention Buffer" and which provides for such property to be utilized only as a landscape buffer that will be maintained by the owner thereof and as off-site retention for the Premises as generally depicted on Exhibit "B";

m.      Seller shall grant to Buyer an easement, in form acceptable to Buyer, that encumbers the property designated on Exhibit "B" as the "Sign Easement" and which grants the right for a sign to be located on such property with such sign being maintained by Buyer or Buyer's assign. Seller and Buyer shall mutually agree on the name of the project Buyer develops on the Premises and such name shall be displayed on the sign that will be located in this "Sign Easement";

n.   Seller shall grant to Buyer, in a form acceptable to Buyer, a right of first refusal on the property designated on Exhibit "B" as the "Right of First Refusal Property;"

o.   Seller shall grant to Buyer an easement, in form acceptable to Buyer, that encumbers the property designated on Exhibit "B" as "Wetland Area B" and which grants to Buyer or Buyer's assign the right to maintain this area, clear vegetation from this area, and groom the mangroves located in this area; and

p.   Before the expiration of the Feasibility Period, Buyer and Seller shall mutually agree upon a Restrictions and Easement Agreement ("REA"), or similar instrument, that will, among other duties, requirements, and restrictions, prohibit Seller and subsequent owners of the property identified as "View Corridor" on Exhibit "B" from constructing vertical improvements in such area however swimming pools and non-elevated decks will be permitted in this area. The REA language shall include further restrictions and guidelines on the future use and development of the Property in order to create and preserve the relationship of the residential lots to the existing resort use on Seller's remaining property. The Easements and Right of First Refusal referred to in this Section 13, which may or may not be incorporated into the REA documentation, shall also be subject to the reasonable prior approval of both Buyer and Seller prior to the expiration of the Feasibility Period. Buyer acknowledges and agrees that its residential development will have future restrictions to support and uphold the value, appearance, and operation of the resort property.

If any of the conditions precedent to Buyer's obligations set forth in this Section 13 or elsewhere in the Agreement is not fulfilled by Closing (or within any earlier times set forth herein for the fulfillment thereof after any applicable cure period), or not otherwise waived in writing by Buyer, Buyer may terminate this Agreement by notice to Seller, in which event the Earnest Money (together with earned interest thereon) shall be returned to Buyer, whereupon this Agreement shall become null and void.

14.   **ADJUSTMENTS AND PRORATIONS.** The following are to be prorated and apportioned as of the Closing Date and shall be adjusted against the Purchase Price:

a.   Ad valorem real estate taxes and any other taxes affecting the Premises for the year of closing shall be prorated based upon one hundred five percent (105%) of the most recently ascertainable gross taxes and

b.   All other taxes or assessments (or installments thereof) accruing prior to the date of Closing, special or otherwise, against the Premises, certified as of the date of the Closing shall be paid by Seller and such items which are not certified, as of the date of the

Closing, and all installments accruing after the date of Closing, shall be assumed by Buyer.

The provisions of this Section 14 shall survive the Closing.

15. **DEED/CLOSING MECHANICS – SELLER.** At the Closing of the transaction Seller shall execute and/or deliver to Buyer the following items, which items, shall be in form and substance reasonably satisfactory to Buyer:

a. A Warranty Deed, in a form suitable for recording, conveying good and marketable fee simple title in the Premises to Buyer, free and clear of all liens and encumbrances, except exceptions permitted under this Agreement;

b. Possession of the Premises;

c. Assignment of the Rights and Permits (to the extent transferable);

d. Closing Statement;

e. Mechanics lien, possession and gap affidavit;

