**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

**S.H.S. RESORT, LLC**                    **Case No.: 8:10-bk-25886-MGW**
                                          **Chapter 11 Case**

      **Debtor.**
_____/

**NOTICE OF FILING FULLY EXECTUED**
**AGREEMENT FOR PURCHASE AND SALE**

      Debtor, S.H.S. Resort, LLC, by and through its undersigned counsel, hereby gives notice

of filing the attached fully executed Agreement for Purchase and Sale  in furtherance of the

Order Preliminarily Granting Amended Motion for Entry of an Order Authorizing Sale of Real

Property Free and Clear of All Liens, Claims and Encumbrances (Doc. 255).

Dated this 15th day of June, 2011.

                            **SHUMAKER, LOOP & KENDRICK, LLP**

                      By: **/s/** Hugo S. deBeaubien _____
                            **Steven M. Berman, Esq.**
                            Florida Bar No.: 856290
                            sberman@slk-law.com
                            **Hugo S. deBeaubien, Esq.**
                            Florida Bar No.: 58100
                            bdebeaubien@slk-law.com
                            101 E. Kennedy Blvd., Suite 2800
                            Tampa, Florida 33602
                            Phone (813) 229-7600
                            Facsimile (813) 229-1660
                            *Attorneys for the Debtor*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on June 15, 2011, the foregoing **Notice of Filing Fully Executed Agreement for Purchase and Sale** was served via CM/ECF or via US Mail on: **Nicole C. Nate, Esq.,** Zimmet, Unice, & Salzman, P.A., 2570 Coral Landings Blvd, Suite 201, Palm Harbor, Fl 34684; **Investment Properties Revocable Trust,** Attn: Chuck Ernst, 2901 Rigsby Lane, Safety Harbor, Fl 34695; **Hywel Leonard, Esq.,** 4221 W. Boy Scout Blvd, Suite 1000, Tampa, FL 33607; and **All Creditors and Parties in Interest** on the attached Local Rule 1007-2 matrix.

By: /s/ Hugo S. deBeaubien
Hugo S. deBeaubien

## AGREEMENT FOR PURCHASE AND SALE

THIS AGREEMENT, made and entered into by and among S.H.S RESORT, LLC, a Florida limited liability company (hereinafter called the "*Seller*"), and THE CITY OF SAFETY HARBOR, a municipal corporation existing under the laws of the state of Florida (hereinafter called the "*Buyer*"). The date upon which the later of the Seller and Buyer execute this Agreement shall be referred to as the "*Effective Date*."

## W I T N E S S E T H:

That for and in consideration of the sum of TEN DOLLARS ($10.00) and other good and valuable consideration in hand paid by each of the parties to the other, the receipt whereof is hereby acknowledged each from the other, and in further consideration of the mutual promises, covenants and agreements herein contained, Buyer and Seller, intending to be legally bound, hereby agree as follows:

1. PROPERTY. Seller hereby agrees to sell, assign, transfer, and convey to Buyer, and Buyer hereby agrees to purchase from Seller, all of Seller's right, title and interest in that certain real and personal property described as follows:

a. Land. Seller's fee simple interest in that certain approximately fifteen (15) acre parcel of real property located in Pinellas County, Florida (hereinafter called the "*Land*"), more particularly described in **Exhibit "A"** attached hereto and incorporated herein by reference. The Land is depicted on the sketch attached hereto as **Exhibit "B"** and incorporated herein by reference. The attached sketch is for informational purposes only and in the event of any conflict between it and the Survey to be obtained by Buyer pursuant to Paragraph 6 of this Agreement, the Survey shall control.

b. Improvements. All structures, parking areas, sidewalks, landscaping, utilities, fixtures and improvements situated thereon, owned by Seller and located on or used in connection with the Land, and all appurtenances thereto, now or hereafter located upon the Land (hereinafter called the "*Improvements*").

c. Easements. All easements, rights of way, licenses, privileges, hereditaments and appurtenances, belonging to or inuring to the benefit of the Land and/or Seller, including without limitation the easement for ingress and egress described in Exhibit "A" attached hereto and incorporated herein by reference, and all right, title and interest of Seller in and to the land lying within a street or roadway adjoining the Land and all right, title and interest of Seller in and to any strips, gores, and other pieces of land and any vacated or hereafter vacated street(s) or road(s) adjoining the Land, and all right, title and interest of Seller, if any, in and to any award to be made in lieu thereof and in and to any unpaid award for damage to the Land by reason of change of grade of any street.

d. Personal Property. All furniture, furnishings, fixtures, machinery, equipment and other items of personal property of every kind, description or nature whatsoever owned by Seller that is now or at the time of Closing, as hereinafter defined, shall be located in or upon or

00156425.DOCSLK_TAM: #1346678v4

affixed to the Land or the Improvements or easements, or any part thereof (hereinafter called the "***Personal Property***"), and Seller shall not remove any portion of said Personal Property prior to the Closing of this transaction of purchase and sale, unless replaced in kind and value or unless approved by Buyer in writing.

e. Intangible Personal Property. All of Seller's right, title and interest in and to all deposits, licenses, governmental approvals, permits, contracts and other intangible rights pertaining in any way to the operation of the Land, the Improvements, easements, and/or Personal Property (hereinafter called the "***Intangible Property***").

All of the foregoing items referenced in this Paragraph 1 may hereinafter be collectively referred to as the "***Property***."

2. PURCHASE PRICE FOR PROPERTY. The full purchase price for the Property (hereinafter called the "***Purchase Price***") shall be Four Million Nine Hundred Fifty-Two Thousand Nine Hundred Eighty-Nine and 80/100 U.S. Dollars ($4,952,989.80), calculated as follows and subject to the following conditions:

(a) Four Million Four Thousand Seven Hundred Seventy-Five and 72/100 Dollars ($4,004,775.72) based on a per square-foot purchase price equal to Ten and 33/100 U.S. Dollars ($10.33) for the approximately 8.9 acres of upland property depicted on Exhibit B attached hereto as "Recreation/Open Space" (hereinafter referred to as "***Property A***") subject to adjustment based upon the exact square footage of Property as determined by the survey to be obtained by Buyer pursuant to paragraph 6 below The resulting purchase price for Property A shall be further subject to confirmation by an appraisal obtained by Buyer based on active recreational uses. If the appraised value of Property A is less than $10.33 per square foot, the parties will renegotiate the purchase price of Property A. If the parties cannot agree to a new purchase price, the City may terminate this Agreement as it relates to Property A; plus

