UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Safety Harbor Resort and Spa,                          Case No. 8:10-bk-25886-MGW
a/k/a S.H.S. Resort, LLC                                Chapter 11

       Debtor.

_____/

## MEMORANDUM OPINION ON PLAN CONFIRMATION[1]

The Debtor proposed a chapter 11 plan that provides for the contribution of substantial

assets from the principals of the Debtor's parent company, Olympia Investment Group, LLC.,

who are also the non-debtor guarantors of a debt owed to a creditor, German American Capital

Corporation, to help effect a successful reorganization. In exchange for that contribution, the

Debtor requested releases for the non-debtor guarantors. The Court, instead, imposed a four-year

stay on any actions by German American against the non-debtor guarantors. German American

has requested that the Court impose certain "lock-up" restrictions on the reorganized Debtor's

business operations and the non-debtor guarantors to prevent the Debtor and the non-debtor

guarantors from disposing of assets during the four-year injunction period to thwart any potential

future collection efforts.

The Debtor objects to German American's proposed "lock-up" restrictions with respect

to the non-debtor guarantors on the basis that they exceed this Court's constitutional authority

under the Supreme Court's recent decision in *Stern v. Marshall*.[2] The Debtor reads *Stern* too

---

[1] The Court conducted hearings on confirmation of the Debtor's plan on April 20, April 26, May 25, June 29, and July 27, 2011 ("Confirmation Hearing"). At the May 25, 2011 hearing, the Court announced its findings of fact and conclusions of law with respect to the contested issues under 11 U.S.C. § 1129(a) argued at the April 20 and April 26, 2011 hearings. Transcript of Hearing (Doc. 267). The Court's oral ruling did not deal with the issues that are the subject matter of this Opinion.

[2] 131 S. Ct. 2594 (2011).

broadly. The Supreme Court's holding in *Stern* was very narrow. The Supreme Court merely held that Congress exceeded its authority under the Constitution in one isolated instance by granting bankruptcy courts jurisdiction to enter final judgments on counterclaims that are not necessarily resolved in the process of ruling on a creditor's proof of claim. Nothing in *Stern* limits a bankruptcy court's jurisdiction over other "core" proceedings. Nor does the *Stern* Court's reliance on its earlier decision in *Granfinanciera*[3] somehow impose some new limitation on this Court's jurisdiction that has not existed since that case was decided over twenty years ago. Besides, parties can still consent—either expressly or impliedly—to a bankruptcy court's jurisdiction after *Stern*.

Accordingly, this Court has jurisdiction to impose "lock-up" restrictions on the reorganized Debtor's business operations and the non-debtor guarantors.

## Background

The Debtor owns and operates a 175-room resort in downtown Safety Harbor, Florida. The Debtor acquired the resort in December 2004 for $25 million. Approximately $17 million of the purchase price was financed through BB&T Bank. In October 2006, the Debtor refinanced its acquisition of the resort through Wells Fargo Bank. The Debtor used the net proceeds from the $29.7 million refinancing for extensive renovations to the guestrooms (and major portions of the common area), as well as capital improvements. Under its loan agreement with Wells Fargo, the Debtor was required to sell or develop 15 acres of undeveloped land adjoining the resort. The principals of the Debtor's parent corporation, Olympia Investment Group, LLC, personally guaranteed the Debtor's obligations to Wells Fargo.

---

[3] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S. Ct. 2782, 106 L. Ed. 2d 26 (1989).

When the Debtor refinanced its mortgage, the appraised value of the resort fully secured the $29.7 million loan. But revenue generated from the resort was only able to support half of the debt service allocated to resort operations. And since 2008, resort revenues have decreased by over 40%. That decrease in revenues, coupled with the collapse of the real estate market, left the Debtor unable to service the debt and either sell or develop the 15 acres of adjoining land.

As a consequence, the Debtor filed for chapter 11 bankruptcy principally to value the secured portion of its loan with Wells Fargo in hopes of reducing its overall debt service. The Debtor and Wells Fargo were able to agree on a value for the resort: approximately $13.8 million. Wells Fargo later sold its loan to German American. As a consequence of the parties' agreement on value, German American holds a secured claim in this case in the amount of approximately $13.8 million and an unsecured claim for the balance in the amount of approximately $15.9 million.

The Debtor's plan proposes to pay German American's secured claim from three sources. First, Olympia Development Group, Inc. ("Olympia"), an entity that is owned by the non-debtor guarantors, will provide approximately $3 million from the sale of some of its assets. Second, the Debtor also proposes to sell a portion of its undeveloped land and use the proceeds from that sale (net of any outstanding real estate taxes) to further pay down the secured claim. Third, under the Debtor's plan, the Debtor proposes to pay German American's reduced secured claim in full based upon a 25-year amortization with a five-year balloon payment.

As for German American's unsecured claim, the Debtor proposes to pay German American a total of $4 million. That amount will be paid at a rate of $500,000 per year for the first four years of the plan, with a $2 million balloon payment. The $2 million balloon payment will be funded from the sale or refinance of a securities portfolio held by Olympia. Under the

Debtor's plan, the $2 million balloon payment is due in four years from the sale of the securities. To further enhance the Debtor's enterprise value and liquidity, the non-debtor guarantors, as Olympia's owners, agree to contribute 100% of their Olympia stock to the Debtor. That stock transfer will produce approximately $200,000 in additional revenue necessary to fund the plan.

In exchange for their stock transfer to the Debtor, Olympia's principals (and German American's non-debtor guarantors) requested a release of their liability to German American under their personal guaranties. German American objected to confirmation, in general, and the proposed third-party releases, in particular. The Court held a lengthy evidentiary hearing on plan confirmation over two days in April 2011. And the Court ultimately determined that the Debtor satisfied the requirements of Bankruptcy Code section 1129. So the Court confirmed the Debtor's plan.