f. An acknowledgment, essentially in the form of Exhibit "D," Affidavit of Entity and No Lien Status, shall be executed and delivered to Buyer at closing in two (2) original counterparts with the incomplete provisions thereof completed [or if Temporary Income Tax Regulation U1.445-2T is hereafter amended so that Buyer is not entitled to rely upon such Affidavit, then Seller shall provide Buyer with such other reasonable evidence (in the opinion of Buyer's counsel) to establish that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445]. In the event (a) Seller does not so execute and deliver to Buyer such Affidavit, or (b) such Affidavit is not fully and properly completed and executed as of the Closing Date, or (c) Temporary Income Tax Regulation U1.445-2T is hereafter amended so that Buyer is not entitled to rely upon such Affidavit, and Seller fails to produce by the Closing Date reasonable evidence (in the opinion of Buyer's counsel) to establish that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445, then, in such event, Buyer shall withhold ten percent (10%) of the Purchase Price and pay the withheld amount to the Internal Revenue Service pursuant to Internal Revenue Code Section 1445. Any such amount thus withheld at closing shall be considered as having been paid by Buyer to Seller as part of Buyer's obligation to pay the Purchase Price hereunder; and

g. Such other executed instruments or documents as may be specifically required to be delivered by Seller under the terms of this Agreement whether or not expressly enumerated in this paragraph; and

h. Such other executed instruments or documents as in the reasonable opinion of counsel for Buyer and Seller may be necessary or desirable to effectuate the Closing.

All of the documents and instruments to be delivered by Seller hereunder shall be in form and substance reasonably satisfactory to counsel for Buyer and Seller.

16. **CLOSING MECHANICS - BUYER**. On or prior to the Closing Date, or as otherwise provided, Buyer shall do or perform the following:

a. Cause to be delivered to Seller the Earnest Money and the balance of the Purchase Price;

b. Execute a Closing Statement, itemizing the dollar amounts of all financial matters related to the Closing, including the adjustments and prorations provided for herein;

c. Execute an Acceptance of the assignments referenced in subparagraph c of Section 15 and assumption of obligations thereunder;

d. Execute and deliver such other documents or instruments as in the reasonable opinion of counsel for Seller may be necessary or desirable to effectuate the Closing; and

e. Execute and deliver such other instruments and documents as may be specifically required to be delivered by Buyer under the terms of this Agreement whether or not expressly enumerated in this paragraph.

All of the documents and instruments to be delivered by Buyer hereunder shall be in form and substance reasonably satisfactory to counsel for Seller and Buyer.

17. **CLOSING COSTS**.

a. Seller shall pay the following costs and expenses in connection with the Closing:

(i) The Costs of the preparation of the Warranty Deed;

(ii) All documentary stamps which are required to be affixed to the Warranty Deed;

(iii) The premium payable for the Title Commitment and Owner's Title Policy issued pursuant thereto, as contemplated by Section 5, above; and

(iv) Real estate commission pursuant to Section 19, below.

b. Buyer shall pay the following costs and expenses in connection with the Closing:

|     |     | (i)  | The cost of the Survey, pursuant to Section 3, above; and |
|-----|-----|------|----|

                    (ii)    The cost of recording the Warranty Deed.

            c.      Buyer and Seller shall each pay its own attorney's fees.

        18.     **DEFAULT.** If Seller fails to consummate this Agreement for any other reason (other than Buyer's default or a termination of this Agreement by Seller or Buyer pursuant to a right to do so expressly provided for in the Agreement), or if there has occurred a material breach of any of Seller's representations, warranties, and/or covenants, Buyer may, at its option, either (i) terminate this Agreement, as aforesaid, and receive a full refund of the Earnest Money (together with accrued interest thereon), or (ii) elect to enforce, by an action for specific performance, this Agreement; provided however, that in the event Seller renders it impossible for Buyer to obtain the remedy of specific performance, Buyer shall have the right to seek and obtain actual and consequential damages from Seller due to such default, but not to exceed the value of the Earnest Money.

        If Buyer fails to consummate this Agreement for any reason (other than Seller's default or a termination of this Agreement by Seller or Buyer pursuant to a right to do so expressly provided for in this Agreement), Seller shall, as Seller's sole remedy, retain the Earnest Money (together with accrued interest thereon) as full and complete liquidated damages.