(b) Thirty-Seven Thousand Three Hundred Seventy-Four and 48/100 U.S. Dollars ($37,374.48) based on a per square-foot purchase price equal to Zero and 13/100 U.S. Dollars ($0.13) for the approximately 6.6 acres of submerged/wetland area shown on Exhibit B as "Wetland Area" (hereinafter referred to as "***Property B***") subject to adjustment based upon the exact square footage of Property as determined by the survey to be obtained by Buyer pursuant to paragraph 6 below The resulting purchase price for Property B shall be further subject to confirmation by an appraisal obtained by Buyer based on preservation use. If the appraised value of Property B is less than $0.13 per square foot, the parties will renegotiate the purchase price of Property B. If the parties cannot agree to a new purchase price, the City may terminate this Agreement as it relates to Property B; plus

(c ) Nine Hundred Ten Thousand Eight Hundred Thirty-Nine and 60/100 U.S. Dollars ($910,839.60) based on a per square-foot purchase price equal to Thirteen and 94/100 U.S. Dollars ($13.94) for that certain approximately one and one-half (1.5) acres depicted on Exhibit "B" as "+/- 1.5 AC" (hereinafter referred to as "***Property C***") subject to adjustment based upon the exact square footage of Property as determined by the survey to be obtained by Buyer pursuant to paragraph 6 below. The resulting purchase price for Property C shall be further subject to

00156425.DOCSLK_TAM: #1346678v4

confirmation by an appraisal obtained by Buyer based on the permissible uses of the current zoning classification of Property C. If the appraised value of Property C is less than $13.94 per square foot, the parties will renegotiate the purchase price of Property C. If the parties cannot agree to a new purchase price, the City may terminate this Agreement as it relates to Property C.

The Purchase Price shall be computed based on the exact size of the properties, computed to the nearest one one-thousandth (1/1000) of an acre, as shown on the survey to be provided to Buyer pursuant to paragraph 6 of this Agreement.

Notwithstanding the foregoing, Buyer and Seller agree that if Buyer or Seller makes a written request within ten (10) days of the Effective Date for Seller to retain a portion of the Land pursuant to this paragraph then, during the Inspection Period (defined below), the parties shall reasonably cooperate with one another to identify an approximately one and one-half (1.5) to two and one-half (2.5) acres of the Property to be retained by Seller (the "Carve-Out Parcel"), in a location mutually acceptable to both Buyer and Seller, as approved by the Safety Harbor City Commission. Upon agreeing to the location of the Carve-Out Parcel and approval of the location by the Safety Harbor City Commission, Buyer and Seller shall enter into an Amendment to this Agreement pursuant to which the Carve-Out Parcel will be legally described, and the Purchase Price adjusted accordingly. The Purchase Price shall be reduced based upon the per square-foot purchase prices for Property A, Property B and Property C set forth above, depending upon location of the Carve-Out Parcel (*for example: if the Carve-Out Parcel is located within Property A, the Purchase Price would be reduced by an amount equal to $10.33 per square foot of property included within the Carve-Out Parcel; if portions of the Carve-Out Parcel are located in both Property A and Property C, then the Purchase Price would be reduced by an amount equal to $10.33 per square foot of property located within Property A, and $13.94 per square foot of property lying within Property C*). In the event the parties have not agreed upon the location of the Carve-Out Parcel and entered into an Amendment to this Agreement as set forth in this paragraph prior to expiration of the Inspection Period, then either party may terminate this Agreement by providing written notice of such termination to the other party and to Escrow Agent, upon which the Escrow Agent shall refund the Escrow Deposit to Buyer, this Agreement shall be of no further force and effect, and the parties shall have no further obligation hereunder.

The Purchase Price shall be payable as follows:

(i) Buyer shall deposit with Zimmet, Unice & Salzman, P.A. (hereinafter referred to as "***Escrow Agent***") an amount equal to five percent (5%) of the Purchase Price by cashiers' check or wire transfer within five (5) days of approval of this Agreement by the Safety Harbor City Commission, which amount hereinafter shall be referred to as the "***Escrow Deposit***," and which shall be credited to Buyer and paid to Seller at Closing subject to the terms of this Agreement. Escrow Agent agrees and is instructed by the parties hereto to accept and hold the Escrow Deposit in escrow, in a non-interest bearing trust account with a federally insured commercial bank in the State of Florida, pursuant to the terms of this Agreement and for the purposes herein expressed. In the event that Buyer properly elects to cancel this Agreement pursuant to any provision hereof, the Escrow Deposit, shall be returned to Buyer forthwith.

(ii) At Closing of this transaction, Buyer shall pay a sum equal to the difference between the Purchase Price and the amount of the Escrow Deposit that may be credited to Buyer in accordance with the provisions of the prior subparagraph. Said sum shall be subject to prorations, credits, and adjustments permitted or required by this Agreement, and shall be paid by wire transfer of immediately available funds, or by certified or cashier's check drawn on a Florida banking institution.

3. CLOSING; CONDITIONS TO CLOSING.

a. Closing of the purchase and sale of the Property (the "*Closing*") shall occur on or before thirty (30) days after the last day of the Inspection Period (the "*Closing Date*"), subject to satisfaction of all Closing Contingencies set forth in section 3(b) below. Closing shall take place at the offices of Escrow Agent, which shall act as closing agent for this transaction.

b. Conditions to Buyer's Obligations. The obligation of Buyer to consummate the Closing is subject to the satisfaction, as of Closing, of each of the following "*Conditions to Closing*" (any of which may be waived in whole or in part in writing by Buyer at or prior to Closing):

(i) *City Commission Approval.* The purchase of the Property must have been approved by the Safety Harbor City Commission; and

(ii) *Required Permits.* Any and all permits, licenses or qualifications from governmental bodies having jurisdiction over the Property that are required for Buyer's Intended Use (defined below) of the Property, including without limitation any zoning approval(s) shall have been obtained; and

(iii) *Access Easement.* Buyer and Seller shall have agreed upon the form of an easement agreement, if necessary, to allow Buyer and its patrons pedestrian and/or vehicular access to the Property. The location of such easement must be determined and agreed-upon by Buyer and Seller; and

(iv) *Restrictions and Easement Agreement.* Buyer and Seller shall have agreed upon the form of a Declaration of Covenants, Conditions and Easements, subject to approval by the Safety Harbor City Commission, which document shall restrict Buyer's use and development of the Property, excluding Property C, to active recreational uses (hereinafter, "*Buyer's Intended Use*").

(v) Prior to Closing, any of the warranties and representations of Seller contained in this Agreement shall prove untrue or incorrect, or at the time of Closing shall no longer be true and correct;

(vi) Seller shall have failed to honor or fulfill any covenant or undertaking of Seller pursuant to any provision of this Agreement after 20 days' notice of default;

00156425.DOCSLK_TAM: #1346678v4

(vii) Prior to Closing, conditions or restrictions are placed on the development of the Property as contemplated by this Agreement, by federal, state, or county or municipal bodies, laws, regulations or ordinances, which would cause a delay in development of the Property for Buyer's Intended Use, and which Seller has not satisfied or otherwise cured so as to prevent such delay;

(viii) Title Company is not committed to issue to Buyer the title insurance policy required pursuant to this Agreement;

(ix) Any other event shall have occurred which gives Buyer the right to termination pursuant to any other provision of this Agreement.