But the Court did not approve the proposed release of the non-debtor guarantors. Instead, the Court entered a limited injunction prohibiting German American from suing the non-debtor guarantors on their personal guaranties for the remainder of the amounts owed by the Debtor (but not paid under the plan) until payment of the final $2 million balloon payment. So long as the Debtor performs under the plan, German American is enjoined from pursuing the non-debtor guarantors on their personal guaranties. But once the $2 million balloon payment is made, the injunction expires. And the non-debtor guarantors will remain liable only for the amount due German American on its unsecured claim (approximately $12 million).

At the conclusion of the confirmation hearing, German American asked the Court to impose restrictions to prevent the non-debtor guarantors from effectively dissipating assets that German American could use to satisfy their obligations under the personal guaranties. The Court

asked both parties to submit proposed "lock-up" restrictions on the Debtor's use of the Olympia stock.

German American proposed that the Court, among other things, prohibit the Debtor and Olympia from: (i) issuing additional equity interests to anyone other than the non-debtor guarantors; (ii) borrowing any additional funds; (iii) transferring or encumbering their equity interests in the Debtor; (iv) materially changing their management personnel or the business in which they are engaged; or (v) purchasing other companies. German American also requested that the Court prohibit the non-debtor guarantors from transferring or pledging their equity interests in the Debtor or Olympia, as well as prohibit Olympia from terminating or materially altering certain leases. The Debtor, on the other hand, proposed only that Olympia be prohibited from selling the securities intended to fund the $2 million balloon payment without German American's consent or Court approval, unless Olympia maintains a positive net worth of no less than $12 million.

Then at a June 29, 2011 hearing on the proposed "lock-up" provisions, the Debtor questioned the Court's constitutional authority to impose German American's—and perhaps any—proposed "lock-up" restrictions. The Debtor contends that the Supreme Court's decision in *Stern* imposes new limitations on bankruptcy courts' jurisdiction. In light of the arguments raised by the Debtor, the Court must first determine whether it has jurisdiction to impose any "lock-up" restrictions on the Debtor or the non-debtor guarantors. To make that determination, the Court must begin by reviewing the *Stern* decision. It is only after a thorough examination of *Stern* that the Court can understand the implications of that decision on the Court's constitutional authority to impose the requested "lock-up" restrictions or other restrictions the Court might fashion.

## Summary of Stern v. Marshall[4]

I.      Overview.

*Stern* involved a tort claim by Vickie Lynn Marshall (a/k/a Anna Nicole Smith) ("Vickie") against E. Pierce Marshall ("Pierce"), the son of her late husband J. Howard Marshall II. Vickie alleged Pierce tortiously interfered with a substantial *inter vivos* gift (estimated to exceed $300 million) that her late husband intended to give to her. Vickie brought the tort claim as a debtor-in-possession in her chapter 11 case pending before the bankruptcy court for the Central District of California. She asserted it as a counterclaim to a proof of claim that Pierce filed based on state-law defamation. Because the counterclaim was brought in response to a claim filed in Vickie's case, it was treated as a core proceeding under 28 U.S.C. § 157(b)(2)(C). Accordingly, after the bankruptcy court found for Vickie, it entered a final judgment in her favor. Pierce appealed the bankruptcy court's final judgment to the district court.

Before filing her bankruptcy case, Vickie had also filed an action in a probate court in Texas claiming Pierce fraudulently induced her late husband to sign a living trust that did not include her. While the bankruptcy appeal was pending, but before the district court entered any final judgment, the Texas probate court upheld the validity of J. Howard Marshall's estate plan and entered judgment in favor of Pierce and against Vickie. As a result, there were two inconsistent conclusions reached by two different courts—the California bankruptcy court and the Texas probate court.

If the bankruptcy court judgment was first in time, then under applicable law, it would be given preclusive effect, and the judgment of the Texas probate court would be invalid. If,

---

[4] This section of the Court's opinion will analyze *Stern* on a section-by-section basis. For ease of understanding, the Court uses the same numerical/alphabetical headings used by the Supreme Court in *Stern*. The Court has added descriptive headings to the numerical/alphabetical headings for clarity.

however, the bankruptcy court did not have the power to enter a valid final judgment on what was in all respects a state law tort claim, then the findings of the Texas probate court would be preclusive, resulting in judgment being entered in favor of Pierce. So Pierce challenged the bankruptcy court's statutory and constitutional authority to enter its final judgment.

II.     Jurisdiction Over Core Proceedings.

A.     Overview of Jurisdictional Basis of Bankruptcy Court Jurisdiction.

At the outset, the Supreme Court discusses generally the basic structure of a bankruptcy court's exercise of the district court's jurisdiction over bankruptcy proceedings under 28 U.S.C. § 1334(b).[5] Congress divided jurisdiction over bankruptcy proceedings into three categories: (i) those proceedings that arise under title 11, (ii) those proceedings that arise in a title 11 case, and (iii) those proceedings that are only related to a case under title 11.[6]

Under 28 U.S.C. § 157(b)(1), bankruptcy judges may hear and enter final judgments in "all core proceedings arising under title 11or arising in a case under title 11."[7] If a bankruptcy court determines that a proceeding is only "related to" a case under title 11, then it is a "non-core" proceeding, and the bankruptcy court may only submit proposed findings of fact and conclusions of law to the district court. In those cases, it is the district court that enters final judgment, after reviewing *de novo* any matter to which a party objects.[8]

---

[5] *Stern* does not raise any issue about a district court's—and, by reference, the bankruptcy court's—original and exclusive jurisdiction under 28 U.S.C. § 1334(a) over all cases under title 11. Unquestionably, a bankruptcy case (*e.g.*, a chapter 7, 11 or 13), as opposed to a proceeding (*e.g.*, an adversary proceeding) or contested matter, can only be commenced in a bankruptcy court by reference from the district court under 28 U.S.C. § 157(a).