        19.     **BROKERAGE.** Buyer and Seller represent and warrant to each other that they have not dealt with any brokers in connection with this transaction, other than Omega Realty and Development Co., representing Seller, and no other broker was the procuring cause of the transaction contemplated by this Agreement. Buyer and Seller each agrees to protect, defend, indemnify and hold harmless the other, their successors and assigns, from and against any and all obligation, cost, expense and liability, including, without limitation, all reasonable attorney's fees and court costs, arising out of any claim for brokerage commission, finder's commission or other such compensation as a result of the dealings of the indemnifying party in connection with this transaction..

20.     **MISCELLANEOUS PROVISIONS.**

            a.      **Assignment.** Buyer may assign Buyer's rights in this Agreement only with Seller's prior written consent.

            b.      **Notices.** All notices allowed or required to be given hereunder must be in writing and delivered in person, by facsimile, by overnight express delivery .(e.g., Airborne Express, Federal Express, etc.) or by United States certified mail, return receipt requested, and addressed:

**If to Seller:**

            SHS Resort, LLC

100 Main Street, Suite 206
Safety Harbor, Florida 34695
Facsimile: _____
Telephone: _____

With copy to:

Howard P.Slomka, Esq.
-2414 Dallas Highway, Suite 301
-Marietta, GA 30064

Facsimile:770-590-3116
Telephone:770-590-3115

**If to Buyer:**

**Investment Properties Revocable Trust**
2901 Rigsby Lane
Safety Harbor, Florida 34695
Attention: Chuck Ernst
Facsimile:   727-726-2337
Telephone:  727-726-1115

With copy to:

**Forlizzo Law Group, P.A.**
2903 Rigsby Lane
Safety Harbor, Florida 34695
Attention: Robert A. Forlizzo, Esquire
Facsimile:   727-669-6929
Telephone:  727-669-0550

Either party hereto may change the address to which any such notice is to be addressed by giving notice in writing to the other party of such change and delivered in the manner noted hereinabove. Any time limitation provided for in this Agreement shall commence on the date that any notification necessary to commence such time limitation is personally delivered or faxed to the recipient; if mailed by United States mail, on the date of postmark of any return receipt indicating the date of mailing; or if sent by overnight express delivery, on the day following deposit of the package with the overnight delivery company. In the event there is no facsimile number listed in this paragraph for the delivery of notices to Seller, but the party to whom copies of notices to Seller are to be delivered does have a listed facsimile number, then any notices timely delivered by Buyer to such third

party's facsimile number shall be deemed to have been timely delivered to Seller. The attorney for a party has the authority to send and receive notices on behalf of such party.

c. **Entire Agreement**. This Agreement and Exhibits "A," "B," "C," and "D" which are attached hereto and made a part hereof constitute the entire agreement between Seller and Buyer, and there are no other covenants, agreements, promises, terms, provisions, conditions, undertakings, or understandings, either oral or written, between them concerning the Premises other than those herein set forth. No subsequent alteration, amendment, change, deletion or addition to this Agreement shall be binding upon Seller or Buyer unless in writing and signed by both Seller and Buyer.

    (i)    Exhibit "A" – Legal Description

    (ii)   Exhibit "B" - Site Plan

    (iii)  Exhibit "C" - Property Owner or Community Association

    (iv)  Exhibit "D" - Affidavit of Entity and No Lien Status

d. **Headings**. The headings, captions, numbering system, etc., are inserted only as a matter of convenience and may under no circumstances be considered in interpreting the provisions of the Agreement.

e. **Binding Effect**. All of the provisions of this Agreement are hereby made binding upon the personal representatives, heirs, successors, and assigns of both parties hereto.

f. **Time of Essence**. Time is of the essence of this Agreement.