In the event that any of the foregoing Conditions to Closing have not been achieved on or prior to the Closing date, Buyer may terminate this Agreement by providing written notice thereof to Seller, and in such event Escrow Agent shall return the Escrow Deposit to Buyer, and this Agreement shall be thereupon null and void and all rights and obligations of the parties shall terminate.

4. INSPECTION. Buyer and Buyer's representatives shall have a period of one hundred twenty (120) days subsequent to the Effective Date (hereinafter called the "*Inspection Period*") during which Buyer, Buyer's agents, contractors, employees and representatives, shall have the right and opportunity to:

a. Conduct physical inspections of the Property;

b. Conduct a review of the applicable zoning and building codes, and confirm that the Property conforms to all such laws;

c. Conduct a complete environmental audit of the Property, including without limitation, an inspection of the subsurface soils, upland habitats and wildlife species, wetlands, and flood plain classifications;

d. Conduct a survey of the Property;

e. Conduct an investigation as to availability of utilities and applicable service areas of the Property;

f. Conduct a review of the title to the Property;

g. enter upon the Property so as to be able to perform all inspections, surveys, studies and audits set forth in this Paragraph 4;

provided, however, that: (i) Buyer shall promptly repair any damage to the Property caused by any of the foregoing; (ii) Buyer shall pay all costs and expenses incurred in connection with the foregoing; and, (iii) Buyer shall indemnify and save Seller harmless of and

00156425.DOCSLK_TAM: #1346678v4

from all losses, costs, injuries, damages and liability of any kind arising out of or in connection with Buyer's activities on the Property, including the acts and omissions of Buyer's agents, employees, architects, engineers and other personnel. Nothing contained herein shall be considered a waiver of any immunity from or limitation of liability the Buyer may be entitled to under the doctrine of sovereign immunity or Section 768.28, Florida Statutes.

Notwithstanding the foregoing, the Inspection Period may be extended by Buyer for an additional period of up to thirty (30) days, upon Buyer delivering written notice of such Inspection Period extension prior to expiration of the original Inspection Period. In such case, the Closing Date shall be extended for an equal number of days, accordingly.

Seller agrees that it will cooperate with Buyer in such inspections by giving Buyer reasonable access to the Property, and by assisting Buyer in obtaining relevant documents in the possession or control of others, provided that all out-of-pocket costs and expenses in connection therewith are paid by Buyer.

If, during the Inspection Period, Buyer determines that the Property is acceptable, Buyer shall provide written notice of acceptance to Seller, prior to expiration of the Inspection Period. In the event Buyer determines, in its sole discretion, that a portion of the Property is unacceptable, Buyer shall provide written notice to Seller and may reduce the size of the Property purchased under this Agreement by the portion identified as unacceptable and the Purchase Price shall be reduced accordingly. In the event the Buyer fails to provide written notice of acceptance to Seller at or before expiration of the Inspection Period, this Agreement shall terminate and be of no further force and effect, whereupon (i) Escrow Agent shall return the Escrow Deposit to Buyer, and (ii) this Agreement shall be thereupon null and void and all rights and obligations of the parties shall terminate.

5. TITLE INSURANCE. Buyer shall, within fifteen (15) days of the Effective Date, obtain a written title insurance commitment from Old Republic National Title Insurance Company (hereinafter referred to as the "*Title Company*"), through Escrow Agent, for the issuance of an ALTA Form "B" Standard Florida Policy of title insurance, insuring Buyer's fee simple interest in the Property, in the full amount of the Purchase Price, together with legible copies of all instruments disclosed therein as affecting title to the Property (hereinafter called the "*Title Commitment*"). The Title Commitment shall reflect that Seller has a marketable, record fee simple title in and to the Property, subject only to ad valorem real property taxes for the year of closing, zoning ordinances (provided that the same do not prohibit any existing use of the Property and are consistent with all terms, representations and warranties contained in this Agreement), such exceptions as Buyer may agree to in writing (the foregoing matters shall hereinafter be referred to as the "*Permitted Exceptions*"), and to matters which shall be fully discharged and removed to Buyer's satisfaction at or prior to Closing (which matters shall not be deemed Permitted Exceptions as that term shall hereinafter be employed). The cost and expense for the Title Commitment search and examination fee shall be paid by Seller.

If the Title Commitment discloses that Seller does not hold fee simple title to the Property, or that such interest in the Property is subject to any liens, encumbrances, easements, restrictions or other matters other than the Permitted Exceptions, that are unacceptable to Buyer,

00156425.DOCSLK_TAM: #1346678v4

Buyer shall notify Seller, in writing, on or before ten (10) days following Buyer's receipt of the Title Commitment, specifying the matters which exist with respect to the title to the Property that are unacceptable to Buyer (hereinafter called the "***Title Defects***"). Upon receipt of such notice, Seller shall use good faith and diligent efforts, to cure all Title Defects to the satisfaction of the Buyer, during a period of thirty (30) days subsequent to the date of receipt of such notice, and this transaction shall be closed on or before twenty (20) days after the Buyer notifies the Seller in writing that the Title Defects have been removed to Buyer's satisfaction and have been removed from the Title Commitment, but not earlier than the date for Closing provided for under Paragraph 3 above. Notwithstanding any provision of this Agreement to the contrary, Seller agrees to use the Seller's proceeds of Closing to cure any liens (including, without limitation, mortgages, judgments and mechanics' liens) affecting title to which proper objection has been made by Buyer, and Buyer agrees that Seller may use Seller's Closing proceeds for such purpose. If Seller fails to cure any Title Defects at or prior to the end of the aforesaid thirty (30) day period, then, at Buyer's option, (i) Buyer may cancel this Agreement, whereupon the Escrow Deposit shall be returned to Buyer upon demand therefor and all rights, obligations and liabilities of the parties under this Agreement shall terminate, or (ii) Buyer may elect to purchase the Property in the same manner as if no Title Defects had been found, without reduction of the Purchase Price, but Buyer shall not thereby waive any remedies for such Title Defects, except that Buyer shall release Seller from any liability therefor and from any obligation to share in or otherwise be responsible for the payment of any costs which are incurred in connection with any effort to cure such Title Defects. These shall be the sole remedies of Buyer in the event of a Title Defect. Seller shall pay the premium for the policy of title insurance to be issued to Buyer at Closing. The title insurance policy shall be issued subject only to the Permitted Exceptions, and with all standard exceptions contained in the Title Commitment deleted (except for the Permitted Exceptions), and said policy shall be issued simultaneously with Closing; provided, that the requirements of this sentence shall be satisfied if the authorized agent of Title Company deletes and initials the "gap" exception in the Title Commitment, and deletes and initials all other exceptions contained therein, including all of the standard exceptions, except the Permitted Exceptions.