[6] *Stern*, 131 S. Ct. at 2603-04.

[7] *Id.* at 2603 (quoting 28 U.S.C. § 157(b)(1)).

[8] *Id.* at 2604.

B.    Core Proceedings are Those that Arise in or under Title 11.

Next, the Supreme Court focused on whether the bankruptcy court had statutory authority to enter a final judgment on Vickie's counterclaim. At first glance, that issue seems easy enough. After all, section 157(b)(2)(C) provides that counterclaims are core proceedings. And section 157 (b)(1), by its terms, authorizes bankruptcy courts to "hear and determine all cases under title 11 and all *core proceedings arising under title 11, or arising in a case under title 11*."[9] Pierce, however, read section 157 to implicitly carve out a subset of core proceedings that neither arise under or in a title 11 case.[10]

But nowhere does section 157 specify what bankruptcy courts are to do with the category of core proceedings that Pierce suggests.[11] So Pierce proposed that the Court treat this other category of core matters—those that neither arise under or in a title 11 case—as proceedings "related to" a title 11 case (*i.e.*, the bankruptcy court can only issue proposed findings of fact and conclusions of law). The Supreme Court, however, observed that "[i]t does not make sense to describe a 'core' bankruptcy proceeding as merely 'related to' the bankruptcy case; oxymoron is not a typical feature of congressional drafting."[12] Instead, the Court observed that "core" proceedings involve the restructuring of debtor-creditor relations.[13] And that would include

---

[9] 28 U.S.C. § 157(b)(1) (emphasis added).

[10] *Stern*, 131 S. Ct. at 2604.

[11] *Id.* at 2605.

[12] *Id.* (citing *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S. Ct. 2858, 2871, 73 L. Ed. 2d 598 (1982)) (plurality opinion).

[13] *Id.* (quoting *Northern Pipeline*, 458 U.S. at 71, 102 S. Ct. at 2871) (distinguishing "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power,… from the adjudication of state-created private rights")).

proceedings arising in or under title 11. The term "non-core," by contrast, is "synonymous" with "related."[14]

Simply put, under the Supreme Court's analysis, there is no such thing as a core matter that is "related to" a case under title 11. Core proceedings are, at most, those that arise in title 11 cases or arise under title 11. According to the Supreme Court, the language of section 157 "simply does not provide for a proceeding that is simultaneously core and yet only related to the bankruptcy case."[15] So the Supreme Court concludes that the bankruptcy court had statutory authority to enter a final judgment on Vickie's counterclaim because it was a core proceeding under section 157(b)(2)(C). But the Supreme Court, foreshadowing its ultimate holding, then observes: "We agree with Pierce that designating all counterclaims as 'core' proceedings raises serious constitutional concerns."[16]

### C.   Pierce's Alternative Argument—157(b)(5).

Before addressing those constitutional concerns, though, the Supreme Court first disposes of Pierce's alternative argument to reaching them: the bankruptcy court lacked jurisdiction to enter a final judgment on his defamation claim under section 157(b)(5). That section provides that "[t]he district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose."[17] The Supreme Court rejects Pierce's alternative argument for two reasons.

---

[14] *Id.* (quoting *Collier on Bankruptcy* ¶ 3.02[2], p. 3–26 n.5 (16th ed. 2010)).

[15] *Id.* (citing 28 U.S.C. § 157(c)(1)).

[16] *Id.*

[17] *Id.* at 2606 (quoting 28 U.S.C. § 157(b)(5)).

First, section 157(b)(5) does not have the hallmarks of a jurisdictional decree. The statutory text does not, in particular, refer to either district court or bankruptcy court "jurisdiction."[18] Instead, it only addresses where personal injury tort claims "shall be tried."[19] So section 157(b)(5) does not implicate the Court's subject-matter jurisdiction. Second, because section 157(b)(5) is not jurisdictional, Pierce could consent to the Bankruptcy Court's resolution of his defamation claim.

The Supreme Court observed that it has recognized 'the value of waiver and forfeiture rules' in 'complex' cases, . . . and this case is no exception."[20] The Supreme Court then found that Pierce consented to the bankruptcy court's resolution of his defamation claim by his course of conduct before the bankruptcy court. According to the Supreme Court, if Pierce objected to the bankruptcy court's lack of authority to decide his defamation claim, "then he should have said so—and said so promptly."[21] But instead, "Pierce repeatedly stated to the Bankruptcy Court that he was happy to litigate there." So the Supreme Court concluded: "We will not consider his claim to the contrary, now that he is sad."[22]

It is important to note that the Supreme Court's finding that Pierce, through his course of conduct had consented to the bankruptcy court's resolution of his defamation claim, was made in the context of section 157(b)(5). This provision deals solely with tort claims and provides that they shall be tried by the district court rather than the bankruptcy court. The discussion in this

---

[18] *Id.* at 2607.

[19] *Id.*

[20] *Id.* at 2608 (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487-88 n.6, 128 S. Ct. 2605, 2618, 171 L. Ed. 2d 570 (2008)).

[21] *Id.*

[22] *Id.*

section of the opinion in no way deals with the larger issue of whether a party can consent to a bankruptcy court's entry of final judgments in proceedings that are only "related to" to the bankruptcy case. This will be discussed below.