g. **Counterparts**. This Agreement may be executed in any number of counterparts, each of which will for all purposes be deemed to be an original, provided all are identical in all other respects.

h. **Applicable Law, Place of Performance**. This Agreement shall be construed under and in accordance with the laws of the State of Florida.

i. **Buyer's Waiver of Conditions Precedent**. Buyer may, at Buyer's sole option, waive any of the conditions precedent to Buyer's performance specified in this Agreement by giving written notice to Seller at any time on or before the Closing Date.

j. **Critical Dates**. In the event that the Closing Date or any other deadline date (a "Critical Date") described in this Agreement falls on a weekend or a holiday, the Critical Date shall be deemed to be the next business day (the "Rollover Date"). In the case of any agreed upon extension of a Critical Date, the extension period shall begin on the Rollover Date.

k.   **Time Limit on Execution**.  In the event Seller has not signed and returned to Buyer a copy of this Agreement signed by Seller by 5:00 p.m. on March 15, 2011, or sooner, this Agreement shall be deemed null and void with neither party having any further obligation to the other.

l.   **Severability**.  This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations.  If any provision of this Agreement or the application thereof to any person or circumstances shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

m.   **No Recordation**.  Neither this Agreement nor a record or a memorandum thereof shall be recorded in the Public Records of any county in the State of Florida by either party hereto.

n.   **Attorney's Fees**.  In the event of any dispute hereunder or of any action to interpret or enforce this Agreement, any provision hereof or any matter arising therefrom, the prevailing party shall be entitled to recover its reasonable costs, fees and expenses, including, but not limited to, witness fees, expert fees, consultant fees, attorney, paralegal and legal assistant fees, costs and expenses and other professional fees, costs and expenses whether suit be brought or not, and whether in settlement, in any declaratory action, at trial or on appeal. For purposes of this paragraph, the term "prevailing party" shall mean, in the case of the claimant, one who is successful in obtaining substantially all relief sought, and in the case of the defendant or respondent, one who is successful in denying substantially all of the relief sought by the claimant.

o.   **Effective Date**.  When used herein, the term "Effective Date" or the phrase "the date hereof" or "the date of this Agreement" shall mean the last date that either Buyer or Seller executed this Agreement.

p.   **Further Acts and Relationship**.

    (i)   In addition to the acts and deeds recited herein and contemplated and performed, executed, and/or delivered by Seller and Buyer, Seller and Buyer agree to perform, execute, and/or deliver or cause to be performed, executed, and/or delivered at the closing or after the closing any and all such further acts, deeds, and assurances as may be reasonably necessary to consummate the transactions contemplated hereby.

(ii) Nothing contained in this Agreement shall constitute or be construed to be or create a partnership, joint venture or any other relationship of buyer and seller of real Premises as set forth in this Agreement.

q. **Joint Preparation**. The preparation of this Agreement has been a joint effort of the parties and the resulting document shall not, solely as a matter of judicial construction, be construed more severely against one of the parties than the other.

r. **Radon Disclosures**. Buyer acknowledges the following Radon Gas disclosures required by Florida Statutes Section 404.056, Subsection 8.

"RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from county public health units."

s. **Facsimile Transmittal**. Transmittal of this Agreement may be accomplished by facsimile. Any facsimile version of this Agreement shall constitute an original.

21. **RISK OF LOSS BY CASUALTY**. In the event of "minor" loss or damage to the Premises by fire or other casualty (being defined for the purpose of this Agreement as damage to the Premises such that the Premises could be repaired or restored to a condition substantially identical to that of the Premises immediately prior to the event of damage at a cost equal to or less than $100,000), this Agreement shall remain in full force and effect provided Seller performs any necessary repairs prior to the Closing, or, at Seller's option, Seller either (i) reduces the Purchase Price in an amount equal to the cost of such repairs as mutually agreed upon by Buyer and Seller, in which event Seller shall retain all of Seller's right, title and interest to any claims and proceeds Seller may have with respect to any casualty insurance policies relating to the Premises or (ii) assigns to Buyer all of Seller's right, title and interest to any claims and proceeds Seller may have with respect to any casualty insurance policies relating to the Premises.