Seller shall furnish to Title Company, at Closing, with a Seller's Affidavit stating either that there have been no improvements made to the Property during the ninety (90) days immediately preceding the date of Closing, or, if there have been such improvements, that all lienors and potential lienors in connection with such improvements have been paid in full. The affidavit shall further state that there are no unrecorded easements or agreements affecting title to the Property, and that there are no parties entitled to possession thereof. The aforesaid affidavit is hereinafter referred to as the "***No-Lien and Possession Affidavit***."

6. SURVEY. Buyer, at Buyer's sole cost and expense, may obtain a survey of the Land and all Improvements thereon prepared by a professional Florida land surveyor licensed to practice in the State of Florida and approved by Buyer (hereinafter referred to as the "***Survey***") and shall deliver a copy of the same to Seller not later than the end of the Inspection Period. The Survey shall be prepared in accordance with the Minimum Technical Standards for Land Surveying in the State of Florida, pursuant to Chapter 21HH-6, Florida Administrative Code, shall be certified to Buyer, Seller, Title Company, and Escrow Agent, and shall show all of the following:

a. an accurate metes and bounds description of the overall perimeter boundaries of the Land;

b. all improvements on the Land;

c. the location of all easements and rights-of-way affecting or serving the Land or Improvements, including but not limited to any easements described on Exhibit "A" hereto;

d. all encroachments on the Land, and all encroachments of any Improvements on the Land onto other lands or any easement;

e. all matters necessary to cause the Title Company to delete the standard survey and unrecorded easement exceptions from the title insurance policy;

f. the location of any easements necessary for the furnishing of off-site improvements;

g. the total acreage of the Land;

h. certification as to whether the Land is located in a floodplain; and

i. all drainage ditches, canals, rivers, creeks, ponds, lakes, and other waterways located on or traversing the Land, if any; and

j. show all dedicated public streets providing access and whether such access is paved to the Land.

If the Survey shows any encroachments on the Land or any easements appurtenant thereto, shows that any Improvements on the Land encroach on any easement or any other lands, shows lack of lawful access to the Land and Improvements over dedicated and publicly maintained streets or roads, is not sufficient to cause the unqualified deletion of the standard survey and unrecorded easement exceptions from the owner's title insurance policy, or shows any other state of facts rendering title to the Property unmarketable (collectively the "*Survey Defects*"), then written notice to that effect shall be given to Seller within the Inspection Period, and Seller shall have the same obligation and same time to remedy such Survey Defects as is allowed under this Agreement for curing Title Defects. If Seller fails to cure any Survey Defects at or prior to the end of the aforesaid period, then, at Buyer's option, (i) Buyer may cancel this Agreement, whereupon the Escrow Deposit shall be returned to Buyer upon demand therefor and all rights, obligations and liabilities of the parties under this Agreement shall terminate, or (ii) Buyer may elect to purchase the Property in the same manner as if no Survey Defects had been found, without reduction of the Purchase Price, but Buyer shall not thereby waive any remedies for such Survey Defects, except that Buyer shall release Seller from any liability therefor and from any obligation to share in or otherwise be responsible for the payment of any costs which are incurred in connection with any effort to cure such Survey Defects. These shall be the sole remedies of Buyer in the event of a Survey Defect.

7. SELLER'S REPRESENTATIONS AND WARRANTIES. Seller hereby makes the following representations and warranties, each of which is true as of the date hereof and all of which will be true on and as of the Closing Date:

a. Title to Property. Seller holds good, indefeasible and marketable title in and to all of the Land, subject only to the Permitted Exceptions.

b. Authority of Seller. Seller is a Florida limited liability company, organized and in good standing under the laws of the Florida, and upon entry of an Order Authorizing the Sale of Property Free and Clear of Liens by the United States Bankruptcy Court, Middle District of Florida, Tampa Division, in Case No.: 8:10-bk-25886-MGW, styled *In re: S.H.S. Resort, LLC, Debtor* (the "***Bankruptcy Case***"), will have the right and power to enter into this Agreement and sell the Property in fee simple in accordance with the terms and conditions hereof. The execution, delivery and performance of this Agreement by Seller have been duly and validly authorized by all necessary company action on the part of Seller and all required consents or approvals by the members of Seller have been duly obtained.

c. Environmental Representations. Seller warrants and represents that it has not performed and has no knowledge of any excavation, dumping or burial of any refuse materials or debris of any nature whatsoever on the Land. Seller represents and warrants to Buyer that to Seller's best knowledge and belief there are no Hazardous Materials (as defined below) on the Property that would subject Buyer to any liability under either Federal or state laws, including, but not limited to, the disposal of any foreign objects or materials upon or in the Land, lawful or otherwise. Without limiting the generality of the foregoing, Seller represents and warrants to Buyer that to the Seller's best knowledge and belief: (1) the Land is not now and has never been used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, process or in any manner deal with Hazardous Materials (as that term is hereinafter defined); (2) no Hazardous Materials have ever been installed, placed, or in any manner dealt with on the Land; (3) no owner of the Land or any tenant, subtenant, occupant, prior tenant, prior subtenant, prior occupant or person (collectively, "Occupant") has received any notice or advice from any governmental agency or any Occupant with regard to Hazardous Materials on, from or affecting the Land and (4) no radon or other radioactive materials are located on the Land. The term "Hazardous Materials" as used herein includes, without limitation, gasoline, petroleum products, explosives, radioactive materials, hazardous materials, hazardous wastes, hazardous or toxic substances, polychlorinated biphenyls or related or similar materials, asbestos or any material containing asbestos, or any other substance or material as may be defined as a hazardous or toxic substance by any Federal, state or local environmental law, ordinance, rule, or regulation including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Section 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801, et seq.) the Resource Conservation and Recovery Act, as amended (42 U.S.C. Section 1251, et seq.), the Clean Air Act, as amended (42 U.S.C. Section 7401, et seq.) and in the regulations adopted and publications promulgated pursuant thereto.

d. No Special Taxes. The Property is free from special taxes and assessments; more particularly, there are no assessments for public improvements or otherwise against the Property which remain unpaid, including without limitation, those for construction of sewer, water, gas and electric lines and mains, streets, roads, sidewalks and curbs and, to the best of Seller's knowledge, none have been proposed.

e. Regulatory and Governmental Status of Property.