    III.    Article III Limits Power of Bankruptcy Judges.

    Having rejected Pierce's alternative argument, the Supreme Court then turns to the constitutional concerns: whether the bankruptcy court had the constitutional authority to enter a final judgment on Vickie's common-law tort claim. To resolve that issue, the Supreme Court reviews generally the basis for Article III judicial jurisdiction, the mandates of its prior pronouncements in the area, the extent and possible application of the public rights doctrine to bankruptcy court jurisdiction, and finally, whether limiting bankruptcy courts' ability to hear state-law counterclaims will have a practical effect on the efficient administration of justice in the bankruptcy courts.

    A.    Article III.

    Article III of the United States Constitution mandates that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."[23] It also protects judges exercising their Article III judicial power by providing that such judges shall hold office during "good Behaviour" and receive compensation that cannot be diminished during their tenure.[24] Article III could not serve its purpose in the system of checks and balances if the other branches of the Federal Government could create a separate court system outside of Article III. It is for this reason that Congress cannot withdraw from the jurisdiction of Article III courts suits founded on "common law, or in

---

[23] *Id.* (quoting U.S. Const. art. III, § 1).

[24] *Id.* (quoting U.S. Const. art. III, § 1).

equity, or admiralty."[25] And the "responsibility for deciding those suits rests with Article III

judges in Article III courts."[26]

        B.     *Northern Pipeline*.

      The Supreme Court then turns to the seminal case on bankruptcy jurisdiction under the

Bankruptcy Act of 1978—*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*[27] It

was in *Northern Pipeline* that the Supreme Court first considered whether bankruptcy judges

could "constitutionally be vested with jurisdiction to decide [a] state-law contract claim" against

an entity that was not otherwise part of the bankruptcy proceedings.[28] The Supreme Court

concluded in *Northern Pipeline* that assignment of such state law claims for resolution by

bankruptcy judges "'violates Art. III of the Constitution.'"[29] But the *Northern Pipeline* Court

recognized that there was a category of cases involving "public" rights that could be adjudicated

by non-Article III courts. So the Supreme Court then considers whether the bankruptcy court's

jurisdiction over Vickie's counterclaim could nevertheless be proper under the public rights

doctrine.

---

[25] *Id.* at 2609 (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 274, 18 How. 272, 284, 15 L. Ed. 372 (1855)).

[26] *Id.*

[27] *Id.* at 2609-10.

[28] *Id.* (quoting *Northern Pipeline*, 458 U.S. at 53, 87 n.40, 102 S. Ct. at 2880 n.40).

[29] *Id.* at 2610 (quoting *Northern Pipeline*, 458 U.S. at 52, 87, 102 S. Ct. at 2880) (plurality opinion); *id.* at 91, 102 S. Ct. at 2882 (Rehnquist, J., concurring in judgment)).

C.    Public Rights Doctrine.

1.    Vickie's Counterclaim is not a Matter of "Public Right."

The Supreme Court initially considers *Murray's Lessee v. Hoboken Land & Improvement Co.*, the first case in which it recognized the public rights doctrine.[30] There, the Supreme Court explained that cases involving public rights are not the "'stuff of the traditional actions at common-law tried by the courts at Westminster in 1789.'"[31] For instance, public rights, according to the *Murray's Lessee* Court, included "[e]quitable claims to land by the inhabitants of ceded territories" and "cases in which land issues were conclusively resolved by Executive Branch officials."[32] Those types of claim can be assigned to non-Article III courts because "[i]n those cases 'it depends upon the will of congress whether a remedy in the courts shall be allowed at all.'"[33]

The Supreme Court also considers the most recent—and only bankruptcy—case in which it discussed the public rights doctrine: *Granfinanciera, S.A. v. Nordberg*.[34] The issue there was "whether the Seventh Amendment grants [defendants] a right to a jury trial" in an action by a trustee to avoid fraudulent transfers.[35] The defendants in that case—the recipients of alleged fraudulent transfers—were entitled to a jury trial on the bankruptcy trustee's fraudulent conveyance claim unless the claim fell within the public rights doctrine.

---

[30] *Id.* at 2611 (citing *Murray's Lessee*, 59 U.S. at 274, 18 How. at 274).

[31] *Id.* at 2609 (quoting *Northern Pipeline*, 458 U.S. at 90, 102 S. Ct. at 2858).

[32] *Id.* at 2612 (quoting *Murray's Lessee*, 59 U.S. at 274, 18 How. at 274).

[33] *Id.* (quoting *Murray's Lessee*, 59 U.S. at 274, 18 How. at 274).

[34] *Id.* at 2614 (discussing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S. Ct. 2782, 106 L.Ed.2d 26 (1989)).

[35] *Granfinanciera*, 492 U.S. at 65 n. 19, 109 S. Ct. at 2803.

The Supreme Court ultimately concluded that a fraudulent conveyance action filed on behalf of a bankruptcy estate against a noncreditor in a bankruptcy proceeding did not fall within the "public rights" exception. The Supreme Court reasoned that fraudulent conveyance suits were "'quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res.'"[36]

As a consequence, the Supreme Court concluded that fraudulent conveyance actions were "'more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions.'"[37] And the *Stern* Court concludes that "Vickie's counterclaim—like the fraudulent conveyance claim at issue in *Granfinanciera*—does not fall within any of the varied formulations of the public rights exception in this Court's cases."[38]

2.    Effect of Filing Claim—*Katchen v. Landy*.

Neither *Northern Pipeline* nor *Granfinanciera* involved a defendant who filed a proof of claim. But in *Stern*, Pierce had filed a claim. So the Supreme Court considers whether the bankruptcy court had authority to adjudicate Vickie's counterclaim under *Katchen v. Landy*[39] or *Langenkamp v. Culp*[40] in light of Pierce's proof of claim.

*Katchen* arose under the Bankruptcy Act of 1898. Under the 1898 Act, bankruptcy proceedings were divided into two categories—those over which the bankruptcy referee could exercise summary jurisdiction and enter final judgments and those that were considered plenary

---

[36] *Stern*, 131 S. Ct. at 2614 (quoting *Granfinanciera*, 492 U.S. at 56, 109 S. Ct. at 2782).