In the event of a "major" loss or damage (being defined as any loss or damage which is not "minor" as defined hereinabove), Buyer shall have the option of either: (i) terminating this Agreement by notice to Seller and receiving a refund of the Earnest Money, together with accrued interest thereon, or (ii) proceeding with the Closing, provided Seller shall assign to Buyer all of Seller's right, title and interest to any claims and proceeds Seller may have with respect to any casualty insurance polices relating to the Premises.

Upon the Closing, full risk of loss with respect to the Premises shall pass to Buyer.

22.   **RISK OF LOSS BY EMINENT DOMAIN.**  If all or any material portion of the Premises is condemned or taken or Seller receives a written notice thereof of such condemnation or taking by eminent domain prior to the Closing, Seller shall promptly give notice to Buyer.  Buyer shall have the option of either:  (a) terminating this Agreement by notice to Seller within ten (10) days after such notice to Buyer and receiving a refund of the Earnest Money, together with accrued interest thereon, or (b) proceeding with the Closing.  If no such election is made by Buyer to terminate this Agreement, or in the event an immaterial part of the Premises is condemned or so taken, this Agreement shall remain in full force and effect and the purchase contemplated herein, less any interest taken by condemnation or eminent domain, shall be effected with no further adjustments regarding the condemnation or taking and upon the Closing, Seller shall assign, transfer and set over to Buyer all of the right, title and interest of Seller in and to any awards that have been or that may thereafter be make for any such  taking or takings relating to Seller's ownership. If Seller's notice to Buyer is given within ten (10) days prior to the Closing Date, the Closing Date shall be extended to a date three (3) business days after the expiration of Buyer's ten-day period.

23.   **PATRIOT ACT DISCLOSURE.**  Seller and Buyer hereby certify to the other that (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order of the United States Treasury Department as a terrorist, "Specially Designated National or Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation.

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

DATED this _____ day of _____, 2011, which is the date this Agreement has been signed by whichever of Buyer or Seller is the last to sign this Agreement.

**WITNESSES:**

Print Name: CHRIS R LOGAN

Print Name: D FRIDKIN

**SELLER:**

SHS Resort, LLC

By: _____ (Seal)

Name: William E. Touloumis

Title: Manager

Dated: _____

**WITNESSES:**

Print Name: Terri.Duncan

Print Name: CHRiSR.LOGAN

**BUYER:**

**Investment Properties Revocable Trust**

By: _____ (Seal)

Name: Carl Conforti

Title: Trustee

Dated: March 9, 2011

# EXHIBIT "A

## LEGAL DESCRIPTION

*Seller to provide complete legal description and survey*

# EXHIBIT "B"

## SITE PLAN



INVESTMENT PROPERTIES REVOCABLE TRUST
2901 Rigsby Lane, Safety Harbor, FL, 34695
Phone – (727) 725-1115

SAFETY HARBOR SPA

EXHIBIT B
SAFETY HARBOR, FL.

# EXHIBIT "C"

## PROPERTY OWNER'S OR COMMUNITY ASSOCIATION FOR PREMISES

# EXHIBIT "D"

## AFFIDAVIT OF ENTITY AND NO LIEN STATUS

**BEFORE ME**, the undersigned authority, personally appeared _____, in his capacity as _____ of _____, a Florida limited liability company (the "Affiant") who, being by me first duly sworn, deposes and says that:

1.   Affiant is the _____ of _____, a Florida limited liability company ("Owner"), and is authorized to make this Affidavit on behalf of the Owner. The Owner is the owner of the property described in **Exhibit "A"** attached hereto and incorporated herein (the "Property") and upon which the designated fee simple interest is being transferred to _____ ("Transferee"). The Transferee's U.S. Employer Identification Number is _____.