(i) To the best of Seller's knowledge, there are no outstanding orders, requirements or demands of any federal, state or local government agency or of any other governmental body, including a court of competent jurisdiction (collectively, an "*Authority*") that have not been complied with, with respect to the Property. Any such orders issued to Seller prior to Closing will be complied with by Seller prior to Closing.

(ii) To the best of Seller's knowledge, other than the Bankruptcy Case and that certain case styled *Wells Fargo Bank National Association vs. SHS Resort, LLC*; Pinellas County Circuit Court Case No.: 10015705CI (the "Foreclosure Action") there are no proceedings, litigation or claims pending before an Authority with respect to the Property (or to Seller's knowledge is threatened); any documents which may hereafter be received by Seller in connection with such a proceeding will promptly be provided to Buyer. If any such proceedings are instituted after the date hereof and before Closing, Seller agrees to take such steps prior to Closing at Seller's own cost and expense, as may be necessary to terminate such proceedings.

f. Leases. There are no leases affecting the Property, and no party has any right to occupy or use the Property other than Seller. Between the date hereof and Closing, Seller will not make any new leases affecting the Property or any part thereof.

g. Management Agreements and Service Contracts. Seller shall furnish Buyer with a true, correct and complete copy of each maintenance, security, and/or service contract, business agreements and all other agreements, if any (the "*Service Contracts*") presently in force with respect to the Property within ten (10) days from the Effective Date hereof. Seller agrees, at Seller's sole expense, to cancel any Service Contract as of Closing upon Buyer's written request. The Service Contracts (if any) are now in full force and effect in accordance with their terms and conditions without any material default by Seller or the other parties thereto. There are no collective bargaining agreements or contracts (written or oral) to which Seller is a party. The Seller shall not amend the Service Contracts and shall not enter into any new Service Contracts or renew any existing Service Contract prior to Closing without first obtaining Buyer's prior written approval, unless such Service Contract is cancelable by Buyer within ten (10) days after Closing.

i. Condemnation Proceedings; Roadways.

(i) To the best of Seller's knowledge, there are no condemnation proceedings against the Property or any part thereof and the Seller has received no notice, oral or written, of the desire of any public authority or other entity to take or use the

Property or any part thereof. Seller shall deliver to Buyer within ten (10) days after Seller's receipt thereof copies of any such notices received through the date of Closing.

(ii) All roadways upon the Property connect to adjacent public streets. Seller has received no notice, oral or written, of any change or proposed change in the route, grade, width, or otherwise affecting any major street or road abutting the Property. If Seller receives any such notice, it promptly will give notice of same to Buyer.

j. Pending Litigation. Other than the pending Bankruptcy Case and the Foreclosure Action, Seller is not now a party to any litigation affecting the Property, and Seller knows of no litigation or threatened litigation affecting or which would affect the Property or any basis for any such litigation. To the best of Seller's knowledge, there is no proceeding pending for the reduction of the assessed valuation of the Property or any portion thereof. Seller shall give Buyer prompt notice of the institution prior to Closing of any such litigation.

k. No Encroachments. To the best of Seller's knowledge, any Improvements are completely within the boundary lines of the Land as described in Exhibit "A," any Improvements on the Property do not violate any setback requirements and no structure of any kind encroaches on the Land, and there are no material encroachments on or from the Property or on or from an easement, right-of-way or roadway.

l. Defaults As a Result of This Agreement. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will: (i) conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, any agreement or instrument to which Seller, or any predecessor of Seller, is a party; or (ii) violate any restriction to which the Seller is subject, including any charter, articles of incorporation, by-laws or similar documents; or (iii) constitute a violation of any applicable code, resolution, law, statute, regulation, ordinance, rule, judgment, decree, or order; or (iv) result in the creation of any lien, charge or encumbrance (except as provided for in this Agreement), upon any of the properties or assets to be sold or assigned to Buyer, pursuant to the provisions of this Agreement.

m. No Mechanic's Liens. All labor performed upon or material furnished for the Property will, as of Closing, be paid for.

n. Seller has no information or knowledge of any change contemplated in any applicable laws, ordinances, or regulations, or any judicial or administrative action, or any action by adjacent landowners, or natural or artificial conditions upon the Property which would prevent, limit or impede Buyer's development or use of the Property.

o. Seller has no knowledge of any failure to have complied with all applicable laws, ordinances, regulations, statutes, rules and restrictions pertaining to and affecting the Property. Performance of this Agreement will not result in any breach of, or constitute any default under, or result in the imposition of, any lien or encumbrance upon the Property under any agreement or other instrument to which Seller is a party or by which Seller or the Property might be bound. Seller shall comply, at its sole expense, with any and all environmental and

other applicable rules, regulations, and conditions of existing and future development or operational permits.

p. No written or verbal commitments have been made to any governmental authority, utility company, school board, church or other religious body, or any homeowners association, or to any other organization, group, or individual, relating to the Property which would impose an obligation upon Buyer or its successors or assigns to make any contribution or dedications of money or land or to construct, install, or maintain any improvements of a public or private nature on or off the Property.

q. Except as depicted on Exhibit B, no other part of the Property has been designated as wetlands or inhabited by any endangered species by any governmental agency having jurisdiction.

r. Seller has not failed to disclose to Buyer any known material adverse fact or condition regarding this Agreement, the Property or the transaction contemplated hereunder.

s. All information furnished to Buyer by or on behalf of Seller prior to the execution hereof or pursuant to the provisions of this Agreement is true and correct in all material respects and fairly and accurately reflects the condition or statement of facts reported to be described or represented thereby.

t. Buyer is the sole contract purchaser of the Property, including all surface and mineral estates.

u. There are no known surface faults, ground settling soil or subsoil conditions or similar problems from any cause on or in the vicinity of the Property which would restrict, impair or prohibit use of the Property in accordance with Buyer's intended use of the Property.

v. Seller shall deliver possession of the Property and all of the rights thereto at Closing.

w. Events Pending Closing and Further Information. Seller agrees to immediately notify Buyer, in writing, of any event or condition of which Seller has knowledge and which occurs prior to Closing hereunder, which causes a material change in the facts relating to, or the truth of any of the above representations. Seller has no knowledge or information of any facts or circumstances which would materially adversely affect the operation of the Property which are not set forth in this Agreement. Each of the warranties and representations contained in this paragraph and other paragraphs of this Agreement shall be deemed made as of the date of this Agreement and again as of the date of Closing. Seller's representations and warranties set forth in this Paragraph 7 shall be continuing and are deemed to be material to Buyer's execution of this Agreement and Buyer's performance of its obligations hereunder. All such representations and warranties shall be true and correct on and as of the Closing, and all of such representations and warranties shall survive the Closing Date or any cancellation or termination of this Agreement, and shall not be affected by any investigation, verification or approval by any party hereto or by anyone on behalf of any party hereto. Seller agrees to indemnify and hold Buyer

harmless for, from, and against any loss, costs, damages, expenses, obligations and attorneys' fees incurred should an assertion, claim, demand, action or cause of action be instituted, made or taken, which is contrary to or inconsistent with the representations or warranties contained herein.