[37] *Id.* at 2614 (quoting *Granfinanciera*, 492 U.S. at 55, 109 S. Ct. at 2782).

[38] *Id.* at 2614.

[39] 383 U.S. 323, 86 S. Ct. 467, 15 L. Ed. 2d 391 (1966).

[40] 498 U.S. 42, 111 S. Ct. 330, 112 L. Ed. 2d 343 (1990).

and could only be decided by the district court. The *Katchen* Court held that a bankruptcy referee could exercise summary jurisdiction over a voidable preference claim brought by the bankruptcy trustee against a creditor who had filed a proof of claim in the bankruptcy case.[41]

In reaching that conclusion, the Supreme Court reasoned that summary adjudication in bankruptcy was appropriate because it was not possible for the referee to rule on the creditor's proof of claim without first resolving the voidable preference issue.[42] Because nothing remained for adjudication in a plenary suit once the referee determined the allowability of the proof of claim in a case in which the creditor was the recipient of a preferential transfer, such a suit "'would be a meaningless gesture.'"[43] Because "'the same issue [arose] as part of the process of allowance and disallowance of claims,'" the bankruptcy court could decide the preference action.[44]

More recently, the Supreme Court, in *Langenkamp*, considered whether a creditor who had filed a proof of claim was entitled to a jury trial on a preference claim brought by the trustee. In concluding that there is no Seventh Amendment right to a jury trial in such cases, the Supreme Court reasoned that the filing of the claim by the creditor triggers the process of allowing and disallowing claims, thereby subjecting the creditor to the bankruptcy court's equitable power.[45] "In other words, the creditor's claim and the ensuing preference action by the trustee become

---

[41] *Stern*, 131 S. Ct. at 2616 (citing *Katchen*, 382 U.S. at 325, 327–328, 86 S. Ct. at 471-72, 474).

[42] *Id.* (citing *Katchen*, 382 U.S. at 329–330, 332–333, 334 & n.9, 86 S. Ct. at 472-74 & n.9).

[43] *Id.* (quoting *Katchen*, 382 U.S. at 334, 86 S. Ct. at 475).

[44] *Id.* (quoting *Katchen*, 382 U.S. at 336, 86 S. Ct. at 476).

[45] *Langenkamp*, 498 U.S. at 44 (citing *Granfinanciera*, 492 U.S. at 58-59 and *Katchen*, 382 U.S. at 336).

integral to the restructuring of the debtor creditor relationship through the bankruptcy court's *equity jurisdiction.*"[46]

In both *Katchen* and *Langenkamp*, the preference actions would necessarily be resolved in ruling on the claims objections. But in *Stern*, "there was never any reason to believe that the process of adjudicating Pierce's proof of claim would necessarily resolve Vickie's counterclaim."[47] The only overlap between Vickie's and Pierce's claims was the question of whether Pierce had tortiously taken control of his father's estate in the manner Vickie alleged in her counterclaim and described in her allegedly defamatory statements. Other than that, Vickie would need to prove numerous elements "above and beyond Pierce's tortious interference."[48]

Another major distinction made by the Supreme Court in *Stern* is that in both *Katchen* and *Langenkamp*, the trustees were asserting rights of recovery created by federal bankruptcy law under Section 60a of the Bankruptcy Act of 1898 and 11 U.S.C. § 547. "Vickie's claim, in contrast, [was] in no way derived from or dependent upon bankruptcy law; it [was] a state court action that exist[ed] without regard to any bankruptcy proceeding."[49] The action brought by Vickie, in fact, arose under and was governed entirely by Texas common law.

For those reasons, the *Stern* Court concluded that the mere filing of a proof of claim is not sufficient to confer on bankruptcy courts authority to enter final judgments on state-law counterclaims under *Katchen* and *Langenkamp*. Instead, the *Stern* Court borrows from *Granfinanciera*'s distinction between actions that seek "to augment the bankruptcy estate" and those that seek "a pro rata share of the bankruptcy res." The Supreme Court refines this

---

[46] *Id.* at 44 (emphasis in original).

[47] *Stern*, 131 S. Ct. at 2617.

[48] *Id.*

[49] *Id.* at 2618.

conclusion by distinguishing between proceedings that "may have *some* bearing on a bankruptcy case," such as Vickie's tortious interference claim whose only effect on the bankruptcy case is that it would "augment the bankruptcy estate," and those that either (1) stem from the bankruptcy itself, or (2) would necessarily be resolved in the claims allowance process.[50]

> 3.      Bankruptcy Courts are not Adjuncts of District Courts.

After concluding that Vickie's counterclaim did not fall within the public rights doctrine, the Supreme Court quickly disposed of another argument advanced by Vickie: that bankruptcy judges are properly deemed "adjuncts" of the district courts under the 1984 Bankruptcy Act. As "adjuncts" of the district courts, bankruptcy judges have the authority, the argument goes, to enter final judgments in all proceedings pending in a bankruptcy court. But the Supreme Court notes that it had rejected a similar argument in *Northern Pipeline*,[51] and the reasoning in that decision "holds true today."[52]

> D.      Restrictions on a Bankruptcy Court's Ability to Hear Matters Will Create Delays.

Last, the *Stern* Court addresses the practical problems raised by the dissent. Justice Breyer, in his dissenting opinion, predicts that the Court's holding will lead to a "constitutionally required game of jurisdictional ping pong between courts," leading to "inefficiency, increased cost, delay, and needless additional suffering among those faced with bankruptcy."[53] But according to the majority, "the fact that a given law or procedure is efficient, convenient, and

---

[50] *Id.*

[51] *Id.* (citing *Northern Pipeline*, 458 U.S. at 84–86, 102 S. Ct. at 2878-2880 (plurality opinion); *id.* at 91, 102 S. Ct. at 2882 (Rehnquist, J., concurring in judgment)).