2.   This Affidavit is made for the purpose of inducing Transferee to purchase the Property.

3.   The Owner is not a foreign corporation, foreign partnership, foreign trust, or foreign estate as those terms are defined in the Internal Revenue Code (the "Code ") and Income Tax Regulations or a disregarded entity as defined in I.R.C. Section 1.1445-2(b)(2)(iii). If this entity is not a foreign corporation by virtue of having made a valid election under Section 897 (i) of the U.S. Internal Revenue Code (the "Code "), a copy of the acknowledgment of the election provided to the entity by the Internal Revenue Service pursuant to Section 1.897-3 (d) (4), Treasury Regulations, is attached hereto as an exhibit and incorporated herein.

4.   The Owner's U.S. Employer Identification Number is _____ _____.

5.   The Owner's main office address is _____.

6.   Affiant acknowledges that this Affidavit is being provided to the Transferee in order to inform Transferee that the transfer of the Property is not subject to the withholding requirement imposed by Section 1445 of the Code.   Affiant acknowledges that this Affidavit may be disclosed to the Internal Revenue Service by the Transferee, and that any false statements contained herein could be punished by fine, imprisonment, or both.

7.   Affiant acknowledges that the Transferee shall be relying on the statements contained herein, and accordingly, the Owner hereby agrees to indemnify and hold Transferee and Transferee's counsel harmless against any and all liability, cost, damage and expense, (including, but not limited to, attorney's fees and costs of litigation and appeals) that Transferee or Transferee's counsel shall ever suffer or incur as a result of any false statement contained in Paragraphs 3 through 7 of this Affidavit.

8.   There are no Mechanic's Liens under Chapter 713 of the Florida Statutes filed against the Property; there have been no repairs, improvements or other work done to or labor, materials or services, bestowed upon the Property or any portion thereof, for which any or all of the cost of the same remains unpaid; and no person, firm or

corporation is entitled to a lien against the Property under Chapter 713 of the Florida Statutes as of the date hereof.

9.     The Owner is in exclusive possession of the Property and no person, firm or corporation has any claim of possession which is not a matter of record in the Public Records of the County in which the Property is located.

10.     Incident to the transfer of the Property to Transferee, Transferee has obtained a certain commitment for the issuance of title insurance issued by _____
_____ (the "Title Company") and its agent, the _____ (the "Title Agent") (the "Commitment"). Affiant is familiar with the Commitment. There are no matters pending against the Owner that could give rise to a lien or encumbrance that would attach to the Property between the effective date of the Commitment as set forth in the Commitment and the recordation of the Special Warranty Deed from the Owner to Transferee.

11.     To the best of Affiant's actual knowledge, there are no unrecorded easements, claims of easements, or rights-of-way for users, or other unrecorded agreements creating adverse interests with respect to the Property, except for those reflected on the Commitment.

The undersigned hereby agrees to indemnify and hold the Title Company harmless of and from all loss, cost, damage and expense of every kind which the Title Company shall sustain or become liable for under its policy now to be issued on account of reliance on the statements made herein.

     FURTHER AFFIANT SAYETH NOT.


                                        HSH Resort, LLC, a Florida limited liability
                                        company

                                        By:_____

                                        Name: _____

                                        Title: _____.


                                                   [CORPORATE SEAL]
STATE OF FLORIDA          )
COUNTY OF  PINELLAS    )

     The foregoing instrument was sworn to an acknowledged before me this _____
day of _____, 2011, by _____, as _____
of _____, a Florida corporation, on behalf of the corporation.
He/she is personally known to me or has provided _____ as
identification.

Notary Public
State of Florida at Large
My Commission Expires:

[NOTARY SEAL]

# AMENDMENT TO PURCHASE AGREEMENT

THIS AMENDMENT TO PURCHASE AGREEMENT ("Amendment") is made and entered into as of the latest date below stated for the signature of either Buyer or Seller and this Amendment is made by and between SHS Resort, LLC (hereinafter referred to as "Seller") and Investment Properties Revocable Trust and/or its assigns (hereinafter referred to as the "Buyer").