8. **BUYER'S REMEDIES IN EVENT OF BREACH OF SELLER'S REPRESENTATIONS AND WARRANTIES.** All obligations of Buyer under this Agreement are subject to the fulfillment, at or prior to Closing, on the condition precedent that all representations, covenants, and warranties of Seller contained in this Agreement shall not only have been true and complete as of the Effective Date hereof, but shall also be true and complete again as of the Closing Date and Seller's performance of all covenants and obligations of Seller under this Agreement. If any of the representations and warranties contained in this Agreement are not true and correct both on the Effective Date of this Agreement and again as of the date of Closing, Buyer may elect to cancel this Agreement, in which event Buyer shall be entitled to a return of the Escrow Deposit and this Agreement shall thereupon be deemed null and void (but without prejudice to any right or remedy Buyer may have as a result of any breach of the representations and warranties contained herein), or Buyer may elect to close the sale without adjustment to the Purchase Price.

9. **SELLER'S DELIVERIES AND CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS:** In addition to other conditions precedent set forth elsewhere in this Agreement, Seller shall deliver to Buyer at Closing all of the following documents, the delivery and accuracy of which shall be a condition to Buyer's obligation to consummate the purchase and sale herein contemplated:

a. _Special Warranty Deed._ Seller shall convey title which is marketable, insurable, and indefeasible. An executed Special Warranty Deed reasonably satisfactory in form and substance to counsel for Buyer and in form for recordation, conveying all of seller's right, title and interest in and to the Land, free and clear of all liens, encumbrances, easements and restrictions except for the Permitted Exceptions as referred to in Paragraph 5 hereof.

b. _Bill of Sale._ A bill of sale, duly executed by Seller and transferring, assigning and conveying to Buyer (i) good and marketable title to all the Personal Property, and (ii) all rights of Seller in, to and under any leases of the Personal Property, if any.

c. _Seller's Authorization._ A certificate of Seller's good standing as a limited liability company in the State of Florida, together with a certified copy of the resolution of Seller's Board of Directors evidencing authorization of the officers or agents acting for Seller and authorization and approval of this Agreement and all transactions and deliveries contemplated hereby.

e. _No-Lien and Possession Affidavit._ Seller shall deliver an owner's affidavit in form sufficient and acceptable to the Title Company so as to allow it to eliminate the applicable standard owner's exceptions, including mechanic's lien, and gap exceptions from the commitment and policy, and otherwise reasonably acceptable to Buyer, and running to the benefit of Buyer, the Title Company, and the Title Agent.

00156425.DOCSLK_TAM: #1346678v4

f. Non-Foreign Affidavit. The Affidavit and/or any Withholding Document, as defined in and required by Paragraph 15 below.

g. Settlement Statement. A settlement statement in form reasonably acceptable to Buyer and Seller.

h. Absolute Assignment of Leases, Permits, Licenses and Services Contracts. Seller must execute and deliver to Buyer, in a form reasonably acceptable to Buyer, an absolute assignment of all leases, permits, licenses and service contracts affecting the Property, including without limitation all security deposits held by Seller in connection with any tenant leases.

i. Other Documents. Seller and Buyer shall execute and/or deliver all other documents required by this Agreement and/or Title Agent, including without limitation an Order of the United States Bankruptcy Court authorizing the sale of the Property to Buyer under the terms and conditions set forth in this Agreement.

Moreover, Seller shall deliver copies of forms of all of the forgoing documents, and all other documents which Seller is required to deliver under the terms of this Agreement, to Buyer's counsel, at the office of said counsel, for review and approval no later than three (3) days prior to Closing.

10. PRORATED ITEMS AND ADJUSTMENTS: The Buyer and Seller shall each pay their own legal fees related to the preparation of this Agreement and all documents required to settle the transaction contemplated hereby. At Closing, the following adjustments and prorations shall be computed as of midnight of the day preceding Closing and the cash portion of the Purchase Price shall be adjusted to reflect such prorations, as follows:

a. Service Contracts and Other Accounts Payable; Insurance. All prepayments made or payments due under any continuing service contract affecting the Property, including water, sewer, electric, gas, telephone and other utility bills, parking, garbage removal, promotional contracts and maintenance agreements and fees and expenses for music, entertainment, trade association dues and trade subscription, and management contracts, shall be prorated, and paid by the Buyer to the Seller, or vice versa, as the case may be. Seller shall be responsible for effecting all "change" notices for all utilities and other service contracts, and all such notices shall be delivered to the provider of the service prior to Closing. Any prepaid insurance premiums relating to policies which Buyer may elect to assume, in its sole discretion, shall be prorated. Seller shall bear all costs for canceling any and all insurance policies, management contracts and other service contracts not assumed by Buyer, and Seller shall cause all such cancellations to occur prior to or as of Closing.

b. Real Property Taxes. Seller acknowledges that Buyer is exempt from real property taxation. At Closing, real estate taxes and assessments for the Property for the year within which the Closing occurs shall be prorated and paid in accordance with the procedures established by §196.295, Florida Statutes. Seller shall remain responsible and liable for all taxes regardless of when accrued and payable based on Seller's ownership.

00156425.DOCSLK_TAM: #1346678v4

c. <u>Personal Property Taxes</u>. Personal property taxes attributable to the Personal Property, if any, shall be paid by Seller.

d. <u>Special Assessments</u>. All special assessments and other similar charges which affect or have become a lien upon the Property at Closing shall, at the Buyer's option, either be paid in full by Seller at Closing or credited against the cash portion of the Purchase Price and assumed by Buyer. If an assessment may be paid in installments, all installments shall be deemed payable as of the day prior to Closing and shall be discharged of record by Seller or Buyer shall be given credit therefor against the Purchase Price.

e. <u>Miscellaneous</u>. In the event accurate prorations and other adjustments cannot be made at Closing because current bills are not obtainable, the parties shall prorate on the best available information, subject to adjustment upon receipt of the final bill. Seller shall use its best efforts to have all Utility meters read on the date of Closing so as accurately to determine the proration of current Utility bills.

11. <u>CLOSING COSTS</u>. Buyer and Seller shall pay the costs of Closing as follows: Seller shall pay the title insurance premium and all other charges by the Title Company, the costs for preparation and recording of any required corrective title documents and state documentary stamp taxes on the warranty deed conveying title to Buyer; Buyer shall pay the cost of recording the warranty deed conveying title to the Buyer, all survey costs for the Survey, the costs associated with any financing obtained by Buyer, and the cost of all due diligence conducted by Buyer.