[52] *Id.*

[53] *Id.* at 2630 (Breyer, J., dissenting).

useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution."[54]

And in any event, Pierce did not argue that the bankruptcy courts are barred from hearing all counterclaims or proposing findings of fact and conclusions of law on those matters, but rather that it must be the district court that finally decides them. Accordingly, the majority concludes that removal of counterclaims such as Vickie's from core bankruptcy jurisdiction will not "meaningfully change" the division of labor between the bankruptcy judges and district judges in bankruptcy cases. Importantly, the Supreme Court notes that the question presented in *Stern* is a "narrow" one.[55]

Majority's Conclusion.

The majority then concludes its discussion with a recap of the decision's important underpinnings: (1) Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article; (2) in enacting section 157, Congress exceeded the limitation contained in Article III in "one isolated respect"; and (3) the bankruptcy court in *Stern* lacked the constitutional authority to enter a final judgment on a state law counterclaim that was not resolved in the process of ruling on a creditor's proof of claim.[56]

**Conclusions of Law**

Having concluded a review of the opinion in *Stern,* the Court considers whether Stern's holding limits the Court's jurisdiction to include the "lock-up" provisions in the order confirming the plan with respect to the non-debtor guarantors. In addition, the Court will consider whether,

---

[54] *Id.* at 2619 (quoting *INS v. Chadha*, 462 U.S. 919, 944, 103 S. Ct. 2764, 2781, 77 L.Ed.2d 317 (1983)).

[55] *Id.* at 2620.

[56] *Id.*

in any event, parties to a bankruptcy proceeding may either expressly or impliedly consent to a

bankruptcy court's entry of final judgments or orders in proceedings over which the bankruptcy

court only has "related to" jurisdiction. The Court will also consider generally the impact of

*Stern* on the other types of proceedings denominated as core under section 157(b)(2), including

potential "Litigation Claims," which are defined under the Debtor's plan as claims brought by

the "Reorganized Debtor to recover fraudulent, preferential or otherwise avoidable transfers."[57]

     A.     *Stern's* Holding.

     The holding in *Stern* is that the bankruptcy court lacked the constitutional authority to

enter a final judgment on a state-law claim that was not resolved in the process of ruling on a

creditor's proof of claim.[58] A constitutional problem arises when, by operation of a statute (in

this case section 157(b)(2)(C)), a common-law cause of action that is merely "related to" a

bankruptcy case is defined as core. Simply put, Congress cannot withdraw from the jurisdiction

of Article III courts, suits founded on "common law, or in equity, or admiralty,"[59] simply by

redefining them as something different from what they are. By defining all counterclaims—

regardless of whether they stem from the bankruptcy itself or would necessarily be resolved in

the claims allowance process—as "core proceedings," Congress did exactly that. Thus, the Court

held that in that "one isolated respect," Congress exceeded Article III's constitutional

limitations. [60]

---

[57] Doc. 175 at 17.

[58] *Stern,* 131 S. Ct. at 2620.

[59] *Id.* at 2609 (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. at 284, 18 How. at 284).

[60] *Id.* at 2620.

B.      *Stern*'s Holding is Narrow.

The Supreme Court plainly intended to, and in fact did, narrowly limit the scope of its holding in *Stern*. To begin with, it agreed that the question before it was a "narrow" one.[61] It also specifically emphasized that Congress only exceeded the limits of Article III in "one isolated respect." And it further emphasized that its narrow holding would not "meaningfully change" the division of labor under section 157.

In fact, the Supreme Court's holding does even not remove all state-law counterclaims from the bankruptcy court's jurisdiction. The Supreme Court recognized in *Stern* that whether a bankruptcy court can enter a final judgment on a state-law counterclaim has to be decided on a case-by-case basis. And if after such analysis it is concluded that the counterclaim stems from the bankruptcy itself or that nothing remains for adjudication of the counterclaim once the bankruptcy judge resolves the claim objection, then the counterclaim can be tried and finally resolved by the bankruptcy court.[62]

But regardless of bankruptcy courts' jurisdiction over state-law counterclaims, nothing in the Supreme Court's opinion actually limits a bankruptcy court's authority to adjudicate the other "core proceedings" identified in section 157(b)(2). Section 157(b)(2) identifies sixteen examples of core proceedings. Those sixteen examples can be broken down into five categories: matters of administration; avoidance actions; matters concerning property of the estate; omnibus categories; and cases filed under chapter 15 of the Bankruptcy Code.[63]

---

[61] *Id.* at 2620.

[62] *Id.* at 2616 (citing *Katchen*, 382 U.S. at 334-36, 86 S. Ct. at 475-76).

[63] *Collier on Bankruptcy* ¶ 3.02[3] (16th ed. 2011).

The first category—"matters of administration"—consists of: matters concerning administration of the estate; allowance or disallowance of claims against the estate or exemptions from property of the estate and estimation of claims or interests for plan confirmation purposes; orders in respect to obtaining credit; motions to terminate, annul, or modify the automatic stay; determinations as to the dischargeability of particular debts; objections to discharge; and confirmation of plans.[64]

"There has never been any doubt about the constitutional authority of a nontenured judge to enter final orders in such matters [of administration], which are unique to bankruptcy cases."[65] As a consequence, this first category of core proceedings has, as one commentator observed, "produced almost no litigation regarding bankruptcy court jurisdiction."[66] And the few cases that have considered whether confirmation is a core proceeding have universally agreed that it is.[67] Nothing in *Stern* changes that.