## RECITALS

WHEREAS Buyer and Seller entered into a Purchase Agreement dated March 9, 2011 (the "Original Agreement") whereby Buyer agreed to purchase from Seller a certain parcel of land consisting of approximately 6.75 acres +/- located near the Safety Harbor Spa, City of Safety Harbor, County of Pinellas, State of Florida; and

WHEREAS Buyer and Seller wish to amend certain terms of the Original Agreement as described below:

NOW THEREFORE in consideration of the mutual covenants contained herein and other good and valuable consideration paid to Buyer and Seller, the receipt and sufficiency of which is hereby acknowledged, Buyer and Seller agree as follows:

1. The First Sentence of Section 8 of the Original Agreement is hereby deleted and replaced with the following:

"Buyer shall have a period of Thirty (30) days following the date the proposed transaction and this Agreement is approved in writing by the Court of competent jurisdiction for the bankruptcy proceeding which affects the Premises ("Feasibility Period") within which to conduct and make such feasibility studies of the Premises as Buyer deems necessary, including but not limited to studies regarding economic use of the Premises, the status of title of the Premises, engineering studies, soil analysis, core drilling, zoning studies, mechanical studies, sewer studies and conduct any and all physical inspections of the Premises."

2. Section 9 of the Original Agreement is hereby deleted in its entirety and replaced with the following:

"CLOSING DATE. The consummation of the transaction contemplated by this Agreement ("Closing" or "Closing Date") shall, unless the closing date is extended as hereinafter provided, take place at a mutually acceptable location in Pinellas County, Florida on or before the later of the following: (a) sixty (60) days after the expiration of the Feasibility Period or (b) fifteen (15) days after the Buyer obtains final, non-appealable site plan approval for Buyer's intended development of the Premises. However, notwithstanding anything to the contrary contained herein, the Closing shall not occur later than 120 days after the expiration of the Feasibility Period, an upon such day Buyer

shall either Close on the transaction contemplated by this Agreement or terminate this Agreement in which event Buyer shall receive a refund of the Earnest Money."

3. Section 13 of the Original Agreement is hereby amended by deleting Subsections 13(e), 13(f), 13(g), 13(h), and 13(k) and replacing them with the following:

"Intentionally Deleted."

4. Other than as amended by this Amendment, the Original Agreement shall continue unamended and this Amendment shall not serve as a novation of the Original Agreement.

IN WITNESSTH WHEREOF Buyer and Seller have set their hand and seal to this instrument the date below stated.

SELLER:

WITNESSES:

SHS Resort, LLC

_____

By: _____ (Seal)

Print Name:

Name: William E. Touloumis

_____

Title: Manager

Print Name:

Dated: _____

BUYER:

WITNESSES:

Investment Properties Revocable Trust

By: _____ (Seal)

Print Name: TERRI DUNCAN

Name: Carl Carter

Title: Trustee

Print Name: Jon Mott

Dated: April 20, 2011



WETLAND
AREA "B"

MITIGATION AREA 1 = 907 SF

MITIGATION AREA 2 = 2381 SF

MITGATION AREA 3 = 452 SF

TOTAL MITIGATION = 3740 SF OR
0.086 ACRES

RIGHT OF FIRST
REFUSAL PROPERTY
(1.35 AC)

INVESTMENT PROPERTIES REVOCABLE TRUST
2801 Rigsby Lane, Safety Harbor, FL 34695
Phone - (727) 726-1115

SAFETY HARBOR SPA

SAFETY HARBOR, FL

EXHIBIT B

GRAPHIC SCALE

0     100     150     200

( IN FEET )
1 inch = 100 ft.

SHEET NO.

1 OF 1