12. <u>CONDEMNATION</u>: In the event of condemnation or transfer in lieu thereof ("***Condemnation***") or receipt of notice of Condemnation of any material part of the Property by governmental authority on or prior to the date of Closing, Buyer may, at its election, terminate this Agreement and the full amount of the Escrow Deposit shall thereupon be returned to Buyer and the parties shall have no further obligation to one another under this Agreement. In the event that Buyer shall not elect to terminate this Agreement, then this Agreement shall remain in full force and effect, and Buyer shall be entitled to receive all awards, proceeds, deposits, and monies received or collected by reason of such condemnation and Buyer shall be entitled to control all negotiations with the condemning authority. Further, Seller shall assign and transfer to Buyer at Closing by written instrument all of Seller's right, title, and interest in any condemnation awards and proceeds.

13. <u>FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT PROVISION</u>. Except as otherwise provided herein, Buyer, pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended ("***Section 1445***") and the regulations promulgated thereunder ("***Regulations***"), shall be required to and shall withhold such amount as is necessary to comply with Section 1445 and the Regulations and shall timely remit to the Internal Revenue Service the amount so withheld along with properly completed remittance forms. If, however, on or before the date of Closing, Seller provides Buyer with (1) an Affidavit of Non-Foreign Status regarding Seller, (2) a Notice of Non-Recognition Treatment, or (3) a Withholding Certificate establishing that no, or a reduced, amount of federal income tax is required to be withheld under Section 1445 (collectively "***Withholding Document***") in proper form as required by the Regulations, and

Buyer has no knowledge or notice that the Withholding Document furnished by Seller is false, as determined in accordance with the Regulations, then Buyer shall not be required to withhold any portion of the amount payable to Seller or shall be allowed to withhold such lesser amount as is required by the applicable Withholding Document, as the case may be, and shall submit the amount so withheld to the Internal Revenue Service along with properly completed remittance forms.

14. BROKERAGE. Buyer and Seller hereby each represent and warrant to one another that neither has dealt with, consulted, or contacted any real estate broker, agent or finder in connection with or in bringing about the sale of the Property. Seller hereby agrees to defend, indemnify and hold Buyer harmless against claims by any broker, agent or salesman claiming by, through or under Seller, for a commission or other compensation in connection with the purchase and sale of the Property. Buyer hereby agrees to defend, indemnify and hold Seller harmless against any claims of any brokers, agents or salesmen claiming entitlement to a commission by, through or under Buyer in connection with the purchase and sale of the Property.

15. DEFAULT OF BUYER. In the event that Buyer defaults with respect to the performance of any or all of its obligations under this Agreement and such default continues for a period of thirty (30) days after delivery of written notice thereof from Seller to Buyer, the Escrow Deposit shall be paid by Escrow Agent to Seller as liquidated and agreed upon damages for the default of Buyer, and in full settlement of all claims, and this Agreement thereupon shall be deemed null and void. This shall be the sole and exclusive remedy of Seller in the event of any default by Buyer under this Agreement.

16. DEFAULT OF SELLER. In the event that Seller defaults with respect to the performance of any or all of its obligations under this Agreement or refuses to perform this Agreement, the Escrow Deposit shall be returned to Buyer, in full settlement of all claims, and this Agreement thereupon shall be deemed null and void. This shall be the sole and exclusive remedy of Seller in the event of any default by Buyer under this Agreement.

17. ATTORNEYS' FEES AND COSTS. In connection with any litigation or court proceedings arising out of this Agreement, the prevailing party shall be entitled to recover all costs incurred, including reasonable attorneys' and legal assistants' fees incurred for services rendered before suit is brought, prior to trial, at trial, on appeal, or in federal bankruptcy proceedings.

18. PROVISIONS WITH RESPECT TO ESCROW AGENT. Escrow Agent shall hold the Deposit in escrow in a non- interest-bearing trust account until the earlier occurrence of (i) Closing, (ii) election by Buyer to terminate this Agreement by reason of a specific right of termination granted to Buyer under this Agreement or (iii) breach of this Agreement by either party. Escrow Agent shall release and pay over to Seller the Deposit upon the earlier of (i) the Closing Date or (ii) Buyer's breach of or default under this Agreement. In the event of a proper termination, then the Deposit including all interest thereon shall be released by Escrow Agent and paid to Buyer. The tax identification numbers of the Parties shall be furnished to Escrow Agent upon request. If, for any reason, the Closing does not occur and either party makes a written demand upon Escrow Agent for payment of the Deposit, Escrow Agent shall give written

notice to the other party of such demand. If Escrow Agent does not receive a written objection from the other party to the proposed payment within five (5) business days after the giving of such notice, Escrow Agent is hereby authorized to make such payment. If Escrow Agent does receive such written objection within such five (5) business day period, Escrow Agent shall continue to hold such amount until otherwise directed by written instructions from the parties to this Agreement or a final judgment or arbitrators' decision. However, Escrow Agent shall have the right at any time to deposit the Deposit with the Clerk of the Court. Escrow Agent shall give written notice of such deposit to Seller and Buyer. Upon such deposit, Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

The parties acknowledge that Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that Escrow Agent shall not be deemed to be the agent of either of the parties for any act or omission on his part unless taken or suffered in bad faith in willful disregard of this Agreement or involving gross negligence. Seller and Buyer shall be responsible to reimburse Escrow Agent for all costs, claims and expenses, including reasonable attorney's fees, incurred in connection with the performance of Escrow Agent's duties hereunder, except with respect to actions or omissions taken by Escrow Agent in bad faith, in willful disregard of this Agreement or involving gross negligence on the part of the Escrow Agent.

The parties shall deliver to Escrow Agent an executed copy of this Agreement, which shall constitute the sole instructions to Escrow Agent. Buyer and Seller may elect, in their sole discretion, to execute preprinted escrow instructions; provided that in the event of any conflict between the preprinted escrow instructions and the provisions of this Agreement, the provisions of this Agreement shall control.

Escrow Agent, as the person responsible for closing the transaction within the meaning of Section 6045 (e) (2) (A) of the Internal Revenue Code of 1986 (the "Code"), shall file all necessary information reports, returns, and statements (collectively, the "tax reports") regarding the transaction required by the Code including, but not limited to, the tax reports required pursuant to Section 6045 of the Code.