Nor does the *Stern* Court's reliance on *Granfinanciera* actually limit a bankruptcy court's jurisdiction to finally resolve the other core proceedings identified in section 157(b)(2).

---

[64] *Id.* at ¶ 3.02[3][a].

[65] *Id.*

[66] *Id.*

[67] *See, e.g., In re Rubicon US REIT, Inc.*, 434 B.R. 168, 174 (Bankr. D. Del. 2010) (holding that "[c]onfirmation of the Plan is a core proceeding" and that the court had "exclusive jurisdiction to determine whether the Plan complie[d] with the applicable provisions of the Bankruptcy Code and should be confirmed"); *In re Watson*, 384 B.R. 697, 702 (Bankr. D. Del. 2008) (holding that "[c]onfirmation of the Debtors' plans is clearly a core proceeding"); *In re Gulf South Sys., Inc.*, No. Civ. A. 97-182, 96-14702, 1997 WL 35288, at *1 (Bankr. E.D. La. Jan. 29, 1997) (holding that the "confirmation hearing in connection with [the Debtor's] plan of reorganization . . . is clearly a core proceeding"); *Artra Group, Inc. v. Salomon Bros. Holding Co. (In re Emerald Acquisition Corp.)*, 170 B.R. 632, 640 (Bankr. N.D. Ill. 1994) (explaining that examples of administrative matters that arise only in bankruptcy cases include matters regarding allowance and disallowance of claims, discharges, orders to obtain credit, and confirmation of plans); *Foster Dev. Corp. v. Morning Treat Coffee Co. (In re Morning Treat Coffee Co.)*, 77 B.R. 62, 63 (Bankr. M.D. La. 1987) (holding that confirmation of a plan and the effect of plan confirmation are core proceedings); *Canadian Shield Fin. Corp. v. Deutscher (In re Vincent)*, 68 B.R. 865, 869 (Bankr. M.D. Tenn. 1987) (explaining that "confirmation of a plan of reorganization is one proceeding at the core of the bankruptcy power" and "as such, disputes arising from orders confirming the plan are always cognizable as matters affecting the administration of the estate").

Understandably, some bankruptcy courts have expressed concerns about the litigation that may result due to uncertainties created by *Stern* with respect to other types of proceedings defined as core under section 157(b)(2) that were not at issue in *Stern*.[68] To be sure, the *Stern* Court did explain that *Granfinanciera*'s "distinction between actions that seek 'to augment the bankruptcy estate' and those that seek 'a pro rata share of the bankruptcy res' reaffirms that Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case."[69] And the *Stern* Court did emphasize that the "question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."[70] It is understandable that some would view that language as a new limit on the Court's constitutional authority to finally resolve other "core" proceedings, such as fraudulent conveyance or preference actions.

But the *Stern* Court's use of the word "reaffirm" makes clear that nothing has changed. The sole issue in *Granfinanciera* was whether the Seventh Amendment conferred on petitioners a right to a jury trial in the face of Congress' decision to allow a non-Article III tribunal to adjudicate the claims against them.[71] *Granfinanciera* did not hold that bankruptcy courts lack jurisdiction to enter final judgments on fraudulent conveyance claims. In fact, the Supreme Court

---

[68] *See, e.g., In re Teleservices Group, Inc.*, Adv. No. 07-80037, 2011 WL 3610050, *1 (Bankr. W.D. Mich. Aug. 17, 2011); *In re BearingPoint, Inc.*, No. 09-10691-REG, 2011 WL 2709295, *1 (Bankr. S.D.N.Y. July 11, 2011); *In re Bigler LP*, Adv. No. 10-03304, 2011 WL 3665007, *14 (Bankr. S.D. Tex. Aug. 19, 2011); *In re Okwonna-Felix*, No. 10-31663-H4-13, 2011 WL 3421561, *4 (Bankr. S.D. Tex. Aug. 03, 2011); *In re Muhs*, Adv. 10-01008, 2011 WL 3421546, *1 (Bankr. S.D. Tex. Aug. 02, 2011); *In re Boricich*, Adv. No. 08-A-00728, 2011 WL 2600692, *9 (Bankr. N.D. Ill. June 29, 2011); *In re DeMarco*, Adv. No. 10-00267-MDC, 2011 WL 2600652, *4-5 n.2 (Bankr. E.D. Pa. June 28, 2011); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holding Inc.)*, Adv. No. 10-03266, *Case Management Order in Relation to Impact of* Stern v. Marshall, Doc. 93 (Aug. 15, 2011).

[69] *Stern*, 131 S. Ct. at 2618 (quoting *Granfinanciera*, 492 U.S. at 56, 109 S. Ct. at 2798) (internal citations omitted) (emphasis in original).

[70] *Id.*

[71] *Granfinanciera*, 492 U.S. at 50.

went to great lengths to emphasize that issue was not even before it in that case.[72] As explained in *Granfinanciera,* "however helpful it might be for us to adjudge every pertinent statutory issue presented by the 1978 Act and the 1984 Amendments, we cannot properly reach out and decide matters not before us. The only question we have been called upon to answer in this case is whether the Seventh Amendment grants petitioners a right to a jury trial."[73] And the language from *Granfinanciera* that some courts and commentators fear may limit bankruptcy courts' jurisdiction—language relied on by the *Stern* Court—has been the law for over twenty years. Yet, this Court is not aware of a single case during the twenty years preceding *Stern* challenging a bankruptcy court's authority to enter final judgments in fraudulent conveyance actions.[74]

In the end, the *Granfinanciera* Court held that the Seventh Amendment guarantees a right to a jury trial in a fraudulent conveyance action. But the Court did not "express any view as to whether the Seventh Amendment or Article III allows jury trials in such actions to be held before non-Article III bankruptcy judges subject to the oversight provided by the district courts."[75] Neither did the *Stern* Court. In fact, in its discussion of both *Katchen* and *Langenkamp*, the *Stern* Court notes that the trustees in those cases were asserting rights of recovery created by federal bankruptcy law under Section 60a of the Bankruptcy Act of 1898 and 11 U.S.C. § 547.