19. <u>NOTICES</u>. Any notice or demand which must or may be given under this Agreement or by law shall be in writing and shall be deemed to have been given when delivered by personal delivery (and for the purposes of this Agreement receipt by telecopy at the notice addresses set forth below shall constitute personal delivery) or when deposited in the United States mail, certified, return receipt requested, full postage prepaid, addressed to the respective parties at the following addresses:

IF TO SELLER:

S.H.S. Resort, LLC
100 Main Street, Suite 206
Safety Harbor, Florida 34695
Facsimile: (727) ___-____

WITH A COPY TO:

Steven S. Berman, Esq.
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard, Suite 2800
Tampa, Florida 33602

Facsimile: (813) 229-1660
sberman@slk-law.com

| | |
|---|---|
| IF TO BUYER: | The City of Safety Harbor ATTN: City Manager |
| | 750 Main Street |
| | Safety Harbor, Florida 34695 |
| | Facsimile: (727) 724-1566 |
| | |
| WITH A COPY TO: | Alan S. Zimmet, Esq. |
| | Zimmet, Unice & Salzman, P.A. |
| | 2570 Coral Landings Blvd., Suite 201 |
| | Palm Harbor, Florida 34684 |
| | Facsimile: (727) 723-1421 |
| | azimmet@zimmetunice.com |
| | |
| IF TO ESCROW AGENT: | Zimmet, Unice & Salzman, P.A. |
| | 2570 Coral Landings Blvd., Suite 201 |
| | Palm Harbor, Florida 34684 |
| | Attn: Alan S. Zimmet |
| | Facsimile: (727) 723-1421 |
| | azimmet@zimmetunice.com |

The foregoing addresses may be changed by the giving of a written notice as provided in this Paragraph. For the purposes of this Agreement, notice given to or by an attorney for any of the parties hereto shall be deemed notice to the party whom said attorney represents in connection with this transaction.

20. <u>GENDER</u>. Words of any gender used in this Agreement shall be held and construed to include any other gender; any words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.

21. <u>CAPTIONS</u>. The captions in this Agreement are inserted only for the purpose of convenient reference and in no way define, limit or prescribe the scope or intent of this Agreement or any part hereof.

22. <u>CONSTRUCTION</u>. The parties hereto acknowledge that with respect to the transactions contemplated herein (A) each party and its counsel has reviewed and revised this Agreement and that no term, covenant or provision of this Agreement shall be construed by any court, government, governmental authority or arbitration panel against any party hereto by reason of such party's being deemed to have drafted or structured such term, covenant or provision; (B) neither party has received from the other any accounting, tax, legal or other advice; and (C) each party has relied solely on the advice of its own accounting, tax, legal and other advisors.

23. <u>ENTIRE AGREEMENT</u>. This Agreement constitutes the entire understanding and agreement of the parties hereto and supersedes all prior understandings, if any, there being no

00156425.DOCSLK_TAM: #1346678v4

other oral or written promises, conditions, representations, understandings, or terms of any kind as conditions or inducements to the execution hereof and none have been relied upon by either party. Any subsequent conditions, representations, warranties, agreements or amendments to or modifications of this Agreement shall not be valid and binding upon the parties unless the same shall be embodied in a subsequent writing signed by the party to be charged thereby.

24. COUNTERPART EXECUTION. This Agreement may be executed by all parties in multiple counterparts, each of which shall be deemed an original, but all of such counterparts taken together shall constitute one and the same Agreement.

25. GOVERNING LAW. This Agreement shall be construed, governed, interpreted and enforced in accordance with the laws of the State of Florida. Jurisdiction for any state action arising out of this Agreement shall lie solely in the Sixth Judicial Circuit in and for Pinellas County, Florida, and for any federal action arising out of this Agreement shall lie solely in the U.S. District Court, Middle District of Florida, Tampa Division.

26. TIME. Any reference herein to time periods of fewer than seven (7) days shall in the computation thereof exclude Saturdays, Sundays and all legal holidays in Pinellas County, Florida. Any time period which shall end on a Saturday, Sunday or legal holiday in Pinellas County, Florida, shall automatically extend to 5:00 p.m. of the next full day which is not a Saturday, Sunday or such legal holiday. Time is of the essence of this Agreement and each and every term and provision hereof.

27. SUCCESSORS AND ASSIGNS. The terms, covenants and conditions of this Agreement shall inure to the benefit of, and shall be binding upon, the respective heirs, personal representatives, successors and assigns of the parties hereto.

28. ASSIGNMENT. This Agreement may not be assigned by Buyer.

29. **Survival.** Notwithstanding any presumption to the contrary, all obligations, covenants, conditions, representations, warranties and agreements of the Seller and Buyer contained in this Agreement shall be restated as true and correct as of Closing and survive the Closing contemplated herein.

30. **Partial Invalidity.** In the event that any paragraph or portion of this Agreement is determined to be unconstitutional, unenforceable or invalid, such paragraph or portion of this Agreement shall be stricken from and construed for all purposes not to constitute a part of this Agreement, and the remaining portion of this Agreement shall remain in full force and effect and shall, for all purposes, constitute this entire Agreement.

31. **Seller's Indemnification.** Seller hereby agrees to defend, indemnify, save and hold Buyer, its successors and assigns, harmless from and against any and all liabilities and claims regarding or relating to the Property, arising from personal injury, property damage and contractual liability existing or occurring on or before the Closing, or as a result of Seller's acts or omissions unless same arise from any negligent actions or activities of Buyer, its agents or employees. The obligations of Seller under this paragraph shall not be affected by an
00156425.DOCSLK_TAM: #1346678v4

investigation by or on behalf of Buyer, or by any information which Buyer may have or obtain, and shall be in addition to any other statutory claim or right of indemnification, contribution or for any other claim for breach of contract Buyer may have. The terms of this paragraph shall expressly survive the Closing.

32. **Waiver of Breach**. The failure of any party hereto to enforce any provision of this Agreement shall not be construed to be a waiver of such or any other provision, nor in any way to affect the validity of all or any part of this Agreement or the right of such party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year hereinafter listed. We have read and fully understand this Agreement.

**SIGNATURES WITNESSED BY:**

Print Name: DENNIS J KOMAR

Print Name:

**SELLER:**

**S.H.S Resort, LLC**, a Florida limited liability company

By:
Print Name: William E. Touloumis
Title:
Date: May ____, 2011

**BUYER:**

**The City of Safety Harbor**, a municipal corporation existing under the laws of the state of Florida

By: Matt McLachlan for Matt Spoor, City Manager
Print Name: Matt McLachlan for Matt Spoor, City Mgr.
Title: Community Development Director
Date: May 20, 2011

ATTEST:

Print Name: Karen Sammons
For CITY CLERK

00156425.DOCSLK_TAM: #1346678v4

**Zimmet, Unice & Salzman, P.A.**

By:_____
    Alan S. Zimmet
    President

Date: _____

# EXHIBIT "A"

# EXHIBIT "B"