---

[72] *Id.* at 64 n.19.

[73] *Id.*

[74] Post-*Stern* there may be some concern about fraudulent conveyance proceedings brought pursuant to section 544(b) and by reference the applicable state fraudulent conveyance law. *See In re Innovative Communication Corporation*, Adv. No. 08-3004, 2011 WL 3439291, *3 (Bankr. D.V.I. Aug. 5, 2011) (Fitzgerald, J.). Unlike proceedings based on sections 547, 548, and 549 that "are a creation of federal statute for application in bankruptcy proceedings," *id.,* actions based solely on state law fraudulent conveyance law may raise issues under *Stern* notwithstanding that they are still "proceedings to determine, avoid, or recover fraudulent conveyances" and technically core under section 157(b)(2)(H). But even in those instances, resolution of the proceedings arising under Title 11 may make the need for a separate suit on the state law claims a "meaningless gesture" by the application principles of collateral estoppel. *See Katchen,* 382 U.S. at 334, 86 S. Ct. at 475.

[75] *Id.* at 64.

Of course, years from now, the Supreme Court may hold that section 157(b)(2)(F) dealing with fraudulent conveyances is unconstitutional, just as it did with section 157(b)(2)(C). But the job of bankruptcy courts is to apply the law as it is written and interpreted today. Bankruptcy courts should not invalidate a Congressional statute, such as section 157(b)(2)(F)— or otherwise limit its authority to finally resolve other core proceedings—simply because dicta in *Stern* suggests the Supreme Court may do the same down the road. The Supreme Court does not ordinarily decide important questions of law by cursory dicta.[76] And it certainly did not do so in *Stern.*

     C.      Bankruptcy Court Have Authority to Enter Final Judgments in Non-Core Matters if the Parties Consent.

Despite the limitations imposed by *Stern*, this Court's authority to enter final judgments in the core proceedings identified in section 157(b)(2) is not necessarily diminished as a practical matter. Parties may, even after *Stern*, consent to bankruptcy courts entering final judgments in non-core matters. In fact, section 157(C)(2) expressly authorizes bankruptcy courts to enter final judgment in non-core proceedings if the parties consent.

Admittedly, the *Stern* Court did not address that specific issue; there was no need to since, at the time the case was tried, the Supreme Court had not yet held section 157(b)(2)(C) unconstitutional. But the Court, in response to Pierce's argument that bankruptcy courts do not have jurisdiction over defamation claims under section 157(b)(5), held that he consented to the bankruptcy court's resolution of his defamation claim given his conduct before the bankruptcy court.[77] In doing so, the *Stern* Court "recognized 'the value of waiver and forfeiture rules' in

---

[76] *In re Permian Area Basin Rate Cases*, 390 U.S. 747, 775, 88 S. Ct. 1344, 1364 20, L. Ed. 2d 312 (1968).

[77] *Stern*, 131 S. Ct. at 2607.

'complex' cases."[78] The Court also recognized that "[n]o procedural principle is more familiar to this Court than that a constitutional right, or a right of any other sort, may be forfeited."[79]

And this Court can envision no reason why the Supreme Court would abandon that principle and not permit parties to consent to bankruptcy courts entering final judgments in non-core proceedings under section 157(c)(2). Although no court has addressed the constitutionality of that statute, ten circuit courts of appeal have upheld the constitutionality of the Federal Magistrate Statute,[80] which permits parties to consent to an Article I judge entering final judgments.[81] What is more, the Supreme Court, although not directly passing on the constitutionality of the Federal Magistrate Statute, has held that consent to proceedings before a magistrate judge—including entry of a final judgment by the magistrate judge—can be inferred from a party's conduct during litigation.[82] For those reasons, this Court agrees with the *Stern* Court that the decision in *Stern* "does not change all that much."[83]

## Conclusion

In this case, the "lock-up" provisions are an integral part of the order confirming the plan under which the non-debtor guarantors will receive the benefit of an injunction protecting them from being sued on their guaranties during the term of the plan. Unquestionably, the Court's consideration of such terms falls within this Court's core jurisdiction under section 157 (b)(2)(L).

---

[78] *Id.* at 2608.

[79] *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 731, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)).

[80] 28 U.S.C. § 636(c).

[81] *Sinclair v. Wainwright*, 814 F.2d 1516 (11th Cir. 1987) (holding that "[a]t least nine other circuits which have considered [the constitutionality of the Federal Magistrate Statute] have held that [it] is constitutional because the act requires that the parties and the district court consent to the transfer of the case").

[82] *Roell v. Withrow*, 538 U.S. 580, 583 123 S. Ct. 1696, 1699, 155 L. Ed. 2d 775 (2003).

[83] *Stern*, 131 S. Ct. at 2620.

Moreover, the Court finds that the non-debtor guarantors, by virtue of their controlling interest in the Debtor as proponent of the plan, have expressly and impliedly consented to this Court's entry of final orders with respect to the lock-up provisions. Accordingly, the objection based on *Stern* will be overruled.

August 30, 2011

**DATED** in Chambers at Tampa, Florida, on _____.

_____
Michael G. Williamson
United States Bankruptcy Judge

Copies to:

Steven M. Berman, Esq.
Hugo S. deBeaubien, Esq.
Shumaker, Loop & Kendrick, LLP
Attorneys for Debtor in Possession

Hywel Leonard, Esq.
Merrick L. Gross, Esq.
Carlton Fields, P.A.
Attorneys for German American Capital Corporation